**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ALEKSANDR SELYUTIN,<br><br>Petitioner,<br><br>v.<br><br>STATE OF ILLINOIS,<br><br>COOK COUNTY STATE ATTORNEY KIM FOXX<br><br>Respondent. | ) **FIRST AMENDED PETITION**<br>) **FOR WRIT OF HABEAS CORPUS**<br>) **Case No.22-cv-4621**<br>)<br>) **Judge Hon John R. Blakey**<br>)<br>) **Magistrate Judge Hon**<br>) **Heather K. McShain**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Cook County Court<br>) Case No.16-MC2-001786<br>) For The Judicial 2nd Circuit<br>) Circuit Court Judge Hon James Allegertti |

**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY**

1.   (a) Name and location of court where conviction entered: **COOK COUNTY COURT FOR THE JUDICIAL SECOND CIRCUIT, Skokie, IL**
(b) Criminal docket or case number (if you know): **16-MC2-001786**

2.   (a) Date of the judgment of conviction (if you know): **06/26/2018**

     (b) Date of sentencing: **07/24/2018**

3. Length of sentence: **12 months conditional discharge.**

4. Nature of crime (all counts): **one count of Aggravated Assault, 720 ILCS 5.0/12-2(c)(1) and one count of Unlawful Use of Weapon 720 ILCS 5.0/24-1-A-4**

5.   (a) What was your plea? (Check one)
              (**X**) Not guilty          (   ) Guilty              (   ) Nolo contendere (no contest)

6.  (a) If you entered a guilty plea to one count or indictment, and not a guilty plea to another count or indictment, what did you plead guilty to and what did you not plead guilty to?

    (b) If you went to trial, what kind of trial did you have?

    Jury   (**X**)        Judge only (   )

7. Did you testify at a pretrial hearing, trial, or post-trial hearing? Yes (   )        No (**X**)

8. Did you appeal from the judgment of conviction? Yes (**X**)        No (   )

9. If you did appeal, answer the following:
    (a) Name of court: **STATE OF ILLINOIS IN THE COURT OF APPEALS FIRST DISTRICT, Chicago, IL**
    (b) Docket or case number: **1-18-1927**
    (c) Result: the Appellate Court of Illinois for 1st District, 3rd Division, Affirmed Petitioner's conviction for misdemeanor charge of Unlawful Use of a Weapon on August 28, 2019.
    (d) Date of result (if you know): **August 28, 2019**
    (e) Citation to the case (if you know): **People of The State of Illinois *v.* Aleksandr Selyutin, 2019 IL App (1st) 181927-U**
    (f) Grounds raised:  **Selyutin filed a pro se appeal based on the following grounds:**
    **I.  Prosecutorial Misconduct:**  Prosecutorial Misconduct 1 during the Petitioner's Sentencing – False Statements / Perjury, the State violated the Due Process; Prosecutorial Misconduct 2, - the State violated the Petitioner's right for fair trial secured by the 6th and 14th Amendments to the United States Constitution and State of Illinois Criminal Code, by denying releasing the names and addresses of State'witnesses prior to trial.
    **II. Court Errors.**
    A.  Whether the Trial court erred in failing to provide to Jury the Self Defense Instructions and to instruct the jury that, to establish the offense Unlawful Use of Weapon, the State was required to prove, beyond a reasonable doubt, that defendant did not act in self-defense.
    B.  Whether the trial court erred in denying Selyutin's motion to dismiss the aggravated assault charge on June 30, 2017.
    C.  Whether the trial court erred in denying Selyutin's motion to dismiss the aggravated assault charge on January 23, 2018.

2

**III.      Whether the Jury erred by finding the Petitioner guilty of the charge UUW.** The evidence presented at trial was insufficient to prove beyond a reasonable doubt that the Petitioner was guilty of the charge UUW.

**IV.      Whether the Petitioner had Ineffective Assistance of Counsels related to the Jury instructions and related to defense attorney Joe Kennelly passing the work products and confidential information about the case and about the Petitioner to State on August 30, 2017**

(g) Did you file a petition for certiorari in the United States Supreme
    Court? Yes ( )    No (**X**)

If "Yes," answer the following:

(1)   Docket or case number (if you know): (2)      Result:

(3)   Date of result (if you know):

(4)   Citation to the case (if you know): (5)      Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?      Yes (**X**) No ( )

11. If your answer to Question 10 was "Yes," give the following
    information: (a) (1) Name of court: COOK COUNTY COURT
FOR THE JUDICIAL SECOND CIRCUIT, Skokie, IL

(2) Docket or case number (if you know): Case No.16-MC2-001786 Sentencing.

(3) Date of filing (if you know): July 24, 2018

(4) Nature of the proceeding: Sentencing.

(5)   Grounds raised:

1) The State failed to prove Selyutin's guilty of UUW

2) The finding is against the weight of evidence.

3) Selyutin did not receive fair trial, violation of 14Th Amendment; Due Process;

4) Jury deliberation was very short 7 minutes.

3

(6) Did you receive a hearing where evidence was given on your
motion, petition or application?    Yes (**X**)    No ( )

(7) Result: Motion for new trial was denied.

(8) Date of result (if you know): July 24, 2018

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your
motion, petition, or application?

(1) First petition:    Yes ( )    No (**X**)

(2) Second petition:    Yes ( )    No (**X**)

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly
why you did not:

Since the Motion for New Trial was denied on the date of sentencing, the Petitioner filed a Direct

Appeal as Pro Se, per recommendation of one of his Defense attorneys, Ms. Huma Rashid. After

the sentencing Ms. Huma Rashid, told the Petitioner that he should not work with Mr. Wigell (her

employer) on post-conviction efforts. Her exact words to Mr. Selyutin were "This is just a Show

and not real". So the Criminal Trial in Cook County Circuit Court Second Division in Skokie, IL,

in June 2018, was not a real, but a FAKE criminal trial. She told the Petitioner to file the Appeal by

himself as Pro Se and she even provided Petitioner with the completed Appellate Form for his

Appeal by email (Please see the Exhibit B). The Petitioner found this highly unusual, and against

the business interests of Wigell Criminal Defense law firm, because Mr. Raymond Wigell told him

on or around July 29, 2018 by phone, that his firm can work with Mr. Selyutin, but for the separate

fee of course, in the amount of around $12, 000.00 (The $12,000.00 is only for an Appeal in 1st

Illinois Court of Appeals, while the Appeal to State of Illinois Supreme Court and to US Supreme

Court are separate cost, but the total is around $50,000.00) plus costs and Mr. Selyutin should call

his office to get information about additional services such as Appellate process from his staff.

Petitioner did not really understand what exactly Ms. Rashid' phrase had to do with his conviction,

but when he found out that his conviction was not entered into the system a year later, in FBI

4

Office in mid August of 2019, Mr. Selytin understood that this was a alleged criminal scheme to extort the money from him and cover it up by Not Entering the Conviction record into the system. And as Mr. Selyutin understood, Ms Huma Rashid did not want to be part of that criminal, unethical and illegal scheme back in July 2018. For unknown reasons, Ms. Rashid did not report the criminal, unethical behavior and illegal acts of Mr. Wigell and Judge Allegretti to the authorities. May be she was in need of a job at Law Offices of Raymond Wigell and Wigell Criminal Defense.

**Please Note:** Ms. Huma Rashid that on or around **01-13-2022,** Ms. Huma Rashid was contacted by the phone by the same private security contractor's team who are still conducting surveillance of Petitioner and was told that Mr. Selyutin is preparing a Complaint against the Judge Allegretti and Complaint about her. She was asked to prepare the sworn affidavit in opposition of Mr. Selyutin Complaints.

**Please Note:** Mr. Selyutin believes (and has digital evidence to support this statement) that on or around **06-28-2022**, around 06:14 PM CST Ms. Huma Rashid personally visited Skokie Gardens Building in Skokie, IL – Petitioner's home residence. Ms. Huma Rashid had meeting there with Contractors; one of them was Mr. Phillip Kljajic, one of the contractors involved in surveillance of Petitioner, that resided in Unit 209, Skokie Gardens Building. Mr. Selyutin believes that Contractors and Ms Rashid met for coordination of their defenses and responses. But exactly what Ms. Huma Rashid, the Clemency Director for Aleph Institute was doing there we will find out during the discovery. When Ms. Huma Rashid and Raymond Wigell represented Petitioner back in March 2018 to July 2018, in his case, they never visited him at his home residence, despite of charging him over $13,000.00 for the Class A misdemeanor charges. They always met in Downtown of Chicago Office and always charged Mr. Selyutin for their trips.

The Petitioner Aleksandr Selyutin believes that Mr. Raymond Wigell, from Wigell Criminal Defense law firm who Petitioner retained to represented him in his criminal case # 16 MC2 001786 (162001786) back in March 2018, and who died in April 2021, conspired with his relative Hon Judge Alegretti to convict the Petitioner Aleksandr Selyutin so later he can extort the money from the Petitioner for the post trial motions, fictitious Appeals to the Illinois Appellate Court, Illinois Supreme Court and finally to the US Supreme Court. Petitioner believes that Mr. Raymond Wigell from the Wigell Criminal Defense, who represented Petitioner, allegedly conspired with his relative Cook County Judge Allegretti to convict the Petitioner, so later he can extort around $50,000.00 for these fictitious Appeals. And to cover this scheme up by not entering the conviction record into the system and even adjusting the arresting record. Petitioner found out about that a year later during his meeting at FBI Rolling Meadows Field Office, Rolling Meadows, IL located at 1600 Golf Rd # 1050, Rolling Meadows, IL 60008, on or around week of August 12, 2019. The FBI Agent on duty asked the Petitioner for his passport and ID, and then he ran a background check and after, he and the FBI Security Agent searched Mr. Selyutin with the portable metal detector, Mr. Selyutin asked them why, he was told that this is because Petitioner had record of arrest for UUW (Unlawful use of weapon) back in July 2016. Mr. Selyutin advised the FBI Field Agent that he has not only had arrest for UUW, but also was arrested for Aggravated Assault and he was convicted for Unlawful use of weapon in the Trial by Jury back in June of 2018 and sentenced in July 2018 a year earlier. The FBI Field agent on duty asked if he was sure about that, because the FBI Field Agent on Duty could Not find in FBI Database any records of Petitioner's Mr. Selyutin Conviction for the Unlawful use of weapon and any records that he was arrested for Aggravated Assault back in July 2016. This was FBI Database as of mid-August of 2019, a year after the Trial and Conviction took place and also more than 3 years after Petitioner was arrested

6

and charged by the Village of Lincolnwood Police Department (Lieutenant Tim O'Connor team) for Aggravated Assault and Unlawful use of weapon and later Prosecuted by Office of Cook County State Attorney Office (ASA James O'Connor team, yes they are related).

**Please Note:** **since 2013 and until present time**, Mr. Selyutin was and still is under surveillance order executed by Private Security Firms and Contractors. For years Private Security Firms and Contractors tortured Mr. Selyutin, they used sleep and heat deprivation in his own residence and his parents residence.

And Hon Judge Maria Valdez conducted proceedings per Order of Hon Judge Pallmayer, back in December 2021. Hon Judge Maria Valdez conducted hearings, collected witness testimonies and sworn affidavits related to this matter and filed report and recommendations on 01-19-2021, Case: 1:18-cv-03951 Document #: 152 Filed: 01/19/21 Page 1 of 9 PageID #:1116.

Petitioner believes that the State (Cook County State Attorney Office, local Police Departments), while Petitioner was released on bond from the 07-04-2016 until 07-24-2018, the time when he was sentenced to 12 Month Conditional Discharge, and until he served his sentence on 07-24-2019, **prevented** the petitioner Mr. Aleksandr Selyutin by the threat of arrest and imprisonment, from filing the Petition For Writ of Habeas Corpus. They acted the way to prevent Mr. Selyutin from filing it.

And the **only reason** that Petitioner can prepare and file this petition now without significant risk to be arrested by the Village of Skokie Police is that on 06-24-2022, Mr. Selyutin filed Civil Case in the US District Court for the Northern District of Illinois against Skokie Police Department, Village of Skokie, Village of Skokie Police Department Chiefs, John Does 1-17, Jane Does 1-3 and Unknown Defendants an 18 Counts Complaint. **Case# 1:22-cv-03335**, **Judge: Hon John J. Tharp**. The 10 Counts are alleged violations of a Federal laws and statues (Violations of 1st, 4th

7

and 14th Amendments of US Constitution, Deprivation of Civil Rights under Color of law, 42 USC 1983, 1985, 1986, and Bivens, Violation of ADA of 1990 Under Title II and Violation of Title V of the Rehabilitation Act of 1973, and 8 counts are alleged violations of State of Illinois laws and statues. In addition, Mr. Selyutin asked for Injunction relief to stop discriminatory practices by Village of Skokie Police in partnership with Police Departments from other Municipalities. (**Please See Exhibit E).**

Below are the episodes with personal involvement of Cook County State Attorney Office. They used their Power, Threats of Arrest, Conspiracy, Threats to Revoke Probation (they actually revoked Petitioner's Probation even before he committed any wrong doing) to harass, and intimidate, the Petitioner, get him arrested, imprisoned, and to Prevent the Petitioner of Filing this Petition on time while he was released on bond on July 4, 2016 and until he served his sentence on 07-24-2019. And even after the Local Police Departments continued the Discrimination, Harassment, Intimidation, Stalking, Threats of Arrest practices until the present time.

1) On or around 12-09-2016, (Please see C22) during the case status hearings at Cook County Circuit Court Skokie Court House, Assistant Cook County State Attorney James O'Connor requested the Circuit Court of Cook County Judge Marcia Orr for an Order of additional special conditions of bail in addition to a regular bond and Order of No Contact that was also active for Petitioner who had no prior arrest history or any issues with the law in the past since September 1991 when he and his family arrived to USA from Ukraine. The assistant Cook County State Attorney James O'Connor request for additional special conditions of bail was granted by Circuit Judge Marcia Orr. And Petitioner believes that this was done in violation of **Eighth Amendment** of the US Constitution that states, "**Excessive bail** shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The special bond had a provision that Petitioner should not possess any Dangerous Weapons. Petitioner believes that ASA James O'Connor who is related to Srg. (now Lt). Tim O'Connor, from Village of Lincolnwood Police Department, the department who arrested the Petitioner back on 07-03-2016, did this per request from Village of Lincolnwood Police Department, and Detective (now Sgt.) David Kramarz who was assigned as a Lead Detective for Petitioner's Case by Sgt. (now Lt) Tim O'Connor, from Village of Lincolnwood Police Department (he is related to ASA James O'Connor). On 07-03-2016, after Mr. Selyutin was arrested by the Village of Skokie Police Department and Village of Lincolnwood Police Department Officers, Village of Lincolnwood Police Officers Jimmy Han and David Kieka searched Mr. Selyutin car and found out that Petitioner had in his trunk several tools, mid size shovel, large snow shovel, small hammer and mid size emergency axe. They reported their findings to Detective (now Sgt.) David Kramarz. As per definition of Cook County Circuit Court, mid size emergency axe would be covered as "dangerous weapon". So the next step was to arrange the "accidental stop" by the Skokie or Lincolnwood PD's of Petitioner's vehicle that would be followed by a search of Petitioner's trunk – with a finding of an emergency axe and a violation of special bond that would lead to imprisonment of Mr. Selyutin. There was an attempt to get this done by disabling a small license plates light in Petitioner s vehicle when he was visiting his parent's house by unknown Contractor / Officer that resided in Petitioner's building in Skokie, IL. This was unsuccessful attempt because Petitioner disposed his emergency axe into the garbage. The Contractors later discussed this unsuccessful attempt in Unit 313 at Skokie Gardens Building.

2)  On or around May 7, 2018, around 03:30 PM CST Assistant Cook County State Attorney Kim Pressling was personally involved in tactical operation with her co-workers from the Cook County State Attorney Kim Fox office, against the Petitioner to create a situation and provoke Mr. Selyutin to commit a wrongdoing, with assistance of a young Pakistani Female Contractor (or pretend to be a

tenant) from the Unit 313 (above Petitioner's), yes, another "victim from the Unit 313 in addition to

Mr. Donald Howard", and to fabricate an Order of No Contact because the a young Pakistani Female

Contractor (or pretend to be a tenant) from the Unit 313 was suppose to show up in the same places

with Petitioner, and later file complaint with Cook County State Attorney Office for Stalking Order

and due to this would be revocation of Petitioner's probation. ASA Kim Pressling personally directed

of Petitioner's whereabouts / location to others involved, while he was around Niles Public Library, in

Niles IL. And another person from Cook County State Attorney Office was also involved, – Tsetan

Lungkara, the Cook County State Attorney Office stenographer, and the tenant of Skokie Gardens

Building Unit 211, that day in the Unit 313 (yes, again) on or around 06:00 PM CST. Earlier, in July

2016, this trick was successfully performed by Contractor Mr. Don Howard, who filed an Order of No

Contact, used public places episodes to claim that Petitioner was stalking him, Mr. Howard even used

one episode against the Petitioner when Petitioner called Skokie Police Department on his oldest son

Kyle Howard, after Petitioner was threatened by Kyle Howard, as example of stalking, another

episodes were used when Petitioner took his disabled father to youth hockey game in public place

Hockey Ring in Skokie, IL. And yes, the Howard's Order of No Contact was fully supported by the

Cook County State's Attorney Office (read by ASA James O'Connor) and granted by various Cook

County Circuit Judges for 2+ years.

Petitioner believes that Cook County State Attorney Office withheld the exculpatory evidence that

Howard was Contractor involved in surveillance of Petitioner's internet and other activities in order to

prevent the Petitioner of using the entrapment defense and get him wrongfully convicted.

3) Petitioner believes that Cook County State Attorney Office also withheld the exculpatory evidence

that Howard had criminal record; Mr. Donald Howard was arrested by Chicago Police Department for

Battery Cause Bodily Harm 720-5/12-3-A-1 MA. And that would be crucial evidence for the Jury; it

10

would explain why Mr. Howard was chasing the Petitioner at very close range for 5 miles to cause the Battery Bodily Harm. And these were violations of the Fifth Amendment of the US Constitution, a guarantee right to have a fair trial.

## Case Summary

Case No. 01127537501

People of the State of Illinois vs. DONALD J HOWARD

Location: Branch 29

Filed on: 12/18/2001

§         Record Division Number: G748900

Central Booking 014980530 Number/Document Control Number:

IR Number: 1463313

Case Type: Municipal

Case Flags:

Payment History on Conversion tab

| Offense | Statute | Deg•ee Offense Date Filed Date |
|---|---|---|

Jurisdiction: Chicago Police Department

**001.** BATTERY **-CAUSE BODILY HA 720-5/12-3-A-1 MA**                **12/18/2001**

Arrest
Date: 12/14/2001
Agency: ILoCPDooo - Chicago Police Department
DCN: 014980530 Sequence: 001

## Statistical Closures

02/04/2002 S.O.L.

Current Case Assignment

Case Number 01127537501

Court          Branch 29

Date Assigned 12/ 18/2001

4) On March 29, 2019 around 9:45 PM, two Village of Skokie Police Officers knocked to Petitioner's doors at Petitioner's home residence in Skokie, IL. Petitioner was told that John Doe from his building called 911 and filed complaint about the loud noise from Petitioner's unit around 9:15 PM. The Officers did not issue any tickets or warnings to Petitioner. They did not find anything illegal or improper, or any violations of municipal code done by the Petitioner. Later, with request under FOIA, Petitioner received the edited 911 call recordings and edited police summary report. The 911 recordings had a John Doe scrambled voice, that stated that" there is a Man in unit 213 (Petitioners unit) that hitting a wall with the ball". Petitioner did not own a ball and did not hit a wall with a ball. Petitioner recognized the voice of the caller. Petitioner believes that John Doe may be an individual who worked for / or worked with Cook County State Attorney Office (and or member of his family).

5) On or around May 2019, Petitioner followed a wrong advice and filed an unemployment claim. Petitioner was told that he may be eligible to get unemployment benefits in 2019. The Contractors involved in Surveillance of Mr. Selyutin had full access to observe his internet activities and they believed that the Petitioner was not in title to receive the unemployment compensation and they did confirm with Petitioner's former employer supervisor at New Age Elderly Inc. in Chicago, IL Lilia Balan, lbalan@newagecare.net, Phone(847) 403-3053 ext. 251. (New Age Elder Care Inc., 2539 W. Peterson Ave. Chicago, IL60659 | 701 Deerfield Parkway, Suite 101, Buffalo Grove, IL 60689, Phone (847) 403-3053 Fax (847) 943-2107). Then the Contractors involved in executing Surveillance Order informed Cook County State's Attorney office, because they were fully aware that Petitioner was on probation. The Petitioner appealed his conviction and his appeal was pending review at First Appellate Court of Illinois. The Unemployment Office (IDES) informed the Petitioner by mail that his employer decided to dispute the unemployment claim. Petitioner believes that Contractors involved in executing Surveillance Order with assistance of Skokie Gardens Building Manager Mr. Pawel Gawron

allegedly stole or misplaced the notice from the unemployment office (IDES) from Petitioner's mailbox. So the Petitioner would miss the phone interview with IDES, would certify for his benefits and would create a fraudulent activity – false unemployment claim. Cook County State's Attorney office prepared memorandum of revoking probation based on false unemployment claim. Cook County State's Attorney office **FORMALLY** informed the First Appellate Court of Illinois about this matter, so Cook County State's Attorney office would not have to file their brief as response to Mr. Selyutin's Appellant's brief. The Contractors involved in executing Surveillance Order and Cook County State's Attorney Office conducted an operation to revoke the Petitioner's probation and have the Petitioner imprisoned. And once again, Cook County State's Attorney Office submitted Revocation of Probation Memorandum to First Appellate Court of Illinois **before (!)** the Petitioner committed a crime, or before he filed a formal certification and before he received funds from IDES. They knew that Petitioner will have no idea about the interview with IDES, and that his former employer challenged his unemployment claim because they knew that the Petitioner will not receive the letter from IDES because they stole it.

The Petitioner never certified his incorrect unemployment claim; never received a penny; and he called to IDES and immediately informed the unemployment office (IDES) about the error and informed his former employer about the unemployment claim filed in error. Alan J. Spellberg, Assistant Cook County State's Attorney and Head of Criminal Appeals Division was personally involved in this matter and he was late on his Appellee's Brief response that was due on February 20, 2019 or 35 days later as per Illinois Supreme Court Rule 343 - since he was informed that he won't even need to prepare response due to Petitioner's Probation Revocation. So Mr. Alan J. Spellberg, Assistant Cook County State's Attorney filed on April 3, 2019, a motion for time extension to file a Brief due to "miscommunications and procedural errors" in the Cook County State's Attorney's

13

Appeals Division. Petitioner believes that this "miscommunications and procedural errors" were due to so called "Probation revocation". The Cook County State's Attorney submitted the Memorandum for Probation Revocation before Petitioner even committed anything illegal such as filing and certifying for "False Unemployment Claim".

Petitioner believes that all listed above episodes are perfect examples how the State (Cook County State Attorney Office) acted to prevent him of filing this Petition on time while he was released on bail and until his sentence was served. So the Petitioner had a **<u>Good Cause</u>** for not filing this Petition on time. Petitioner was in fear of probation revocation, arrest and imprisonment.

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

## STATEMENT OF THE CASE

(Please see C104-C105, R77-R79, and Audio File with 911 Call Recordings, file 0000000337_06,W911-2_2016-07-03_18_42_25_by_ui_startdate_desc.wav - audio). This case originated on July 03, 2016. Mr. Donald J Howard and Ms. Andrea MacLennan induced the Petitioner for self defense by following the Petitioner at very close range from his car for miles, to display the weapon in self defense by pointing it up at 45 degree angle while in his vehicle and putting it back down two seconds later, and then they called the police, while still following him for miles and later had him arrested. (Please see C4-C6) On July 03, 2016 the Petitioner was arrested and charged with one count of Aggravated Assault, 720 ILCS 5.0/12-2(c)(1) and one count of Unlawful Use of Weapon 720 ILCS 5.0/24-1-A-4 and released on bond on July 4, 2016. (Please see R180, R238) The Jury trial took place on June 26, 2018. (Please see C149-C150) The Jury was not given the Self Defense or Necessity Defense Instructions. The Aggravated Assault charge was dismissed, while the Petitioner was found guilty of Unlawful Use of Weapon. (Please see R256) And on July 24, 2018 was sentenced to 12 months conditional discharge.

## STATEMENT OF FACTS

(Please see R78). On July 3rd, 2016, Don Howard and his fiancée Andrea MacLennan were coming home, Andrea MacLennan was driving and Don Howard was at front passenger side and they observed the Petitioner driving in the opposite direction. They pulled in their driveway, they backed out, and they followed the Petitioner northbound on Trumbull. (Please see R77-R78). According to the

15

911 call recordings, Donald Howard reported an **aggravated assault** to Lincolnwood Police 911 dispatcher stating that the driver of the vehicle that Mr. Donald Howard and Andrea MacLennan were following displayed a handgun by pointing it up at 45 degree angle and putting it back down two seconds later. The caller Mr. Donald Howard and Ms. Andrea MacLennan continued to follow the vehicle for approximately 3.6 miles at very close range while ignoring the 911 dispatcher's plea's to stop following the vehicle and to report the incident at the Lincolnwood Police Department. (Please see R77) Donald Howard stated that he and MacLennan were returning home when they observed a vehicle parked across the street from their residence. Andrea MacLennan informed Donald Howard that she is going to follow the vehicle to get a license plate. Howard and MacLennan followed the vehicle for around 1.6 miles where he was able to obtain the vehicle's license plate. (Please see R79) In area where "Air Room and the Lincolnwood Police Station" located, Howard observed the Petitioner reaching out to the passenger side and displaying a handgun by pointing it up at 45 degree angle and putting it back down two seconds later. (Please see R89). Donald Howard pulled his phone and called the 911 quickly. Donald Howard and Andrea MacLennan continued to follow the vehicle at very close range for another 3.6 miles southbound of Leigh Ave. in Niles IL. Donald Howard stated that he and Ms. Andrea MacLennan continue to follow the Petitioner because (Please see R89-R90) "I don't know the procedures of the police and I thought that I would stay near him to - if he were pulled over and picked up that we can identify him". (Please see R102-103) Mr. Donald Howard also stated that "except for this, while being neighbors with Petitioner and except for the incident he suggested occurred awhile back, a couple years back, to the 911 operator, the Petitioner and him hadn't had any other bad contacts". Mr. Donald Howard also stated that (Please see R107) that the Petitioner

16

during the pursuit, always ahead of him, and he was behind the Petitioners vehicle of around 30 feet. (Please see R111) He also stated that he told 911 Operator "I want to be there when they catch him". (Please see R137) Lincolnwood Police Officer Kieca stated that the Petitioner freely admitted to me that he had two firearms in his vehicle that were located in his backpack on the front seat of his passenger's seat (Please see R138 and Supp E16) Lincolnwood Police Officer Kieca stated that prior to searching the Petitioner's vehicle for the firearms took photographs of the vehicle and the location of the backpack that was secured by locked Safety Belt on passenger seat (Please see Supp E16). He removed the backpack from Petitioner's vehicle and placed it on the ground. (Please see R158 and Supp E17) He opened the backpack and removed several items prior to finding a small zippered pouch bag. (Please see R138-R139) He opened that small pouch and inside was a Smith & Wesson 380 Bodyguard. (Please see Supp E18). Also inside that was a loaded magazine inside the pouch, not inside the actual firearm. (Please see Supp E17). Another pouch he found in there was actually a black plastic carrying case, and it had letters the "CZ" written on top of it. He opened that case, and there was a loaded 9-millimeter magazine, no firearm though. (Please see Supp E19). And then he actually located a larger zippered pouch bag inside the backpack. He opened that pouch and inside the pouch was a black CZ P09 9-millimeter handgun with a loaded magazine inside the weapon. And outside of those three pouches, there were no other firearms in the backpack. (Please see R152 and Supp E17). Lincolnwood Police Officer Kieca stated that both pouches were zipped and closed. (Please see R154) That the weapon with loaded magazine inside but without a round in chamber. (Please see Supp E22) And it was not technically ready to shoot. (Please see R158-R159) He also stated that that the zippered bags with the weapons in it were not at the top of the backpack. (Please see Supp E17). And

17

that the other items were above the weapons. And that the weapons were just in there mixed in with all the other stuff. (Please see R46, R47 and Supp E15). The Petitioner had active Firearm Owner's Identification Card under Number 15820090. (Please see C4-C5) The Petitioner was charged with one count of Aggravated Assault, 720 ILCS 5.0/12-2(c)(1) and one count of Unlawful Use of Weapon 720 ILCS 5.0/24-1-A-4 and released on bond on July 4, 2016. (Please see C36-C37) In February 2017, per request of his first attorney Joseph Kennelly, the Petitioner was evaluated by Licensed Clinical Psychologist Erick A. Neu, Psy.D., at Forensic Clinical Services in Chicago IL, following the order of Hon. Michael J. Hood, Judge of the Second Municipal District Circuit Court of Cook County (Please see C38) and found Legally SANE. (Please see C25-C26, SEC C3, C4) On June 30, 2017 the motion to dismiss the charges submitted by Joseph Kennelly, was denied by Judge Michael Gerber. (Please see R15-R16) In August 2017, the Petitioner advised his attorney at the time Joseph Kennelly that he thinks that his arrest may be an entrapment and retaliation from his former employer because he had multiple meetings with Federal Bureau of Investigations (FBI). The Petitioner asked Kennelly to confirm if Mr. Donald Howard a law enforcement officer or Contractor and then pursue an Entrapment Defense. (Please see R18) Kennelly refused and filed motion to withdraw that was granted on August 30, 2017. (Please see R21) Also, on August 30, 2017, Joseph Kennelly passed to State the Case Folder with working products that included (Please see R32) all working materials with personal and confidential information of the case and about the Petitioner Mr. Selyutin, their strategies for the trial, emails exchanges. (Please see C79) From October 2017 to March 13, 2018, the Petitioner represented himself as Pro Se. (Please see C100, C101, C102 and -C105). On September 15, 2017, Petitioner filed a motion for discovery, (Please see C100 – C102). The Petitioner's motion for

18

Discovery included (please see C72) under#3 request to release the names and addresses of the witnesses that prosecution intends to call during the trial. (Please see C82) This motion was granted by Hon Judge Hood on October 20, 2017. Prosecution refused to release the names and addresses of the witnesses that prosecution intends to call during the trial to Petitioner. (Please see C97) The Petitioner followed up with ASA Kim Pressling with formal written request. ASA Kim Pressling did not release the requested info to Petitioner. (Please see C100) On January 23, 2018, the Petitioner as Pro Se presented the Motion to Compel Discovery for List of the State's witnesses, requesting the Court for an order directing the State Attorney Office to furnish the Petitioner/Defendant, prior to trial, a list containing the names, addresses and telephone numbers of all persons the prosecution intends to call as witnesses in the trial of this cause. Also, on January 23, 2018, the Petitioner presented a motion to Dismiss Aggravated Assault charge. The motion to dismiss the Aggravated assault charge was denied by Hon Judge Michael Hood, and (Please see C122 Court Order) the Motion to Compel Discovery for List of the State's witnesses prior to trial was granted. (Please see C129) Despite of that the State refused to release the State's names and addresses of the witnesses prior to trial, the State said they will call any witness from the Lincolnwood Police Discovery report. (Please see C98). On January 23, 2018 the State released the Lincolnwood Police Department Report and DVD with 911 call audio recordings to the Petitioner. The Petitioner examined the Discovery materials and 911 call recordings that indicated that Mr. Howard and Ms. MacLennan may stage the Petitioner's arrest by using the entrapment technique based on comments between 911 Operator and Don Howard. (Please see R25-R28) On March 7, 2018, the Petitioner's motion for Stand By Counsel was denied. (Please see C131) On March 14, 2018 the Petitioner hired Raymond Wigell and Associates to represent him in this case.

19

The Petitioner shared with Mr. Raymond Wigell and Ms. Huma Rashid the 911 call recordings and Howard's history of criminal arrest. The Jury trial took place on June 26, 2018. During the trial the defense attorneys neglected to prepare and tender the Self-Defense or Necessity Defense Instructions for Jury. During the trial the defense attorneys neglected to ask the Court for the Order to release the Identity of Mr. Howard and if he was a law enforcement officer or contractor. During the trial the defense attorneys neglected to call Ms. Andrea MacLennan, the second Petitioner, who was driving a car, as a witness to confirm the real identity of Mr. Donald J Howard (Under 720 ILCS 5/32-2, Illinois perjury statue, Peace officer who testifies under assumed identity or a false or fictitious name in the enforcement of the criminal laws, is exempt from the perjury prosecution. But their spouses are not exempt). The Aggravated Assault charge was dismissed, when Hon Judge James Allegretti granted the Petitioner's motion for Directed Finding, while the Petitioner was found guilty of Unlawful Use of Weapon. (Please see C170-C173) The Jury deliberations took a long 7 minutes. (Please see R252-R253) On July 24, 2018 during the sentencing, ASA Nate Bernard committed act of perjury by making false statements about the civil case filed by Donald Howard against the Petitioner on July 7, 2016 to, so the Petitioner would get much harsher sentencing with special conditions. (Please see C159-C160) Based on ASA Nate Bernard false statements on July 24, 2018 the Petitioner was sentenced to 12 months conditional discharge with special conditions. (Please see C169-C175) The motion for new trial was denied by Hon Judge Allegretti on July 24, 2018. (Please see C162) On August 17, 2018 the Petitioner filed an Appeal as Pro Se.

The Appellate Court of Illinois for 1st District, 3rd Division, Affirmed Petitioner's conviction for misdemeanor charge of Unlawful Use of a Weapon on August 28, 2019.

All the rimes related to this matter, starting around 2013 and until present time, Petitioner believes that he was under surveillance by Private Security Contractors and Donald J Howard was one of the Contractors, who was executing surveillance order but lied under oath about that. And this info was not released to the Jury.

**GROUND ONE:** Aleksandr Selyutin was denied the right to a fair trial protected by the Sixth and Fourteenth Amendments because the State violated the Due Process by making False Statements during the Petitioner's Sentencing;

(a) **Supporting facts:**

**Prosecutorial Misconduct 1:** (Please see R252, R253, R254) Whether the Assistant State's Attorney Nate Bernard knowingly made a false statements about the civil case – Order of No Contact filed by Donald Howard in July 2016, to mislead the Hon Judge James Allegertti, so that the Petitioner would get much harsher sentence with special conditions; And by doing so whether the Assistant State's Attorney Nate Bernard violated the Petitioner's constitutional right to due process secured by the 6th and 14th Amendments to the United States Constitution and State of Illinois Constitution. On 07-24-2018, during the sentencing Petitioner's attorney (please see R253-R254) Huma Rashid stated the Mitigation factors to Court and that the Petitioner is a 49-year-old man. He has lived in Illinois in the Cook County District for many, many years. He is a naturalized citizen and has been for 15 years. He is very well educated and has a MBA and professional degree in accounting. He worked for a Fortune

21

500 company in that capacity for about 16 years. He had been fully employed and lived in the area. He is also the primary caretaker of his disabled elderly parents who live in the area in Chicago. What that means is that the Petitioner visits their home at least five times a week. In addition to doing normal household chores like cleaning, getting their groceries, preparing their food, making sure they take their medicine, he also assists them with physical tasks like grooming. They are very dependent on him. So the Defense would suggest that a sentence of supervision would be appropriate for Mr. Selyutin. (Please see R252, R253, R254) While ASA Nate Bernard for Aggravation factors for the Petitioner's sentence made a false statements that "there was there was a restraining order filed after the Petitioner's arrest, that was granted with the complaining witness in this case and that was the basis for that restraining order was that the defendant was appearing at his home, at his child's sports events, but the basis is the defendant appearing at their home." (Please see R252 – R253).

Hon Judge James Allegretti did not read the Civil case and did not know any details about the Civil case (Please see R253). Based on the false statements that ASA Nate Bernard provided to Court, Hon Judge James Allegretti sentenced the Petitioner to 12 months conditional probation and also added special conditions to the Petitioner's sentence – No Contact of Don Howard and his family and that the Petitioner cannot possess firearms. (Please see C155).  Since all episodes of Civil Case were not discussed during the Criminal Trial in details, but significantly impacted the Petitioner's sentence due to a false statements that ASA Nate Bernard made to Court, the Petitioner would like to explain the Civil Case, for all episodes from No Contact Order that was filed by Donald Howard on 07-07-2016, or 4 days after Mr. Howard and Ms. Maclennan induced the Petitioner for self defense and had him arrested. Mr. Howard listed 5 episodes (Please see the SUP3 C29, C30, C31) on July 7, 2016, 3

22

episodes stated that the Petitioner appeared at his place of work: 2 times at Skokie Ice Rink, Skokie IL – Public place (Please see R95), open entrance for public, and one time at Quad Dome in Evanston, IL – privately owned, open entrance for public (Please see R96). Another episode (Please see C30) when Howard did see the Petitioner, while the Petitioner was driving by his house in his car at slow speed due to a speed bumps and this is Public Street, (please see R96). And finally, one episode involved the Petitioner who called Skokie Police when he had been threatened by Howard's older son Kyle (Please see SUP3 C31). As you can see (Please see the SUP3 C29, C30, C31) the Petitioner in civil case Mr. Howard never stated that the basis for the restraining order was that the Petitioner was appearing at his home, and at his child's sports events, and that the basis is the Petitioner appearing at their home.  So it appears that ASA Nate Bernard knowingly made false statements so that the Petitioner would get much harsher sentence with additional conditions. The Civil case episodes never been discussed during the criminal trial in details, the Petitioner did not have attorney representation for civil case. And also the Petitioner did not have a chance to cross examine the witnesses or claimant during the criminal trial for civil trial matters. If the Hon Judge James Allegretti would allow the Petitioner to present some facts in his defense for the Howard's allegations in Civil case, he would learn, that the Petitioner was taking his disabled father, who suffers from severe Alzheimer's, at least once a week, for several years, to youth hockey games at Skokie Ice Rink, Skokie, IL and to amateur adult soccer games at Quad Dome in Evanston, IL.  And yes, the Petitioner did pass by Howard's house occasionally, on his way to local public library to pick up some reading materials for his disabled mother.

23

Originally, the Petitioner was charged with one count of Aggravated Assault, 720 ILCS 5.0/12-2 and one count of Unlawful Use of Weapon 720 ILCS 5.0/24-1-A-4. But during the criminal trial on June 26, 2018, the charge of Aggravated Assault, 720 ILCS 5.0/12-2 was dismissed when Hon Judge James Allegretti granted the Petitioner's motion for Directed Finding. Also, during the criminal trial Hon Judge James Allegretti made a short statement about the Howards accusations please see R179, "As far as seeing him (the Petitioner) in a couple of other places, who cares? That's public places. When he sees him (the Petitioner) parked, I don't' care, you start following somebody down the street and around blocks and everything else, and that's the person (the Petitioner) who is in apprehension of receiving a battery, not the one doing the following." So as per Hon Judge James Allegretti statements during the criminal trial, the Petitioner is the one who was in apprehension of receiving a battery, the Petitioner was a victim and Howard was the Aggressor. The Petitioner was never given an opportunity to present reasons why the No Contact Order in civil case action should not be taken during the criminal trial. The Petitioner's right to present evidence, including the right to call witnesses and cross-examine adverse witnesses and or claimants was also violated during the criminal trial for the civil case matters because all episodes listed in civil case never been discussed in details during the criminal trial and the Petitioner never had attorney representation for civil matter. No matter what was the motive of ASA Nate Bernard during the Petitioner's sentence, there is no excuse for making up the facts and by doing so violating due process rights. **(Please see the Legal Argument in Support Ground One in Petitioner's Memorandum of Legal Arguments in Support of his Petition for Writ of Habeas Corpus).**

24

**Conclusion:** The Petitioner believes that the Assistant State's Attorney Nate Bernard committed act of perjury by knowingly making false statements to mislead Hon Judge James Allegretti, so the Judge would impose the harsher sentence with special conditions on the Petitioner. Assistant State's Attorney Nate Bernard violated Due Process and violated The Fifth and Fourteenth Amendments to the United States Constitution and Illinois Constitution. The Petitioner's sentence should be reversed and all conditions should be removed from the Petitioner's sentence due to violation of Procedural Due Process in Civil Case and due to violation of The Fifth and Fourteenth Amendments to the United States Constitution and Illinois Constitution. This prosecutorial misconduct would not change the Jury verdict, but the Petitioner feels that since the Assistant State's Attorney Nate Bernard violated the Law of the State of Illinois - Committed the Act of Perjury by knowingly making the false statements about the civil case, this issue should be listed as most important under #1. The Assistant State's Attorney Nate Bernard should not make up the facts to win the case and/or to get the sentencing for the Petitioner that he wanted. This is illegal under 720 ILCS 5/32-2 Perjury. The denial of due process of law by prosecution vitiated the verdict and the sentence.

(b) **Direct Appeal of Ground One:**
   (1)  If you appealed from the judgment of conviction, did you raise this issue?
           Yes (**X**)            No ()
   (2)  If you did not raise this issue in your direct appeal, explain why: This is a claim of ineffective assistance counsel which the Seventh Circuit has determined to be appropriately raised in a Section 2255 petition rather than in a direct appeal.
(c) **Post-Conviction Proceedings**:
   (1)  Did you raise this issue in any post-conviction motion, petition, or application? Yes ( )      No (**X**)
   (2)  If your answer to Question (c)(1) is "Yes," state:
        Type of motion or petition:

25

Name and location of the court where the motion or petition was filed:
Docket or case number (if you know):
Date of the court's decision:
Result (attach a copy of the court's opinion or order, if available:

(3)   Did you receive a hearing on your motion, petition, or application?
                    Yes (  )                No (  )

(4)   Did you appeal from the denial of your motion, petition, or application?
                    Yes (  )                No (  )

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
Yes (  )        No (  )

(6)   If your answer to Question (c)(4) is "Yes," state:
Name and location of the court where the appeal was filed:
Docket or case number (if you know):
Date of the court's decision:
Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did
not appeal or raise this issue:

**GROUND TWO:** Aleksandr Selyutin was denied the right to a fair trial protected by the Sixth
and Fourteenth Amendments because the State denied the  release the names and addresses of
State's witnesses prior to trial.

**(a)  Supporting facts:**

**2. Prosecutorial Misconduct 2:** Whether the State violated the Petitioner's right for fair trial secured

by the 6th and 14th Amendments to the United States Constitution and State of Illinois Criminal Code,

by denying to release the names and addresses of State's witnesses prior to trial. (Please see C71-C77)

On September 15, 2017, Petitioner filed a motion for discovery, (Please see C100 – C102). The

Petitioner's motion for Discovery included (please see C72) under#3 request to release the names and

addresses of the witnesses that prosecution intends to call during the trial. (Please see C82) This

26

motion was granted by Hon Judge Hood on October 20, 2017. Prosecution refused to release the names and addresses of the witnesses that prosecution intends to call during the trial to Petitioner. (Please see C97) The Petitioner followed up with ASA Kim Pressling with formal written request. ASA Kim Pressling did not release the requested info to Petitioner. (Please see C100) On January 23, 2018 the Petitioner as Pro Se presented the Motion to Compel Discovery for List of the State's witnesses, requesting the Court for an order directing the State Attorney Office to furnish the Petitioner/Defendant, prior to trial, a list containing the names, addresses and telephone numbers of all persons the prosecution intends to call as witnesses in the trial of this cause as per People v. Schmidt, 56 Ill.2d 572 (1974). The motion was granted by Hon Judge Michael Hood (Please see C122 Court Order). Hon Judge Michael Hood specifically stated that the State must release the list of the witnesses to the Petitioner, and (Please see SUP3 R47) to be "In full Compliance of People v. Schmidt", and (Please see SUP3 R51) Hon Judge Michael Hood assured the Petitioner that he is getting the list of witnesses prior to trial. But the ASA Kim Pressling, refused to do so, (Please see C129) and advised the Petitioner that the State can call as witness anyone listed in Lincolnwood Police Report that was given to the Petitioner as part of Discovery. **(Please see the Legal Argument in Support Ground Two in Petitioner's Memorandum of Legal Arguments in Support of his Petition for Writ of Habeas Corpus).**

**Conclusion:** The Petitioner thinks that the State violated the due process and Petitioner's right for fair trial secured by the 6th and 14th Amendments to the United States Constitution and State of Illinois Criminal Code, by denying release the names and addresses of State's witnesses prior to trial. Therefore, the Petitioner's conviction and sentence should be reversed. The Petitioner feels that since

the Due Process was violated, and the Petitioner's right for fair trial secured by the 6th and 14th

Amendments to the United States Constitution and State of Illinois Criminal Code were also violated,

by the Assistant State's Attorney Kim Pressling, this issue should be listed as second important under

#2.

(b) **Direct Appeal of Ground Two:**
    (1)   If you appealed from the judgment of conviction, did you raise this issue?
                        Yes (**X**)              No ()
    (2)   If you did not raise this issue in your direct appeal, explain why: This is a claim of ineffective assistance counsel which the Seventh Circuit has determined to be appropriately raised in a Section 2255 petition rather than in a direct appeal.

(c) **Post-Conviction Proceedings**:
    (1)   Did you raise this issue in any post-conviction motion, petition, or application? Yes ( )      No (**X**)
    (2)   If your answer to Question (c)(1) is "Yes," state:
           Type of motion or petition:
           Name and location of the court where the motion or petition was filed:
           Docket or case number (if you know):
           Date of the court's decision:
           Result (attach a copy of the court's opinion or order, if available:
    (3)   Did you receive a hearing on your motion, petition, or application?
                      Yes ( )        No ( )
    (4)   Did you appeal from the denial of your motion, petition, or application?
                      Yes ( )           No ( )
    (5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
          Yes ( )      No ( )
    (6)   If your answer to Question (c)(4) is "Yes," state:
           Name and location of the court where the appeal was filed:
           Docket or case number (if you know):
           Date of the court's decision:
           Result (attach a copy of the court's opinion or order, if available):

    (7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:** Aleksandr Selyutin was denied the right to a fair trial protected by the Sixth and Fourteenth Amendments, and because the Hon Judge Allegretti failed to provide the Self Defense instructions to the Jury.

(a)  **Supporting facts:**

A. Whether the Trial court erred in failing to provide to Jury the Self Defense Instructions and to instruct the jury that, to establish the offense Unlawful Use of Weapon, the State was required to prove, beyond a reasonable doubt, that defendant did not act in self-defense.

Argument - (Please see R175) During the criminal trial, Hon Judge James Allegretti stated that: "It sound like the only one at least initially with a reasonable apprehension of receiving a battery was the Petitioner. He's the one who was followed for blocks with a car that was continually coming up on him. Later Hon Judge James Allegretti stated during the criminal trial, (Please see R178 – R179), "My question to both sides is how can anyone follow someone for blocks where the person who's being followed clearly knows he's being followed and how can that person who's being followed and how can that person who's doing the following ever believe that anything good is going to come of that following? How can he ever think that you can jump in your car, turn around, clearly see whoever it is – the person who's being followed clearly was able to see him following him? Mr. Howard follows for

29

blocks and blocks and blocks. If you're in that car being followed, I don't know what you're going to do, but you're going to be in apprehension of receiving a battery, not the guy who's doing the following. What's he afraid of? He's chasing somebody down. I don't know how anybody could call him ever, under any bit of the evidence that's here, in fear of receiving a battery. The guy who is in fear of receiving a battery is the guy that's getting chased. I did not hear that he stopped and got out of the car and that's what scared him. I heard he followed him for blocks and blocks and blocks. Sometimes, 30 feet away right behind him. How is that going to make you feel if you're a citizen on the street?" Per Hon Judge James Allegretti, the Petitioner was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks. The Petitioner, had valid FOID card (Please see Supplement E15), had two unloaded, locked, non immediately accessible weapons in transit, and the Petitioner had right to defend himself in case of confrontation, because he was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks by Howard and MacLennan. According to a Trial Court, Hon Judge James Allegretti, the Petitioner was the one who was placed by claimants, Mr. Donald Howard and Andrea MacLennan, in fear of reasonable apprehension of receiving a battery. As for the self-defense instruction, the self-defense instruction must be given whenever "some evidence," whether presented by the prosecution or defense, has raised the issue. The Trial Court failed to instruct the jury that, to establish the offense Unlawful Use of Weapon, the State was required to prove, beyond a reasonable doubt, that defendant did not act in self-defense.

**(Please see the Legal Argument in Support Ground Three in Petitioner's Memorandum of Legal Arguments in Support of his Petition for Writ of Habeas Corpus).**

**Conclusion:** If the Trial Court would provide the Self Defense instructions to the Jury, the

Verdict for the UUW charge would be Not Guilty. Therefore, the Conviction should be reversed.

    (b) **Direct Appeal of Ground Three**:

        (1)   If you appealed from the judgment of conviction, did you raise this issue?

                      Yes (**X**)          No ()

        (2)   If you did not raise this issue in your direct appeal, explain why: This is a claim of ineffective assistance counsel which the Seventh Circuit has determined to be appropriately raised in a Section 2255 petition rather than in a direct appeal.

    (c) **Post-Conviction Proceedings**:

        (1)   Did you raise this issue in any post-conviction motion, petition, or application? Yes ( )      No (**X**)

        (2)   If your answer to Question (c)(1) is "Yes," state:

             Type of motion or petition:

             Name and location of the court where the motion or petition was filed:

             Docket or case number (if you know):

             Date of the court's decision:

             Result (attach a copy of the court's opinion or order, if available:

        (3)   Did you receive a hearing on your motion, petition, or application?

                      Yes ( )           No ( )

        (4)   Did you appeal from the denial of your motion, petition, or application?

                      Yes ( )           No ( )

        (5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal? Yes ( )     No ( )

        (6)   If your answer to Question (c)(4) is "Yes," state:

             Name and location of the court where the appeal was filed:

             Docket or case number (if you know):

             Date of the court's decision:

             Result (attach a copy of the court's opinion or order, if available):

        (7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:** Aleksandr Selyutin was denied the right to the effective assistance of counsel. Under the United States Constitution amendments VI and XIV a defendant is guaranteed the right to the effective assistance of counsel.

**Supporting facts:**

1) Whether Petitioner's defense counsel was ineffective for failing to tender a jury instruction to establish the offense Unlawful Use of Weapon, the State was required to prove, beyond a reasonable doubt, that defendant did not act in self-defense. The defense counsel failed to advice the Petitioner to plead guilty on Unlawful Use of Weapon charge, so the Petitioner could use the Self Defense strategy. The defense counsel failed to tender the Self Defense instructions to Jury, failed to timely object to the absence of the self Defense instruction, and failed to include the issue in post-trial motion.

The Self-Defense Argument: In the case of a claim for ineffective assistance of counsel for failure to tender a jury instruction to establish the offense Unlawful Use of Weapon, the State was required to prove, beyond a reasonable doubt, that defendant did not act in self-defense, defendant must show the un-argued that failure to tender a Self Defense instruction to the Jury meritorious and there is a reasonable probability the verdict would have been different. The defense counsel failed to advice the Petitioner to plead guilty on Unlawful Use of Weapon charge, so the Petitioner could use the Self Defense strategy. So let's review the trial court comment: As Hon Judge James Allegretti stated during the criminal trial, (Please see R178-R179), "My question to both sides is how can anyone follow someone for blocks where the

32

person who's being followed clearly knows he's being followed and how can that person who's being followed and how can that person who's doing the following ever believe that anything good is going to come of that following? How can he ever think that you can jump in your car, turn around, clearly see whoever it is – the person who's being followed clearly was able to see him following him? Mr. Howard follows for blocks and blocks and blocks. If you're in that car being followed, I don't know what you're going to do, but you're going to be in apprehension of receiving a battery, not the guy who's doing the following. What's he afraid of? He's chasing somebody down. I don't know how anybody could call him ever, under any bit of the evidence that's here, in fear of receiving a battery. The guy who is in fear of receiving a battery is the guy that's getting chased. I did not hear that he stopped and got out of the car and that's what scared him. I heard he followed him for blocks and blocks and blocks. Sometimes, 30 feet away right behind him. How is that going to make you feel if you're a citizen on the street?". Per Hon Judge James Allegretti, the Petitioner was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks. The Petitioner, had valid FOID card (Please see Supp E15), had two unloaded, locked, non immediately accessible weapons in transit, and the Petitioner had right to defend himself in case of confrontation, because he was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks by Howard and MacLennan. But according to a Trial Court, Per Hon Judge James Allegretti, the Petitioner was the one who was placed by claimants, Mr. Donald Howard and Andrea MacLannan, in fear of reasonable apprehension of receiving a battery. As for the self-defense instruction, the self-defense instruction must be given whenever "some evidence,"

33

whether presented by the prosecution or defense, has raised the issue. A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony. 720 ILCS 5/7-1 (West 1998). Once self-defense is raised, either by the prosecution or the defense, it is the prosecution's burden to prove beyond a reasonable doubt it was not self-defense. The defense counsel Mr. Wigell did state during the defense closing arguments (Please see R197-R198) that Mr. Howard was aggressor and that he was the one who chased the Petitioner and Mr. Howard was the person who was trying to get to the Petitioner. (Please see R168, R169, R170, R171, R172, R173) During the 911 call, "Mr. Howard stated to 911 Operator (Please see the DVD with 911 Audio Call Recordings), that he's a passenger in a vehicle driven by his wife and he just observed a flash of a weapon. Mr. Howard was not hysterical, he was not upset, and he was not carrying any kind of dramatic fashion. He was speaking for the most part rather matter of factually. He was a little heated it sounded like because he was adamant because he wanted to follow the Petitioner and be there when this person was caught. One of the first things Mr. Howard said on the call was the plate number. The call started. There were one or two introductory, phrases, and then he relayed the plate number. And he stated that was the whole reason that he was following the Petitioner. So that's very telling. Mr. Howard testified that while he was a passenger in this vehicle, the

34

vehicle followed the Petitioner before the alleged flash of the weapon for purpose of getting a plate. Then weapon was flashed, according to Mr. Howard, and they still followed the Petitioner's car. Most reasonable people when they see a weapon they go in the opposite direction, they don't follow, but Mr. Howard and his wife followed an he relayed the play by play in matter of fact way to the 911 operator who told him twice, don't follow this man. You saw him with a gun, so don't follow him, Mr. Howard claimed on the stand that he did not really know how police procedures worked and that's why he was following the Petitioner. He was told twice police procedures: Don't follow him, Wait for officers. Pull over so the Police Officers, can do their thing. Then go back to the police station and talk to the officers. Mr. Howard was not very good at following and understanding those police procedures. Mr. Howard stated during the 911 call that he wanted to be there when the person was stopped by the police. He said at one time with frustration that no one's going to catch this guy if Mr. Howard did not keep following him. That speaks to someone who is making assertive aggressive moves toward a purpose of Petitioner be arrested. That speaks of vigilante justice. Not someone who is afraid of being hurt. Mr. Howard also testified that he and his girlfriend, and now wife, made the joint decision to follow the Petitioner; that they made four turns during this whole thing after seeing the gun.  He stated that they caught -- that their car caught up with Mr. Selyutin eventually.  Eventually undermines the reasonable apprehension of receiving a bodily harm too.  It suggests that a whole bunch of stuff happened before the actual incident eventually occurred, and we know what that is, the following before and the following for a long time after the weapon was observed by Mr. Howard.  He also testified that he saw Mr.

35

Selyutin holding a gun 90 degrees in the air from 30 feet away. He didn't say at any time that Mr. Selyutin had pointed the gun at him, had turned around in his seat and pointed it at him, had pointed it like this over his shoulder -- indicating for the record that my biceps is parallel to the floor with my elbow bent at a 45-degree angle and my finger pointing behind my head in the shape of a gun. None of that. 90 degrees in the air towards the ceiling of his car. On direct examination the State asked Mr. Howard what his impression was or something to that effect when he saw the weapon, and Mr. Howard said I was not sure what to feel. That doesn't speak to reasonable apprehension of a bodily harm either. That if someone has a gun shown or pointed to them at a way that they are -- that they apprehensive of receiving a bodily harm, they know what they're feeling. They're afraid. And he had a chance on the stand to say I was afraid, I thought I was going to die, you know, I wanted to get away from this guy, and instead he said I wasn't sure what to feel, and in the 911 call, there is no sound of distress in his voice. And, though, it's not directly related to Mr. Howard's testimony, it's tangentially related to the circumstances of this matter. The Court heard Officer Rannochio testify that after he made contact with Mr. Selyutin, he cuffed him and then uncuffed him and Mr. Selyutin stood with him for 15 to 20 minutes unrestrained, and that doesn't go along with the picture Mr. Howard painted of someone that he was in fear of. He followed this man. He knew he had a weapon. He still followed him. He followed him through all these twists and turns. He didn't listen to dispatch when they said to stop, and he saw a weapon pointed towards the ceiling of the car at a 90-degree angle, in his own words. And for those -- meaning that he could not have been in

reasonable apprehension of receiving bodily harm because those actions are not consistent with that fear."

In addition, on or around January 2015, Petitioner had meeting with John Edward Byrne, P.I. M14841, 7101 S. 87 Ct., Justice, IL, 60458, 708-389-3884. The meeting took place in North Shore Skokie Hospital, 9600 Gross Point Rd., Skokie, IL 60076, on the 1st floor. The subject was Mr. Donald J. Howard, Petitioner's former neighbor and person who Petitioner believed was conducting surveillance of Petitioner's activities from the condo unit above his. Petitioner shared with Mr. Byrne his matter, his reports to FBI, (Please see Exhibit D, pages 27 to 32) and asked to check if Mr. Donald J. Howard was Private Investigator who was conducting surveillance due to Petitioner's complaints to FBI, EEOC and his former employer HR. And during the meeting, Mr. Byrne, P.I from his phone checked several databases, and was able to locate licensed Private Investigator Mr. Donald J. Howard, from Evanston, who had license to carry weapons. So when Petitioner was chased by Mr. Howard and Ms. MacLennan, Petitioner believed that Mr. Howard had a weapon with him. So the self defense strategy was fully justified. And Petitioner shared this with Mr. Raymond Wigell, but this was not disclosed to the Jury.

**Conclusion:** The Petitioner thinks that his defense counsel was ineffective for failing to tender a jury instruction to establish the offense Unlawful Use of Weapon, the State was required to prove, beyond a reasonable doubt, that defendant did not act in Self Defense. The defense counsel failed to advice the Petitioner to plead guilty on Unlawful Use of Weapon charge, so the Petitioner could use the Self Defense strategy. The defense counsel failed to tender the Self

Defense instructions to Jury, failed to timely object to the absence of the Self Defense instructions, and failed to include the issue in post-trial motion. If the Defense Counsels would tender the Self Defense instructions to the Jury, the verdict for UUW charge would be not guilty. Fortunately, no one got killed or injured, as in Kyle Rittenhouse case. But both cases are similar in nature of self - defense, with one significant difference, the Non Guilty Verdict in self-defense case was deliberated by the Jury in Kenosha County, WI and guilty Verdict in Petitioner's self defense case was in County of Cook, IL, where the Defense Attorneys and a Judge failed to distribute the self defense instructions to a Jury.

Therefore, the conviction should be reversed.

2) **Whether Petitioner's defense counsel** was ineffective for failing to tender a jury instruction to establish the offense Unlawful Use of Weapon, the State was required to prove, beyond a reasonable doubt, that defendant did not act in Necessity defense. The defense counsel failed to advice the Petitioner to plead guilty on Unlawful Use of Weapon charge, so the Petitioner could use the Necessity Defense strategy. The defense counsel failed to tender the Necessity Defense instructions to Jury, failed to timely object to the absence of the Necessity Defense instructions, and failed to include the issue in post-trial motion.

The Defense of Necessity Argument – defendant is entitled to present evidence on a necessity defense and have the jury instructed accordingly once he has adequately established—through an offer of proof—that all four requisite factors are met: (1) he was "faced with a choice of evils and chose the lesser evil"; (2) he "acted to prevent imminent harm"; (3) he "reasonably

anticipated a causal relation between his conduct and the harm to be avoided"; and (4) there were "no other legal alternatives to violating the law.

So let's go back and review again the comments of the Hon Judge James Allegretti that he stated during the criminal (Please see R178-R179), "My question to both sides is how can anyone follow someone for blocks where the person who's being followed clearly knows he's being followed and how can that person who's being followed and how can that person who's doing the following ever believe that anything good is going to come of that following? How can he ever think that you can jump in your car, turn around, clearly see whoever it is –the person who's being followed clearly was able to see him following him? Mr. Howard follows for blocks and blocks and blocks. If you're in that car being followed, I don't know what you're going to do, but you're going to be in apprehension of receiving a battery, not the guy who's doing the following. What's he afraid of? He's chasing somebody down. I don't know how anybody could call him ever, under any bit of the evidence that's here, in fear of receiving a battery. The guy who is in fear of receiving a battery is the guy that's getting chased. I did not hear that he stopped and got out of the car and that's what scared him. I heard he followed him for blocks and blocks and blocks. Sometimes, 30 feet away right behind him. How is that going to make you feel if you're a citizen on the street?". Per Hon Judge James Allegretti, the Petitioner was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks. The Petitioner, had valid FOID card (Please see Supplement E15), and 1) Had two unloaded, locked, non immediately accessible weapons in transit, and the Petitioner had right to defend himself, because he was the one in fear of receiving a battery, after being chased for

39

blocks and blocks and blocks by Howard and MacLennan. 2) While he displayed a gun – Showed a Force, Howard and MacLennan did not stop. They continue to chase him at very close range from his car for another 3.6 miles and he acted to prevent imminent physical harm. 3) The Petitioner reasonably anticipated a causal relation between his conduct and the physical harm to be avoided while been chased by Howard and MacLennan for 5 miles at very close range from his car. 4) There were "no other legal alternatives to displaying a gun, even after the Petitioner displayed the gun, Howard and MacLennan did not stop. They continue to chase him at very close range from his car for another 3.6 miles. So the Petitioner was able to avoid the physical and may be violent confrontation with Howard and MacLennan by displaying a gun. The defense counsel failed to advice the Petitioner to plead guilty on Unlawful Use of Weapon charge, so the Petitioner could use the Necessity Defense strategy. The defense counsels Mr. Wigell and Ms. Rashid did not pursue the Defense of Necessity and did not provide the Defense of Necessity instructions to the Jury, despite the comments of the Hon Judge James Allegretti, that the Petitioner was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks.

**Conclusion:** The Petitioner thinks that his defense counsel was ineffective for failing to tender a jury instruction to establish the offense Unlawful Use of Weapon, the State was required to prove, beyond a reasonable doubt, that defendant did not act in Necessity defense. The defense counsel failed to advice the Petitioner to plead guilty on Unlawful Use of Weapon charge, so the Petitioner could use the Necessity Defense strategy. The defense counsel failed to tender the Necessity Defense instructions to Jury, failed to timely object to the absence of the

Necessity Defense instructions, and failed to include the issue in post-trial motion. If the Defense Counsels would provide the Defense of Necessity instructions to the Jury, the verdict for UUW charge would be not guilty. Therefore, the conviction should be reversed.

3) Whether Petitioner had ineffective assistance of counsel related to defense attorney Joe Kennelly passing the work products and confidential information about the case to State on August 30, 2017. The trial court had a hearing on August 30, 2017 for the Petitioner's counsel Joseph Kennelly motion to withdraw from the case. During the hearing (Please see R18-R19), Hon Judge Hood asked Kennelly to return all discovery at some point; Kennelly passed the discovery folder to State. Hon Judge Hood asked Kennelly - Is there any work product in there? (Please see R19). Kennelly said no. This was not accurate at all. Kennelly passed all the work products, Petitioner's confidential emails and materials, strategies for trial, email exchanges, witness interview by Investigator, to the State. The State gave it back to Kennelly sometime in March 2018, and not to Mr. Selyutin. The State asked Court to seal these materials and this was done in March 2018 (Please see R32). But the knowledge of these confidential work products enabled State to file the Motion Inlimine that prevented the Petitioner to use and even mention the instances of misconduct, police reports, and interviews with the Federal Agencies from other cases during his trial.

**Conclusion:** The Petitioner thinks that this is an example of Ineffective Assistance of Counsel. Due to Kennelly's error, the Petitioner's defense was significantly damaged. And after Kennelly withdrew from the case, the Petitioner's new attorneys Wigell & Associates should address this issue by deposing the Assistants State's Attorney(s), to find out what exactly they learned from the confidential work products that Kennelly passed to Sate and prevent the State of using their

knowledge during the trial. But unfortunately for the Petitioner, Wigell & Associates were making their own mistakes, instead of fixing errors of others. Therefore, the conviction should be reversed.

**Interesting fact,** the Appellate Court of Illinois for 1st District, 3rd Division, in its Order No. 1-18-1927, filed on August 28, 2019, 2019 IL App (1st) 181927-U, fully agreed with the Petitioner, "Based on comments in the record by the assistant state's attorneys, defendant, and the trial court, it does appear that the file tendered by Kennelly to the State included materials beyond those that the State should have received." But they blamed the Petitioner that he failed to provide the transcript of the hearing on the motions in limine and did not include any of those materials that were improperly tendered as part of record on appeal. First, the confidential work products that Kennelly passed to Sate were not part of the Record at All, they included confidential client attorney privileged materials that were not even released to the Petitioner by the State, but released back to Kennelly. So they were not included as part of the Record on Appeal. As for Motion in limine hearing, in reality it was NO MOTION IN LIMINE HEARING, AT ALL, NO OBJECTIONS, and THERFORE NO TRANSCITPS. The only two records exists on the motions in limine, in ROP: On March 07, 2018 ASA Edith Rios advised Circuit Court Cook County Judge Marcia Orr that" My Partner planes to file motions in limine". (Please see D-14, R-37). And the next during the trial on 06-27-2018, was no hearings, or objections from the Defense Attorneys on the motions in limine, is during the trial on 06-27-2018, (Please see E10, E11, R50, R51), so let's review it again:

"THE COURT: Any motions? MR. WIGELL: Motion to exclude. MS. HICKS: Join. THE COURT: Everybody's responsible for their own witnesses. Everybody's aware of the motions in limine that were granted. MS. HICKS: Do you want another copy, Judge? THE COURT: If you have a spare right there, yes. I don't anticipate anybody having a problem, but it's only going to

come out of the mouth of some witness if it's going to happen, and that's more likely your side. So they all know, right? MS. HICKS: Right"

(The full opinion of the Appellate Court of Illinois for 1st District, 3rd Division, in its Order No. 1-18-1927, filed on August 28, related to this matter in Exhibit C).

One simple sentence of Circuit Court Cook County Judge James Allegretti "Everybody's aware of the motions in limine, that were granted." That's it, nothing else. And once again, perfect example of so ineffective assistance of a counsels Wigell and Rashid. But the Cook County State Attorney office submitted a copy of the Motion in Limine, but without a date. This Motion was not Stamped by the Cook County Clerk Office, and entered by Cook County Clerk Office as Motion 1 on 07-27-2016 (Please see C2, C23, C24), means the same day as of Appearance of the Defense Attorney Joseph Kennelly. Petitioner believes that this was not just a simple error, Motion in limine was not even recorded on the Criminal Disposition sheet at that day on 06-27-2018 (Please see C140, C139, C138, C137). So The Cook County Clerk Office and Cook County State Attorney office buried the record of Motion in limine, with full assistance of the Defense Attorneys Raymond Wigell and Huma Rashid. This was in Trial Script, so in case if they wanted to find the record, it takes just simple search in PDF file and in Trial Script that was ordered and paid by the Petitioner, was only two records related to Motion in limine, as stated above, during the hearings with Judge Orr on 03-07-2018 (Please see C23, C24) and on 06-27-2018, remark by Judge Allgeretti, that the motions in limine was granted. No objections from the Defense Counsels Wigell and Rashid. But the Appellate Court of Illinois for 1st District, 3rd Division, decided to blame the Petitioner for "Failing to provide the transcript of the hearing on the motions in limine" and that Petitioner did not include confidential client attorney work products materials that were released by State back to

43

Kennelly, and not to Petitioner, and this was done per ruling of Judge Marcia Orr, (please see R36, R37), as she stated that there may be parts of the Kennelly's file that he does not want to give the Petitioner that are work product. So nothing was released to the Petitioner. But the Appellate Court of Illinois for 1ˢᵗ District, 3ʳᵈ Division did not want to reverse the verdict. Also, there is **No Records** at all of Mr. Wigell's Motion in limine, nothing was tendered to Clerk's Office, Wigell's Motion in limine was not even recorded on the Criminal Disposition sheet at that day on 06-27-2018 (Please see C140, C139, C138, C137). So another example of ineffective assistance of the defense counsel, who actually sabotaged Petitioner's best interests.

Petitioner believes that his conviction was fully granted on all levels of Cook County Justice system even before the verdict, they just decided to ignore the US Constitution and Due Process in Petitioner's case. And this is based on the statement made by one of the Contractors Mr. Hasan M. Sayed, the Contractor, involved in surveillance of Petitioner and a former resident of Skokie Gardens, Units 205 and 201, who stated around end of July 2019, even before the Appellate Court of Illinois for 1st District, 3rd Division, issued the Order No. 1-18-1927, on August 28, 2019, that Mr. Selyutin is just wasting his money on his appeal, he will not get anything from that.

**(Please see the Legal Argument in Support Ground Four in Petitioner's Memorandum of Legal Arguments in Support of his Petition for Writ of Habeas Corpus).**

(b) **Direct Appeal of Ground Four:**
   (1)  If you appealed from the judgment of conviction, did you raise this issue?
                  Yes (**X**)            No ()
   (2)  If you did not raise this issue in your direct appeal, explain why: This is a claim of ineffective assistance counsel which the Seventh Circuit has determined to be appropriately raised in a Section 2255 petition rather than in a direct appeal.

(c) **Post-Conviction Proceedings**:

(1)   Did you raise this issue in any post-conviction motion, petition, or application? Yes ( )          No (**X**)

(2)   If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available:

(3)   Did you receive a hearing on your motion, petition, or application?
                              Yes ( )                No ( )

(4)   Did you appeal from the denial of your motion, petition, or application?
                              Yes ( )                No ( )

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
Yes ( )          No ( )

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

## **The Evidence that was not included during the trial or during Direct Appeal:**

**GROUND FIVE:** Aleksandr Selyutin was denied the right to a fair trial protected by the Sixth and Fourteenth Amendments because the State of Illinois Cook County State Attorney Office and defense attorneys Raymond Wigell, Huma Rashid and earlier Joseph Kennelly withheld the exculpatory evidence about Mr. Donald J Howard.

**Supporting facts:**

1)  Petitioner believes that State of Illinois Cook County State Attorney Office and Defense attorneys Joseph Kennelly and Raymond Wigell, Huma Rashid withheld the exculpatory evidence that Howard was Contractor, who was executing surveillance order of Petitioner's internet and other activities in order to prevent the Petitioner of using the entrapment defense and to get him wrongfully convicted. On or around April 24, 2017 the Petitioner witnessed interesting episode of an inquiry about this evaluation and to the nature and severity of the disability, and medications. Petitioner witnessed that his attorney Joseph Kennelly, at Skokie Court Building, discussed on the phone Petitioner's evaluation with not yet identified person. Mr. Joseph Kennelly exhibited full knowledge about his evaluation, and asked Petitioner some questions related to the information that Petitioner provided only to Erick A. Neu, Psy.D., Licensed Clinical Psychologist at Forensic Clinical Services in Chicago IL, during his evaluation – such as Petitioner's military record. Mr. Joseph Kennelly stated to not yet identified person, "We have a problem, he was found legally SANE". Petitioner believes that the fact that he was found legally sane completely contradicted the false rumors of what Mr. Kennelly was told about the Petitioner. Despite of that Mr. Kennelly, decided to withdraw from the case, so he would not have to act in the best interests of Petitioner.

46

**Conclusion:** The Petitioner believes that his defense counsel was ineffective for withholding the exculpatory evidence about Mr. Donald J Howard, the facts that Mr. Howard was Law Enforcement Contractor. If this evidence would be presented to the Jury, the verdict for UUW charge would be not guilty. Therefore, the conviction should be reversed.

2)   On or around August 17, 2017, Petitioner's former attorney Kennelly, during his meeting with Mr. Selyutin in his office located at 2536 S California Ave Chicago, IL, at 3:10 PM, shared with Petitioner that Howard (Donald Howard) was not an Officer, but Contractor who was monitoring Petitioner's activities. Mr. Kennelly also stated that the "the Boys" (the other Police Officers and Contractors) thought that Mr. Selyutin was dangerous. As Petitioner understood Mr. Kennelly's statement, the Police Officers and Contractors that were involved in execution of surveillance order  might have planned his arrest and later a civil case (Order of No Contact), filed later by Mr. Donald Howard against the Petitioner. So this was a Law Enforcement / Police Operation, but the evidence was not presented to the Jury and Petitioner. Petitioner informed Mr. Wigell about all of this.  In addition, Mr. Raymond Wigell commented that this matter involved National Security and that Mr. Howard was waiting for Petitioner a week before, to do the same trick, to follow him, and to provoke him for self defense. Because "they thought he was dangerous", and they knew that Mr. Selyutin is driving from his parents residence sometimes by Howards residence, on his way home to drop / pick up the books for his disabled mother in local public library. So this was an operation, and the State and Defense attorneys Wigell and Rashid withheld the exculpatory evidence that Howard was Contractor, who was executing surveillance order of Petitioner's internet and other

47

activities in order to prevent the Petitioner of using the entrapment defense and get him wrongfully convicted.

**Conclusion:** The Petitioner believes that his defense counsel was ineffective for withholding the exculpatory evidence about Mr. Donald J Howard, the facts that Mr. Howard was Law Enforcement Contractor. If this evidence would be presented to the Jury, the verdict for UUW charge would be not guilty. Therefore, the conviction should be reversed.

3) Petitioner believes that State of Illinois Cook County State Attorney Office and Defense attorney Raymond Wigell withheld from the Jury the exculpatory evidence that Howard had criminal record; Mr. Donald Howard was arrested by Chicago Police Department for Battery Cause Bodily Harm 720-5/12-3-A-1 MA. And that would be crucial evidence for the Jury; it would explain why Mr. Howard was chasing the Petitioner at very close range for 5 miles to cause the Battery Bodily Harm. And these were violations of the Fifth Amendment of the US Constitution, a guarantee right to have a fair trial. Below please see Mr. Howard's arrest sheet. Ptitioner personally printed the below listed Howard arrest record and tendered to Mr. Wigell and Ms. Rashid prior to trial.

## Case Summary

Case No. 01127537501

People of the State of Illinois vs. DONALD J HOWARD

Location: Branch 29

Filed on: 12/18/2001

§        Record Division Number: G748900

        Central Booking 014980530 Number/Document Control Number:
IR Number: 1463313

Case Type: Municipal

Case Flags: Payment History on Conversion tab

Offense                          Statute          Deg•ee Offense Date Filed Date

Jurisdiction: Chicago Police Department

**001.** BATTERY -CAUSE BODILY HA 720-5/12-3-A-1 MA                          **12/18/2001**

    Arrest
      Date: 12/14/2001
      Agency: ILoCPDooo - Chicago Police Department
    DCN: 014980530 Sequence: 001

## Statistical Closures

02/04/2002 S.O.L.

    Current Case Assignment

    Case Number 01127537501

    Court           Branch 29

    Date Assigned 12/ 18/2001

**Conclusion:** The Petitioner believes that his defense counsel was ineffective for withholding the exculpatory evidence about Mr. Donald J Howard, the facts that Mr. Howard had criminal record arrest for Battery Bodily Harm. If this evidence would be presented to the Jury, the verdict for UUW charge would be not guilty. Therefore, the conviction should be reversed.

4) Petitioner believes that Defense attorney Raymond Wigell withheld the evidence from the Jury that Howard was a much bigger man than Petitioner. Mr. Don Howard, 6.3' tall and 275 pounds weight, Petitioner is 6.1' tall and 180 pounds weight. Simple comparison of Petitioner and Mr. Donald Howard standing next to each other would be crucial evidence for the Jury; it would explain why Mr. Howard was chasing the Petitioner at very close range for 5 miles to cause the Battery Bodily Harm. The Petitioner Mr. Selyutin for self defense purposes and in order to avoid

49

violent confrontation had to display while in his car his legally purchased weapon by pointing a weapon up in the air for 2 seconds and then putting it back. Ironically, during the trial, Hon. Judge James Allegretti, stated during the trial that the Petitioner Mr. Selyutin was the one in apprehension of receiving a battery and not Howard.

**Conclusion:** The Petitioner believes that thinks that his defense counsel was ineffective for withholding the exculpatory evidence about Mr. Donald J Howard, the facts that Mr. Howard was, much bigger male than Mr. Selyutin. If this evidence would be presented to the Jury, the verdict for UUW charge would be not guilty. Therefore, the conviction should be reversed.

**<u>Summary Conclusion for Ground 5:</u>** The Petitioner believes that his defense counsel was ineffective for withholding the exculpatory evidence about Mr. Donald J Howard, the facts that Mr. Howard was Law Enforcement Contractor, much bigger male than Mr. Selyutin, and that Howard had criminal record arrest for Battery Bodily Harm. If this evidence would be presented to the Jury, the verdict for UUW charge would be not guilty. Therefore, the conviction should be reversed.

**<u>(Please see the Legal Argument in Support Ground Five in Petitioner's Memorandum of Legal Arguments in Support of his Petition for Writ of Habeas Corpus).</u>**

  (b) **Direct Appeal of Ground Five:**
    (1)  If you appealed from the judgment of conviction, did you raise this issue?
                    Yes ( )              No (**X**)
    (2)  If you did not raise this issue in your direct appeal, explain why: This is a claim of ineffective assistance counsel which the Seventh Circuit has determined to be appropriately raised in a Section 2255 petition rather than in a direct appeal.
  (c) **Post-Conviction Proceedings**:

(1)  Did you raise this issue in any post-conviction motion, petition, or application? Yes ( )     No (**X**)

(2)  If your answer to Question (c)(1) is "Yes," state:

   Type of motion or petition:

   Name and location of the court where the motion or petition was filed:

   Docket or case number (if you know):

   Date of the court's decision:

   Result (attach a copy of the court's opinion or order, if available:

(3)  Did you receive a hearing on your motion, petition, or application?

                        Yes ( )                No ( )

(4)  Did you appeal from the denial of your motion, petition, or application?

                        Yes ( )                No ( )

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

   Yes ( )        No ( )

(6)  If your answer to Question (c)(4) is "Yes," state:

   Name and location of the court where the appeal was filed:

   Docket or case number (if you know):

   Date of the court's decision:

   Result (attach a copy of the court's opinion or order, if available):

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SIX:** Aleksandr Selyutin was denied the right to the effective assistance of counsel, because his Defense Attorney Raymond Wigell allegedly created a criminal scheme to extort $50,000.00 from the Petitioner for Fake Appeals. Under the United States Constitution amendments VI and XIV a defendant is guaranteed the right to the effective assistance of counsel.

**Supporting facts:**

51

After the trial and before conviction, Mr. Wiggell asked the Petitioner for additional funds of $10,000.00 for the "Extraordinary Efforts for Sentencing Preparations and Motion for New Trial" and as he said "So the Judge can be more flexible during the sentencing". The Petitioner refused to pay more and Mr. Wigell did not even show up for the sentencing and let (the associate from his firm was there, Ms. Huma Rashid) his relative Hon Judge Allegretti convict the Petitioner who did not have any prior criminal history of arrests or any violation of law before, for refusing to pay more fees. The Petitioner was convicted to 1 year Probation, Conditional Discharge and not to Supervision as Illinois law states for the first time offenders. And during the criminal trial, as part of the Trial Directed Finding Motion hearing the Court (Hon Judge James Allegretti) stated that (Please see R 179), "As far as seeing him (Don Howard did see Mr. Selyutin in public places) in a couple of other places, who cares? What's that got to do with anything? That's public places". But during the sentencing about 30 days later when Petitioner refused to pay to Hon Judge James Allegretti relative Mr. Raymond Wigell additional $10,000.00, Hon Judge James Allegretti stated to Petitioner during the sentencing, (Please see R 256) "Sir, you can't do that to people. You can't follow them around. You can't go to places where they are. That sets people on -- ill at ease, they're uncomfortable with that". So the Hon Judge James Allegretti remarks completely changed. And the price for this change is $10,000.00. Petitioner believes that he was punished by much harsher sentencing (1 year of Probation, Conditional Discharge instead of Court's Supervision) by Hon Judge Alegretti for refusing to pay to his relative Mr. Raymond Wigell additional $10,000.00. On or around August 5th 2018, Petitioner received the letter from Mr. Wigell, dated July 30, 2018, with the statement, that again requested payment an additional fees (please see Exhibit A), again,

for the "Extraordinary Efforts for Sentencing Preparations and Motion for New Trial" and separately for the post disposition fee and additional fee of $2,325.00 for the research and drafting the Motion for New Trial. This time, due to catastrophic output for the Petitioner during the sentencing, Mr. Wigell added the range of requested fees, from $1,000.00 to $5,000.00 for each, (immediately after the trial he asked for $10,000.00, that is a summary of the higher ends of both fees). And during the sentencing argument another Defense Attorney Ms. Huma Rashid, from the Law Offices of Raymond Wigell, in which he did not even showed up, she did not mention the self defense or necessity defense, and she did not even make an argument during the sentencing that Howard fabricated the Order of No Contact after he orchestrated the Petitioner's arrest and used the facts that the Petitioner took his disabled farther who is suffering from severe Alzheimer's to youth hockey games at Scatium Ice Arena, located at Weber Leisure Center, at 9340 Weber Park Pl, Skokie, IL, a Public place, at least once a week, where Howard was working as part time coach as "Three Stalking Episodes" – (Please see Sup 3 C28,29,30,31) , the actual handwritten request for Order of No Contact written by Don Howard, that he filed after he orchestrated Mr. Selyutin's arrest).  She did not even mention Howards arrest record for the Battery Cause Bodily Harm. And the Petitioner refused to pay more. Petitioner believes that his arrest might be an operation, joint operation conducted by the Contractors and the Village of Skokie PD and Village of Lincolnwood PD and that the Police used Howard and MacLennan as bait to provoke the Petitioner for self-defense actions. Petitioner believes that Cook County Judge Allegretti and his relative Mr. Raymond Wigell from the Wigell Law Offices, who represented Petitioner, were fully aware of that, but decided to hide this exculpatory evidence, so Petitioner would not be able to use the

Entrapment Defense, Self Defense or necessity defense and Petitioner would get convicted. And this way, Mr. Wigell would be able to get $50,000.00 for post trial motions and fake appeals. And to cover it up they decided to arrange it not to entering the actual conviction into the system. Petitioner found out about that a year later during his meeting at FBI Rolling Meadows Office, IL located at 1600 Golf Rd # 1050, Rolling Meadows, IL 60008, on or around week of August 12, 2019. The FBI Agent on duty asked the Petitioner for his passport and ID, and then he ran a background check and after, he and the FBI Security Agent searched Mr. Selyutin with the portable metal detector, Mr. Selyutin asked them why, he was told that this is because Petitioner had record of arrest for UUW (Unlawful use of weapon) back in July 2016. Mr. Selyutin advised the FBI Field Agent that he has not only had arrest for UUW, but also was arrested for Aggravated Assault and he was convicted by for Unlawful use of weapon in the Trial by Jury back in June of 2018 and sentenced in July 2018 a year earlier. The FBI Field agent on duty asked Mr. Selyutin, if he was sure about that, because the FBI Field Agent on Duty could Not find in FBI Database any records of Petitioner's Mr. Selyutin Conviction for the Unlawful use of weapon and any records that he was arrested for Aggravated Assault back in July 2016. This was FBI Database as of mid August of 2019, a year after the Trial and Conviction and also more than 3 years after Petitioner was arrested and charged by the Village of Lincolnwood Police Department (Lieutenant Tim O'Connor) for Aggravated Assault and Unlawful use of weapon and later Prosecuted by Office of Cook County State Attorney Office (ASA James O'Connor, yes they are related). Only arrest record for Unlawful use of weapon was in FBI Database as of mid August of 2019, a year after the Trial and Conviction. Petitioner believes that Mr. Raymond Wigell from the Wigell Law Offices,

54

who represented Petitioner, conspired his relative Cook County Judge James Allegretti to convict the Petitioner, so later he can extort the money from the Petitioner for the post conviction motions and fictitious Appeals to the Illinois Appellate Court, Illinois Supreme Court and finally to the US Supreme Court. This way Mr. Raymond Wigell from the Wigell Law Offices, who represented Petitioner and his relative Cook County Judge James Allegretti would be able to cover up their actions – No Convictions Records in the system and even arrest records were adjusted. On March 14, 2018, Mr. Selyutin informed Mr. Raymond Wigell in Cook County Court House around 10:30 AM CST, that he was offered indirectly a Bribe to plead guilty in this case, Mr. Selyutin advised Mr. Wigell to inform Cook County State Attorney Office about this but Mr. Wigell never did so. Instead, he told Mr. Hasan Sayed, one of the Contractors who were conducting the surveillance of Mr. Selyutin in his home residence in Skokie, IL, and who as Mr. Selyutin believes arranged that Bribe, during their meeting later on March 14, 2018, that the Petitioner told him that he was offered a Bribe. In State of IL there a Criminal Statue that in case if, you were offered a Bribe in Criminal Case and did not report it, this is a Felony Class 3. Since Mr. Wigel failed to inform Cook County State Attorney Office about that, Mr. Selyutin informed FBI Field Agent about this back in August 2019 during their meeting in Rolling Meadows, IL FBI Office. The complete details of the Bribe, a.k.a "Dream Real Estate Opportunity" were also filed by Mr. Selyutin in his Federal Case against his former employer Aon plc. (Please See EXHIBIT D, Case: 1:18-cv-03951 Document #: 69-1 Filed: 11/01/19 Pages 54 to 63 PageID #:255). And in addition, as Petitioner believes, a small cover up operation was done by some of the Contractors back on or around 02-22-2020, in Skokie Gardens Building at 8828 Niles Center Rd. Unit 313, the Cook County Assessor's database was

55

adjusted for several units (Unit 201, 301,401,501 and 601), the estimated price was decreased

down by around $40,000.00 and not only for the current year, but also for the year prior. But after

the sentencing another attorney from Mr. Wiggels firm Ms. Huma Rashid, told the Petitioner that

he should not work with Mr. Wigell on post-conviction efforts. Her exact words to Mr. Selyutin

were "This is just a Show and not real". So this was not a real but a FAKE trial. She told the

Petitioner to file the Appeal by himself as Pro Se and she even provided Petitioner with the

completed Appellate Form for his Appeal by email (Please see the copy in Exhibit B). The

Petitioner found this highly unusual, and against the business interests of Wigell Criminal Defense

law firm, because Mr. Raymond Wigell told him on or around July 29, 2018 by phone, that his

firm can work with Mr. Selyutin, but for the separate fee of course, in the amount of around $12,

000.00 (This is only for an Appeal in 1st Illinois Court of Appeals) plus costs and Mr. Selyutin

should call his office to get information about additional services such as Appellate process from

his staff. Petitioner did not really understand what exactly Ms. Rashid' phrase had to do to his

conviction, but when he found out that his conviction was not entered into the system a year later,

in FBI Office in mid August of 2019, Mr. Selytin understood that this was a alleged criminal

scheme to extrort the money from him and cover it up by Not Entering the Conviction record into

the system. And as Mr. Selyutin understood, Ms Huma Rashid did not want to be part of that

criminal, unethical and illegal scheme back in July 2018. For unknown reasons, Ms. Rashid did not

report the criminal, unethical behavior and illegal acts of Mr. Wigell and Judge Allegretti to the

authorities. May be she was in need of a job at Law Offices of Raymond Wigell and Wigell

Criminal Defense.

**Please Note:** Ms. Huma Rashid that on or around 01-13-2022, Ms. Huma Rashid was contacted by the phone by the same team who still conducting surveillance of Petitioner and was told that Mr. Selyutin is preparing a Complaint against the Judge Allegrett and Complaint about her. She was asked to prepare the sworn affidavit in opposition of Mr. Selyutin Complaints.

**Please Note:** Mr. Selyutin believes (and has digital evidence to support this) that on or around **06-28-2022**, around 06:14 PM CST Ms. Huma Rashid personally visited Skokie Gardens Building in Skokie, IL – Petitioner's residence. Ms. Huma Rashid had meeting there with the Contractors; one of them was Mr. Phillip Kljajic. Mr. Selyutin believes that the Contractors and Ms Rashid met for coordination of their defenses and responses, after Petitioner filed his case on 06-24-2022, against the Village of Skokie. But what exactly Ms. Huma Rashid, the Clemency Director for Aleph Institute was doing there we may be able to find out during the discovery. When Ms. Huma Rashid and Raymond Wigell represented Petitioner back in March 2018 to July 2018, in his case, they never visited him at his home residence, despite of charging him over $13,000.00 for the Class A misdemeanor case charges. They always met in Downtown of Chicago Office and always charged Mr. Selyutin for their trips, even for the trip to Skokie Courthouse.

**Conclusion:** The Petitioner believes that his defense counsel was ineffective for conspiring the criminal scheme to extort the $50,000.00 from the Petitioner. The defense counsel who is related to the Judge James Allegretti got Petitioner convicted so later he could get $50,000.00 for the post conviction motions and fake Appeals. Therefore, the conviction should be reversed.

  (b) **Direct Appeal of Ground Six:**
    (1)   If you appealed from the judgment of conviction, did you raise this issue?

                Yes ( )           No (**X**)

    (2)   If you did not raise this issue in your direct appeal, explain why: This is a claim of ineffective assistance counsel which the Seventh Circuit has determined to be appropriately raised in a Section 2255 petition rather than in a direct appeal.

(c) **Post-Conviction Proceedings**:

    (1)   Did you raise this issue in any post-conviction motion, petition, or application? Yes ( )        No (**X**)

    (2)   If your answer to Question (c)(1) is "Yes," state:

        Type of motion or petition:

        Name and location of the court where the motion or petition was filed:

        Docket or case number (if you know):

        Date of the court's decision:

        Result (attach a copy of the court's opinion or order, if available:

    (3)   Did you receive a hearing on your motion, petition, or application?

                 Yes ( )          No ( )

    (4)   Did you appeal from the denial of your motion, petition, or application?

                 Yes ( )          No ( )

    (5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal? Yes ( )       No ( )

    (6)   If your answer to Question (c)(4) is "Yes," state:

        Name and location of the court where the appeal was filed:

        Docket or case number (if you know):

        Date of the court's decision:

        Result (attach a copy of the court's opinion or order, if available):

    (7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SEVEN:** State of Illinois, Cook County Circuit Court, Hon Judge James Allegretti and Cook County State Attorney Office of Hon Kim Foxx failed to follow and ignored the Decisions and Rulings of the US Supreme Court and US Court of Appeals for 7th Circuit in key gun cases during this case. Therefore, Aleksandr Selyutin conviction and sentence should be vacated and charges should be dropped. Based on the Federal Case law, Mr. Selyutin, should not

even be arrested, and charged, because nothing illegal, unlawful, or even questionable was done by the Petitioner.

a) **Supporting facts:**

**Key SCOTUS and & US Court of Appeals for 7th Circuit Applicable to This Case:**

District of Columbia v. Heller, 554 U.S. 570 (2008)
Moore v. Madigan, No. 12-1269 (7th Cir. 2012)
McDonald v. City of Chicago, U.S., 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)

It is undisputed that at the time of his arrest Petitioners Mr. Selyutin was ordinary, law-abiding, adult citizen—part of "the people" whom the Second Amendment protects. The Petitioner, Mr. Selyutin in February 2017, was evaluated by Licensed Clinical Psychologist Erick A. Neu, Psy.D., at Forensic Clinical Services in Chicago IL and was found Legally **SANE**. (Please see C25-C26, SEC C3, C4). The Petitioner Mr. Selyutin never had any prior convictions, arrests, or any issues with the low in the past. The Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation, and confrontation can surely take place outside the home.

Oxford Languages defines confrontation as "A hostile or argumentative meeting or situation between opposing parties".

Mr. Selyutin had valid FOID card at the time of the confrontation. Mr. Selyutin had two unloaded, locked, not immediately accessible weapons in transit; Mr. Selyutin was chased by two individuals at very close range for 5 miles. One of the individuals that chased Mr. Selyutin was much bigger male, Mr. Donald J. Howard, 6.3', 275 pounds, who in the past was arrested by the Chicago PD for battery

cause bodily harm. Mr. Selyutin was in anticipation of receiving battery, and that was even stated by the Circuit Court Judge James Allegretti. (Please see R175) Hon Judge James Allegretti stated that: "It sound like the only one at least initially with a reasonable apprehension of receiving a battery was the Petitioner. He's the one who was followed for blocks with a car that was continually coming up on him. Later Hon Judge James Allegretti stated during the criminal trial, (Please see R178 – R179), "My question to both sides is how can anyone follow someone for blocks where the person who's being followed clearly knows he's being followed and how can that person who's being followed and how can that person who's doing the following ever believe that anything good is going to come of that following? How can he ever think that you can jump in your car, turn around, clearly see whoever it is – the person who's being followed clearly was able to see him following him? Mr. Howard follows for blocks and blocks and blocks. If you're in that car being followed, I don't know what you're going to do, but you're going to be in apprehension of receiving a battery, not the guy who's doing the following. What's he afraid of? He's chasing somebody down. I don't know how anybody could call him ever, under any bit of the evidence that's here, in fear of receiving a battery. The guy who is in fear of receiving a battery is the guy that's getting chased. I did not hear that he stopped and got out of the car and that's what scared him. I heard he followed him for blocks and blocks and blocks. Sometimes, 30 feet away right behind him. How is that going to make you feel if you're a citizen on the street?" Per Hon Judge James Allegretti, the Petitioner was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks. But according to a Trial Court, Hon Judge James Allegretti, the Petitioner was the one who was placed by claimants, Mr. Donald Howard and Andrea MacLennan, in fear of reasonable apprehension of receiving a battery.

60

Mr. Selyutin had valid FOID card **(Please see Supplement E15),** had two unloaded, locked, non immediately accessible weapons in transit, and the Petitioner had right to defend himself in case of confrontation, because he was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks by Howard and MacLennan.

Mr. Selyutin used his legally purchased guns outside of his house, to avoid violent attack with two individuals who confronted him and chased him for 5 miles at very close range. Based on the information that was provided to Mr. Selyutin, Mr. Selyutin believed that one individual that chased his car for 5 miles at very close range from his car, Mr. Donald J. Howard may be carrying a firearm with him. Mr. Selyutin told the arresting Police Officer that he acted in self defense. Mr. Selyutin did not do anything illegal, therefore, his sentence should be vacated and charges should be dropped. **<u>(Please see the Legal Argument in Support Ground Seven in Petitioner's Memorandum of Legal Arguments in Support of his Petition for Writ of Habeas Corpus).</u>**

**Conclusion:** If the State of Illinois, Cook County State Attorney Office, Hon Judge James Allegretti, would follow the guidance of the listed above the decisions and rulings by the SCOTUS & US Court of Appeals for 7th Circuit in the listed above key gun cases, then they would never prosecute the Petitioner. There is nothing illegal was done by the Petitioner, as per decisions by the US Supreme Court and US Court of Appeals for 7th Circuit. The Petitioner was confronted by two individuals. chased for miles, and he was in apprehension of receiving battery, and used his legally purchased weapon to defend himself. Therefore, Aleksandr Selyutin conviction and sentence should be vacated and charges should be dropped.

(b) **Direct Appeal of Ground Seven:**
   (1)   If you appealed from the judgment of conviction, did you raise this issue?
                Yes ( )          No (**X**)
   (2)   If you did not raise this issue in your direct appeal, explain why: This is a claim of ineffective assistance counsel which the Seventh Circuit has determined to be appropriately raised in a Section 2255 petition rather than in a direct appeal.

(c) **Post-Conviction Proceedings**:
   (1)   Did you raise this issue in any post-conviction motion, petition, or application? Yes
      ( )      No (**X**)
   (2)   If your answer to Question (c)(1) is "Yes," state:
       Type of motion or petition:
       Name and location of the court where the motion or petition was filed:
       Docket or case number (if you know):
       Date of the court's decision:
       Result (attach a copy of the court's opinion or order, if available:
   (3)   Did you receive a hearing on your motion, petition, or application?
                Yes ( )          No ( )
   (4)   Did you appeal from the denial of your motion, petition, or application?
                Yes ( )          No ( )
   (5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
      Yes ( )      No ( )
   (6)   If your answer to Question (c)(4) is "Yes," state:
       Name and location of the court where the appeal was filed:
       Docket or case number (if you know):
       Date of the court's decision:
       Result (attach a copy of the court's opinion or order, if available):

   (7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND EIGHT:** Aleksandr Selyutin was denied the right to a fair trial protected by the Sixth and Fourteenth Amendments, due to Ineffective assistance of counsel, through cumulative errors made by trial counsel.
   a)  Supporting facts:

62

Mr. Selyutin was denied the right to a fair trial protected by the Sixth and Fourteenth Amendments, due to Ineffective assistance of counsel, through cumulative errors made by trial counsel, Prosecution, and Court.  The above errors by counsel, court and prosecution, were cumulative errors. Each of these errors and violations, as laid out above, is sufficient for relief under the Constitution of the United States, and when added together, the sum prejudice of these errors is irrefutable evidence that Mr. Selyutin was denied a fair trial under the law due to ineffective assistance of counsel. Therefore, the conviction should be reversed.

(b) **Direct Appeal of Ground Seven:**
    (1)   If you appealed from the judgment of conviction, did you raise this issue?
                  Yes (  )          No (**X**)
    (2)   If you did not raise this issue in your direct appeal, explain why: This is a claim of ineffective assistance counsel which the Seventh Circuit has determined to be appropriately raised in a Section 2255 petition rather than in a direct appeal.

(c) **Post-Conviction Proceedings**:
    (1)   Did you raise this issue in any post-conviction motion, petition, or application? Yes (  )    No (**X**)
    (2)   If your answer to Question (c)(1) is "Yes," state:
           Type of motion or petition:
           Name and location of the court where the motion or petition was filed:
           Docket or case number (if you know):
           Date of the court's decision:
           Result (attach a copy of the court's opinion or order, if available:
    (3)   Did you receive a hearing on your motion, petition, or application?
                  Yes (  )           No (  )
    (4)   Did you appeal from the denial of your motion, petition, or application?
                  Yes (  )           No (  )
    (5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
       Yes (  )     No (  )
    (6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:
Docket or case number (if you know):
Date of the court's decision:
Result (attach a copy of the court's opinion or order, if available):

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did
not appeal or raise this issue:

**GROUND NINE:**  Aleksandr Selyutin conviction and sentence should be vacated and charges
should be dropped in light of the recent US Supreme Court decision in Case# 20-843 New York
State Rifle & Pistol Assn., Inc. v. Bruen (published 06/23/2022). Based on US Supreme Court
desission, Mr. Selyutin, if this would happen today, should not even be arrested, and charged,
because nothing illegal, unlawful, or even questionable was done by the Petitioner. In its New
York ruling, the SCOTUS changed a test lower courts had used for evaluating challenges to gun
laws. Judges should no longer consider whether the law serves public interests like enhancing
public safety, the opinion authored by Justice Clarence Thomas said. Instead, they should only
weigh whether the law is "consistent with the Second Amendment's text and historical
understanding."

**Supporting facts:**

It is undisputed that petitioners Mr. Selyutin ordinary, law-abiding, adult citizen—is part of "the
people" whom the Second Amendment protects. The Petitioner, Mr. Selyutin in February 2017, was
evaluated by Licensed Clinical Psychologist Erick A. Neu, Psy.D., at Forensic Clinical Services in

64

Chicago IL and was found Legally SANE. (Please see C25-C26, SEC C3, C4). The Petitioner Mr. Selyutin never had any prior convictions, arrests, or any issues with the low in the past.

<u>Oxford Languages</u> defines confrontation as "A hostile or argumentative meeting or situation between opposing parties".

Mr. Selyutin had valid FOID card at the time of the confrontation. Mr. Selyutin had two unloaded, locked, not immediately accessible weapons in transit; Mr. Selyutin was chased by two individuals at very close range for 5 miles. One of the individuals that chased Mr. Selyutin was much bigger male, Mr. Donald J. Howard, 6.3', 275 pounds, who in the past was arrested by the Chicago PD for battery cause bodily harm. Mr. Selyutin was in anticipation of receiving battery, and that was even stated by the Circuit Court Judge James Allegretti. (Please see R175) Hon Judge James Allegretti stated that: "It sound like the only one at least initially with a reasonable apprehension of receiving a battery was the Petitioner. He's the one who was followed for blocks with a car that was continually coming up on him. Later Hon Judge James Allegretti stated during the criminal trial, (Please see R178 – R179), "My question to both sides is how can anyone follow someone for blocks where the person who's being followed clearly knows he's being followed and how can that person who's being followed and how can that person who's doing the following ever believe that anything good is going to come of that following? How can he ever think that you can jump in your car, turn around, clearly see whoever it is – the person who's being followed clearly was able to see him following him? Mr. Howard follows for blocks and blocks and blocks. If you're in that car being followed, I don't know what you're going to do, but you're going to be in apprehension of receiving a battery, not the guy who's doing the

65

following. What's he afraid of? He's chasing somebody down. I don't know how anybody could call him ever, under any bit of the evidence that's here, in fear of receiving a battery. The guy who is in fear of receiving a battery is the guy that's getting chased. I did not hear that he stopped and got out of the car and that's what scared him. I heard he followed him for blocks and blocks and blocks. Sometimes, 30 feet away right behind him. How is that going to make you feel if you're a citizen on the street?" Per Hon Judge James Allegretti, the Petitioner was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks. But according to a Trial Court, Hon Judge James Allegretti, the Petitioner was the one who was placed by claimants, Mr. Donald Howard and Andrea MacLennan, in fear of reasonable apprehension of receiving a battery.

Mr. Selyutin had valid FOID card **(Please see Supplement E15),** had two unloaded, locked, non immediately accessible weapons in transit, and the Petitioner had right to defend himself in case of confrontation, because he was the one in fear of receiving a battery, after being chased for blocks and blocks and blocks by Howard and MacLennan.

Petitioner believes that State of Illinois law covering the Unlawful Use of Weapon, the offense that Petitioner was charged with and convicted, specifically section 24-1(a)(4) of the Criminal Code of 2012. 720 ILCS 5/24-1(a)(4) is not in sync with the recent US Supreme Court decision in Case# 20-843 New York State Rifle & Pistol Assn., Inc. v. Bruen (published 06/23/2022).

Under section 24-1(a)(4) of the Criminal Code of 2012. 720 ILCS 5/24-1(a)(4) (West

2016). A person commits this offense when that person knowingly:

"Carries or possesses in any vehicle or concealed on or about his person except

when on his land or in his own abode, legal dwelling, or fixed place of business, or on the

land or in the legal dwelling of another person as an invitee with that person's

permission, any pistol, revolver, stun gun or taser or other firearm, except that this

subsection (a) (4) does not apply to or affect transportation of weapons that meet one of

the following conditions:

(i) are broken down in a non-functioning state; or

(ii) are not immediately accessible; or

(iii) are unloaded and enclosed in a case, firearm carrying box, shipping box,

or other container by a person who has been issued a currently valid Firearm

Owner's Identification Card; or

(iv) are carried or possessed in accordance with the Firearm Concealed

Carry Act by a person who has been issued a currently valid license under the

Firearm Concealed Carry Act[.]" Id.

But as per as per US Supreme Court decision in 20-843 New York State Rifle & Pistol Assn., Inc. v.

Bruen (published 06/23/2022), nothing in the Second Amendment's text draws a home/car/ public

67

distinction with respect to the right to keep and bear arms, and the definition of "bear" naturally encompasses public carry. Moreover, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," id., at 592, and confrontation can surely take place outside the home. Pp. 23–24.

So basically, since the only requirement in State of Illinois, to have a loaded firearm when on his land or in his own abode, legal dwelling, or fixed place of business, is to have a valid Firearm Owner's Identification Card, and since "nothing in the Second Amendment's text draws a **home/car/ public distinction** with respect to the right to keep and bear arms", the section 24-1(a)(4) of the Criminal Code of 2012. 720 ILCS 5/24-1(a)(4), is outdated and not in sync with the US Supreme Court decision in 20-843 New York State Rifle & Pistol Assn., Inc. v. Bruen (published 06/23/2022). There is no distinction between **home and car** with respect to the right to keep and bear arms, therefore, a person with the valid Firearm Owner's Identification Card, is allowed to have a loaded firearm in his car similarly as to when on his land or in his own abode, legal dwelling, or fixed place of business.

Mr. Selyutin used his legally purchased guns outside of his house, in his car, as per US Supreme Court decision in 20-843 New York State Rifle & Pistol Assn., Inc. v. Bruen (published 06/23/2022), to avoid violent battery from two individuals who confronted him and chased him for 5 miles at very close range. Based on the information that was provided to Mr. Selyutin, Mr. Selyutin believed that one individual that chased his car for 5 miles at very close range from his car, Mr. Donald J. Howard may be carrying a firearm with him. Mr. Selyutin told the arresting Police Officer that he acted in self defense. Mr. Selyutin did not do anything illegal. And now, as per US Supreme Court decision in 20-

68

843 New York State Rifle & Pistol Assn., Inc. v. Bruen (published 06/23/2022), nothing in the Second Amendment's text draws a home/car/ public distinction with respect to the right to keep and bear arms, and the definition of "bear" naturally encompasses public carry. Moreover, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," id., at 592, and confrontation can surely take place outside the home. Pp. 23–24.

In its New York ruling, the SCOTUS changed a test lower courts had used for evaluating challenges to gun laws. Judges should no longer consider whether the law serves public interests like enhancing public safety, the opinion authored by Justice Clarence Thomas said. Instead, they should only weigh whether the law is "consistent with the Second Amendment's text and historical understanding."

**(Please see the Legal Argument in Support Ground Nine in Petitioner's Memorandum of Legal Arguments in Support of his Petition for Writ of Habeas Corpus).**

**Conclusion:** Mr. Selyutin used his legally purchased guns outside of his house, in his car, as per US Supreme Court decision in 20-843 New York State Rifle & Pistol Assn., Inc. v. Bruen (published 06/23/2022), to avoid violent battery from two individuals who confronted him and chased him for 5 miles at very close range. Based on the information that was provided to Mr. Selyutin, Mr. Selyutin believed that one individual that chased his car for 5 miles at very close range from his car, Mr. Donald J. Howard may be carrying a firearm with him. Mr. Selyutin did not do anything illegal, therefore, his conviction should be vacated and charges should be dropped.

    (b)**Direct Appeal of Ground Nine:**

(1) If you appealed from the judgment of conviction, did you raise this issue?
Yes ( )          No (**X**)

(2) If you did not raise this issue in your direct appeal, explain why: This is a claim of ineffective assistance counsel which the Seventh Circuit has determined to be appropriately raised in a Section 2255 petition rather than in a direct appeal.

(c) **Post-Conviction Proceedings**:

(1) Did you raise this issue in any post-conviction motion, petition, or application? Yes ( )          No (**X**)

(2) If your answer to Question (c)(1) is "Yes," state:
Type of motion or petition:
Name and location of the court where the motion or petition was filed:
Docket or case number (if you know):
Date of the court's decision:
Result (attach a copy of the court's opinion or order, if available:

(3) Did you receive a hearing on your motion, petition, or application?
Yes ( )          No ( )

(4) Did you appeal from the denial of your motion, petition, or application?
Yes ( )          No ( )

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
Yes ( )     No ( )

(6) If your answer to Question (c)(4) is "Yes," state:
Name and location of the court where the appeal was filed:
Docket or case number (if you know):
Date of the court's decision:
Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal or state court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

<u>**Yes**</u>, the alleged, Grounds 5, 6, 7, cumulative ground 8 and ground 9, that is based on the latest ruling of the US Supreme Court, in 20-843 New York State Rifle & Pistol Assn., Inc. v. Bruen (published 06/23/2022) were not presented in Federal or State Court. In addition, there was an alleged violation of

70

Eighth Amendment of the US Constitution that states, "Excessive bail" due to alleged conspiracy involved Cook County State Attorney Office and Village of Lincolnwood Police Department. Below are full summary:

On or around 12-09-2016, (Please see C32) during the case status hearings at Cook County Circuit Court Skokie Court House, Assistant Cook County State Attorney James O'Connor requested the Circuit Court of Cook County Judge Orr for an Order of additional special conditions of bail in addition to a regular bond and Order of No Contact that was also active for Petitioner who had no prior arrest history or any issues with the law. The assistant Cook County State Attorney James O'Connor request for additional special conditions of bail was granted by Circuit Judge Marcia Orr. And Petitioner believes that this was done in violation of **Eighth Amendment** of the US Constitution that states, "**Excessive bail** shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The special bond had a provision that Petitioner should not possess any Dangerous Weapons. Petitioner believes that ASA James O'Connor who was related to Srg. (now Lt) Tim O'Connor, from the Village of Lincolnwood Police Department, the department who arrested the Petitioner back on 07-03-2016, did this per request was from the Village of Lincolnwood Police Department. Detective (now Sgt.) David Kramarz who was assigned as a Lead Detective for Petitioner's Case by Sgt. (now Lt) Tim O'Connor, from Village of Lincolnwood Police Department (he is related to ASA James O'Connor). On 07-03-2016, after Mr. Selyutin was arrested by the Village of Skokie Police Department and Village of Lincolnwood Police Department Officers, Village of Lincolnwood Police Officers Jimmy Han and David Kieka searched Mr. Selyutin car and found out that Petitioner had in his trunk several tools, mid size shovel, large snow shovel, small hammer and

71

mid size emergency axe. They reported their findings to Detective (now Sgt.) David Kramarz. As per definition of Cook County Circuit Court, mid size emergency axe would be covered under the "dangerous weapon". So the next step was to arrange the "accidental stop" by Skokie or Lincolnwood PD's of Petitioner's vehicle that would be followed by a search of Petitioner's trunk – with a finding of an emergency axe and a violation of special bond that would lead to imprisonment. This was attempted to be done by disabling a small license plates light in Petitioner s vehicle when he was visiting his parent's house by unknown Contractor that resided in Petitioner's building in Skokie, IL. The Contractors that were involved in execution of surveillance order later discussed this unsuccessful attempt in Unit 313 at Skokie Gardens Building.

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the case you are challenging?                Yes (  )        No ( **X** )

15. Give me the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging?
    (a) At the preliminary hearing: Joseph P. Kennelly, 2536 S. California Ave
    Chicago, IL 60608-4623, (312) 622-1781
    (b) At the arraignment and plea: Joseph P. Kennelly, 2536 S. California Ave
    Chicago, IL 60608-4623, (312) 622-1781
    (c) At the trial: Raymond Wigell and Huma Rashid, Law Offices of Raymond G. Wigell, Ltd.,
    20280 Governors Highway, Suite 204, Olympia Fields, IL 60461
    (d) At sentencing: Huma Rashid, 3833 Vardon Court Woodridge, IL 60517-1465, (312) 961-4249
    (e) On appeal: Aleksandr Selyutin, Pro Se, 8828 Niles Center Rd., apt 213, Skokie, IL
60077
    (f) In any post-conviction proceeding: N/A
    (g) On appeal from any ruling against you in a post-conviction proceeding:  N/A

16. Were you sentenced on more than one court of an indictment, or on one more than one indictment, in the same court and at the same time?  Yes (  )        No ( **X** )

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?  Yes ( )   No ( **X** )

    (a) If so, give name and location of court that imposed the other sentence you will serve in the future:

    (b) Give the data the other sentence was imposed:

    (c) Give the length of the other sentence:

    (d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future? Yes ( ) No (**X**)

## CIVIL ORDER OF NO CONTACT FABRICATION CIVIL CASE# 160P20260 AGAINTS PETITONER

In addition to a Criminal Case orchestration of Petitioner's arrest, Mr. Donald J Howard fabricated a civil case – filed Order of No Contact on 07-07-2016, CASE# 160P20260 or 4 days after Mr. Howard and Ms. Maclennan induced the Petitioner for self defense and had him arrested. The two cases were combined later. Mr. Howard listed 5 episodes (Please see the SUP3 C29, C30, C31) on July 7, 2016, 3 episodes stated that the Petitioner appeared at his place of work: 2 times at Skokie Ice Rink, Skokie IL – Public place (Please see R95), open entrance for public, and one time at Quad Dome in Evanston, IL – privately owned, open entrance for public (Please see R96). Another episode (Please see C30) when Howard did see the Petitioner, while the Petitioner was driving by his house in his car at slow speed due to a speed bumps and this is Public Street, (please see R96). And finally, one episode involved the Petitioner who called Skokie Police when he had been threatened by Howard's older son Kyle (Please see SUP3 C31). As you can see (Please see the SUP3 C29, C30, C31) the Petitioner in civil case Mr. Howard never stated that the basis for the restraining order was that the Petitioner was appearing at his home, and at his child's sports events, and that the basis is the Petitioner appearing at their home.  The Civil case episodes never been discussed during the criminal trial in details, the Petitioner did not have

attorney representation for civil case. And also the Petitioner did not have a chance to cross examine the witnesses or claimant during the criminal trial for civil case matters.

Petitioner believes that Mr. Don Howard fabricated this civil case. There was no legal reason to grant this Order, but Petitioner was not given an opportunity to cross examine the witnesses or claimant during the trial for civil case matters.

The Petitioner was taking his disabled father, who suffers from severe Alzheimer's, at least once a week, for several years, to youth hockey games at Skokie Ice Rink, Skokie, IL and to amateur adult soccer games at Quad Dome in Evanston, IL.  So the actual number of episodes that Petitioner appeared at these public places with his disabled father is in access of 50. But for some reason Howard listed only 3. And yes, the Petitioner did pass by Howard's house occasionally, on his way to local public library to pick up some reading materials for his disabled mother. Again, Petitioner believes that this was a pure fabrication.

**Please Note**: In June of 2022, the Village of Skokie Police Department, Mr. Don Howard with assistance of City of Evanston Police Department and Village of Skokie Police Department allegedly wanted to repeat this trick again. On or around 06-23-2022, Petitioner went for a walk to the Twiggs Park in Evanston IL. Parked his car on the public parking lot at International Friendship Garden, Rotary, Evanston, IL. After short walk Petitioner decided to return to the parking lot, stopped near the parking lot and witnessed interesting conversation between City of Evanston Police Officer who parked his squad car license plates M 20 946 on the same parking lot as Petitioner and Village of Skokie Police Officer, they had discussion about the Petitioner, and how they can to set him up using again, Mr. Donald Howard. For this assignment they had Mr. Howard come that evening to Butler

74

Park, Evanston, IL to do some Contractor's assignment. Mr. Howard would park his vehicle near Hartley and Foster but in Butler Park, Evanston, IL. And when Mr. Selyutin would walk by Mr. Howard's vehicle in Butler Park, Evanston, IL, Mr. Howard would report that Mr. Selyutin is stalking him again. And as per their conversation, this trick would help the Village of Skokie Police Department, because Petitioner is suing them in Federal Court. The City of Evanston Police Officer that was in police squad car looked like Sergeant Carter of City of Evanston PD. Obviously, Petitioner did not pass even near Mr. Howard and left Butler Park as soon as possible. And Mr. Howard was allegedly told to leave Butler Park, Evanston, IL around 09:05 PM CST in his truck. This may be just a Village of Skokie Police Operation using situation and the same guy for same trick as they did back in 2016, or joint Operation with City of Evanston PD. Obviously, this was not a public safety issue, crime prevention and not a National Security issue. Not even for the purposes to revoke the Petitioner's FOID Card, because Petitioner's FOID card was revoked in July of 2016. Yes, On July 3rd 2016, after Petitioner was arrested by the Village of Skokie Police Department and later after his extradition, charged by the Lincolnwood Police Department with 2 misdemeanor counts, Unlawful Use of Weapons UW 720 ILCS 5/24-1 (a)4 and Aggravated Assault 720 ILCS 5/12-2(c)1, Petitioner's FOID Card was confiscated and Sergeant (Now lieutenant) Travis Raypole of the Village of Lincolnwood PD filed a Person Determined to Pose a Clear and Present Danger form for a Petitioner, because Petitioner displayed his firearm, pointed the weapon into the air inside of his vehicle as he was being followed by the complainant / victim. So Petitioner, who was in anticipation of receiving battery was found to Pose a Clear and Present Danger for using his legally purchased weapon to avoid a violent battery from a much bigger male who was arrested by the Chicago Police in the past for

75

battery / bodily harm. And the Village of Lincolnwood Police Department sent to Illinois State Police his FOID card together with a Form Determined to Pose a Clear and Present Danger on **07-04-2016**. And of course his FOID card was revoked by the Illinois State Police.

Petitioner believes that Mr. Don Howard fabricated this civil case. There was no legal reason to grant this Order, but Petitioner was not even given an opportunity to cross examine the witnesses or claimant during the trial for civil case matters.

The Petitioner did not do anything illegal. The Petitioner was taking his disabled father, who suffers from severe Alzheimer's, at least once a week, for several years, to youth hockey games at Skokie Ice Rink, Skokie, IL and to amateur adult soccer games at Quad Dome in Evanston, IL. And yes, the Petitioner did pass by Howard's house occasionally, on his way to local public library to pick up some reading materials for his disabled mother.

Therefore, Petitioner prays that this Hon Court will grant his Petition and will allow Petitioner to Seal and or expunge this fabricated Civil Case of Order of No Contact.

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

**(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;**

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been

discovered through the exercise of due diligence.

2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

**(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;**

**The Timeline** for the Writ Of Habeas Corpus: Mr. Selyutin was arrested by the Village of

Skokie Police Department on 07-03-2016, extradited to Village of Lincolnwood on the same

day, was charged with Aggravated Assault with Deadly Weapon and Unlawful Use of a Weapon

by Lincolnwood Police Department, and was released on bond on 07-04-2016. He was on bond

until his sentence on July 24, 2018, and then sentenced to 12 months conditional discharge. **But**

**his Arrest record for Aggravated Assault with Deadly Weapon and conviction record for**

**Unlawful Use of a Weapon were entered into the system in August 2019. So the time clock**

**starts here.** Petitioner filed a direct appeal as Pro Se and 1st Appellate Court of Appeals affirmed

the verdict of the Circuit Court on August 28, 2019.

The post conviction relieve was not filed, in Illinois, misdemeanor cases have only 6 months for post conviction relief. (felonies 3 years). Since 2013 and until present time, Mr. Selyutin was under surveillance order executed by Private Security Firms and Contractors. For years Private Security Firms and Contractors tortured Mr, Selyutin, they used sleep and heat deprivation in his own residence.

**Mr. Selyutin did not file Habeas Corpus Petition due to clear and present danger for him to be arrested, and sentenced to a jail.**

Office of Cook County State Attorney office even sent a formal revocation of his probation memorandum to the 1st Appellate Court of Illinois, before Mr. Selyutin even committed any violation. Contractors that were executing the surveillance order allegedly committed multiple provocations just to revoke Petitioners probation. Later in 2020, the Village of Skokie Police Department, Village of Lincolnwood Police Department, Village of Morton Grove Police Department and City of Chicago Police Department harassed, discriminated, stalked and intimidated the Petitioner due to his disability, asthma and due to his medication. Petitioner was hunted down by the uniformed on Duty Police Officers, they wanted to create a reason to arrest him and use the force or even deadly force. Later Petitioner was targeted with several alleged attempts to create car accident, two attempts took place on July 3rd 2021, and Petitioner informed the Chicago FBI Office Assistant Special Agent in Charge Mr. Aris Anastasas about that on July 4th 2021. And in June of 2022, the Village of Skokie Police Department, Mr. Don Howard with assistance of City of Evanston Police Department and Village of Skokie Police Department allegedly wanted to fabricate another Order of No Contact, as they did back in 2016. So the only

78

reason that Petitioner can now file this Writ with this Hon Court now without fear to be arrested and imprisoned is because on 06-24-2022 Petitioner filed as Pro Se a Discrimination Civil Case againt Village of Skokie Police Department, Village of Skokie, Village of Skokie Chief of Police and Former Chief of Police. Before that, the Petitioner was in danger to be arrested, his probation could be revoked, he could be put in jail, if he would even did any research about this Petition earlier, the Contractors would inform the Village of Skokie Police about that.

So that is a **Good Cause**.

**Below are the multiple episodes:**

1) On or around 12-09-2016, during the case status hearings at Cook County Circuit Court Skokie Court House, Assistant Cook County State Attorney James O'Connor requested the Circuit Court of Cook County Judge Marcia Orr for an Order of additional special conditions of bail in addition to a regular bond and Order of No Contact that was also active for Petitioner who had no prior arrest history or any issues with the law in the past since September 1991 when he and his family arrived to USA from Ukraine. The assistant Cook County State Attorney James O'Connor request for additional special conditions of bail was granted by Circuit Judge Marcia Orr. And Petitioner believes that this was done in violation of **Eighth Amendment** of the US Constitution that states, "**Excessive bail** shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The special bond had a provision that Petitioner should not possess any Dangerous Weapons. Petitioner believes that ASA James O'Connor who is related to Srg. (now Lt). Tim O'Connor, from Village of Lincolnwood Police Department, the department who arrested the Petitioner back on 07-03-

79

2016, did this per request from Village of Lincolnwood Police Department, and Detective (now Sgt.) David Kramarz who was assigned as a Lead Detective for Petitioner's Case by Sgt. (now Lt) Tim O'Connor, from Village of Lincolnwood Police Department (he is related to ASA James O'Connor). On 07-03-2016, after Mr. Selyutin was arrested by the Village of Skokie Police Department and Village of Lincolnwood Police Department Officers, Village of Lincolnwood Police Officers Jimmy Han and David Kieka searched Mr. Selyutin car and found out that Petitioner had in his trunk several tools, mid size shovel, large snow shovel, small hammer and mid size emergency axe. They reported their findings to Detective (now Sgt.) David Kramarz. As per definition of Cook County Circuit Court, mid size emergency axe would be covered as "dangerous weapon". So the next step was to arrange the "accidental stop" by the Skokie or Lincolnwood PD's of Petitioner's vehicle that would be followed by a search of Petitioner's trunk – with a finding of an emergency axe and a violation of special bond that would lead to imprisonment of Mr. Selyutin. There was an attempt to get this done by disabling a small license plates light in Petitioner s vehicle when he was visiting his parent's house by unknown Contractor / Officer that resided in Petitioner's building in Skokie, IL. This was unsuccessful attempt because Petitioner disposed his emergency axe into the garbage. The Contractors later discussed this unsuccessful attempt in Unit 313 at Skokie Gardens Building.

2)  On or around May 7, 2018, around 03:30 PM CST Assistant Cook County State Attorney Kim Pressling was personally involved in tactical operation with her co-workers from the Cook County State Attorney Kim Fox office, against the Petitioner to create a situation and provoke Mr. Selyutin to commit a wrongdoing, with assistance of a young Pakistani Female Contractor (or pretend to be a tenant) from the Unit 313 (above Petitioner's), yes, another "victim from the Unit 313 in addition to

Mr. Donald Howard", and to fabricate an Order of No Contact because the a young Pakistani Female Contractor (or pretend to be a tenant) from the Unit 313 was suppose to show up in the same places with Petitioner, and later file complaint with Cook County State Attorney Office for Stalking Order and due to this would be revocation of Petitioner's probation. ASA Kim Pressling personally directed of Petitioner's whereabouts / location to others involved, while he was around Niles Public Library, in Niles IL. And another person from Cook County State Attorney Office was also involved, – Tsetan Lungkara, the Cook County State Attorney Office stenographer, and the tenant of Skokie Gardens Building Unit 211, that day in the Unit 313 (yes, again) on or around 06:00 PM CST. Earlier, in July 2016, this trick was successfully performed by Contractor Mr. Don Howard, who filed an Order of No Contact, used public places episodes to claim that Petitioner was stalking him, Mr. Howard even used one episode against the Petitioner when Petitioner called Skokie Police Department on his oldest son Kyle Howard, after Petitioner was threatened by Kyle Howard, as example of stalking, another episodes were used when Petitioner took his disabled father to youth hockey game in public place Hockey Ring in Skokie, IL. And yes, the Howard's Order of No Contact was fully supported by the Cook County State's Attorney Office (read by ASA James O'Connor) and granted by various Cook County Circuit Judges for 2+ years.

Petitioner believes that Cook County State Attorney Office withheld the exculpatory evidence that Howard was Contractor involved in surveillance of Petitioner's internet and other activities in order to prevent the Petitioner of using the entrapment defense and get him wrongfully convicted.

### 3) Heat Deprivation Episodes.

Background.

**The Issue:** On or around December 25, 2018, Petitioner Aleksandr Selyutin, informed his former

attorney John O'Toole, (who represented him in Federal case against Skokie Gardens Condominium

Association and who also volunteered to represent him in Settlement Conference with Aon plc.,

Petitioner's former employer) about the ongoing Incidents of heat deprivation at his home residence.

Attorney O'Tool advised the Petitioner by email to document by make written notes each time the heat

Fan has been turned off, when, length of time, and who he contacted and result. The Petitioner

followed the advice and documented all incidents of heat deprivation.

In each listed below incident of heat deprivation, the Petitioner contacted ComEd at 1-800-334-7661

and reported partial power outage. ComEd remotely tested the Petitioner's meter, no issues were found

in each reported incident. Also, the Petitioner spoke with ComeEd customer service representative on

or around January 10, 2019 and confirmed that no one, except of him and his Unit 213, from 8828

Niles Center rd. Skokie Gardens Condominiums Building reported any full or/and partial loss of

power to ComEd within last 12 months. The Petitioner contacted the manufacturer of Heat/Air-

conditioned equipment, First Company, located at 8273 Moberly Lane Dallas, TX 75227, Phone:

(214) 388-5751. And spoke with Customer Service representative, and described the issues, was told

how to test the equipment by using the Cen-Tech 7 Function Digital Multimeter. Later, the Petitioner

contacted the Company that installed this equipment in his unit - GHC Mechanical Inc., located at 990

Pauly Dr., Elk Grove Village, IL 60007, (847)-593-0123, he spoke with customer service

representative, and described the issues, was told how to trouble shoot / test the fuses, wires and the

Heat Equipment by using the Cen-Tech 7 Function Digital Multimeter, that Petitioner purchased

earlier. The Petitioner followed the guidance's of ComEd, First Company and GHC Mechanical Inc.

and examined / tested in each incident, wires, fuses and equipment by measuring the voltage as per

guidance from the manual. In each instance, no issue was found with the fuses, wires and equipment.

ComEd also tested the meter and in each reported incident and they confirmed that meter for Unit 213,

was running correctly with no interruptions. And later, in each incident, the Heat Fan started working

again. Both the manufacturer and the installing company stated that if any of the Heat / Air-

conditioned equipment components or wires or fuses are getting old and/or malfunctioned, they could

not fix itself and work properly again. The only possible scenario that GHC Mechanical Inc.

representative stated is that the power can be interrupted within the building and from another unit

above his, a Unit 313. So the Petitioner believes that power interruptions that caused heat deprivation

incidents in his unit were intentional collusion to intimidate and torture him by Contractors that were

executing surveillance order working for Government or with Aon plc., Littler Mendeslon, PA and

local Police Departments. The Contractors used Heat Deprivation / interruption methods to torture

Petitioner – they turned off his heat fan during cold Chicago winter.

But after this issue was documented in Petitioner's Complaint, interesting episode took place in

Skokie Gardens Building. On or around February 26, 2019, the Unknown Contractor that was on duty

in Unit 313, contacted Mr. Pawel Gawron, building manager, he was asked to come to the Unit 210,

Lungkara residence. He was told that Mrs. Ngawang Y Lungkara, wants to tell Mr. Gawron that she

experienced the power interruption. Prior to that, the Unknown Contractor that was on duty in Unit

313, contacted Mr. Tsetan Wangyal Lungkara, who worked for Cook County State Attorney Kim

83

Foxx as stenographer, at Skokie Circuit Court Building, Skokie IL, and asked him to help them with a little problem and to cover up this issue. Mr. Tsetan Wangyal Lungkara allegedly called his wife Mrs. Ngawang Y Lungkara and asked her to call Mr. Gawron and tell him that she experienced the power interruption. And after Mr. Gawron came to her door on the 2nd floor 10 feet from the Petitioner's unit, he knocked to her doors, she opened the door and told him one phrase " We are experienced the power interruption", then she closed the door, and Mr. Gawron left. Another perfect example on how the witness testimonies were orchestrated by the Contractors with assistance of Cook County State Attorney Office staff. This was not the first time when Contractors that were involved in execution of surveillance order did involve Mr.Tsetan Wangyal Lungkara in their business. Around summer 2018, Petitioner personally observed that Mr.Tsetan Wangyal Lungkara was driving a vehicle Toyota Corolla License Plates RHB4497 that was a property / or in use by Mr. Hasan M. Sayed, Contractor that was involved in execution of surveillance order, and his family, 8828 Niles Center Rd, Units 205 and 201. Petitioner also witnessed that Tenant of Unit 313, very large South Asian male Contractor that was involved in execution of surveillance order (Indian or Pakistani) multiple times visited Unit 210 in 2018 and 2019 where Mr.Tsetan Wangyal Lungkara resided.

**Heat Deprivation Incidents, dates and time of documented incidents.**

| | |
|---|---|
| 12/25/2018 | From 11:00 PM to 1:52 AM. |
| 1/9/2019 | From 11:00 AM to 11:35 AM |
| 1/10/2019 | 8 PM to 9 PM |
| 1/11/2019 | 2 hr 35 min 9 AM to 11:35 PM |

| | |
|---|---|
| 1/12/2019 | from 11:15 AM to 1:32 PM |
| 1/13/2019 | from 10:32 AM to 11:45 AM |
| 1/14/2019 | No issues |
| 1/15/2019 | from 1:40 PM to 3:01 pm |
| 1/16/2019 | No issues |
| 1/17/2019 | No issues |
| 1/18/2019 | No issues |
| 1/19/2019 | From 11:30 PM to 12:24 AM |
| | |
| 1/20/2019 | No issues |
| 1/21/2019 | No issues |
| 1/22/2019 | No issues |
| 1/23/2019 | No issues |
| 1/24/2019 | No issues |
| 1/25/2019 | No issues |
| 1/26/2019 | From 10:35 PM to 11:48 PM |
| 1/27/2019 | No issues |
| 1/28/2019 | No issues |

| | |
|---|---|
| 1/29/2019 | No issues |
| 1/30/2019 | No issues |
| 1/31/2019 | No issues |

| | |
|---|---|
| 2/01/2019 | No issues |
| 2/02/2019 | No issues |
| 2/03/2019 | From 10:35 PM to 11:48 PM |
| 2/15/2019 | From 10:0 AM to 11:12 AM |
| 2/24/2019 | From 01:35 PM to 01:15 PM |
| 2/25/2019 | From 07:45 PM to 09:20 PM |

| | |
|---|---|
| 3/06/2019 | From 10:04 AM to 11:20 AM |

4) On March 29, 2019 around 9:45 PM, two Village of Skokie Police Officers knocked to Petitioner's doors at Petitioner's residence located at 8828 Niles Center Rd. in Skokie, IL. Petitioner was told that a person (John Doe) from his building called 911 and filed complaint about the loud noise from Petitioner's unit around 9:15 PM. The Officers did not issue any tickets or warnings to Petitioner. They did not find anything illegal or improper, or any violations of municipal code done by the Petitioner. Later, with request under FOIA, Petitioner received the edited 911 call recordings and edited police summary report. The 911 recordings had a John Doe scrambled voice, that stated that" there is a Man in unit 213 (Petitioners unit) that hitting a wall with the ball". Petitioner did not own a ball and did not hit a wall with a ball. Petitioner recognized the voice of the caller. Petitioner believes that John Doe may be an individual who worked for / or worked with Government and Cook County State Attorney Office (and or member of his family).

5) On or around May 2019, Petitioner followed a wrong advice and filed an unemployment claim. Petitioner was told that he may be eligible to get unemployment benefits in 2019. The Contractors that were involved in execution of surveillance order had full access to observe his internet activities and they believed that the

86

Petitioner was not in title to receive the unemployment compensation and later they did confirm about that with Petitioner's former employer supervisor at New Age Elderly Inc. in Chicago, IL Lilia Balan, lbalan@newagecare.net, Phone (847) 403-3053 ext. 251. (New Age Elder Care Inc., 2539 W. Peterson Ave. Chicago, IL60659 | 701 Deerfield Parkway, Suite 101, Buffalo Grove, IL 60689, Phone (847) 403-3053 Fax (847) 943-2107). Then the Contractors that were involved in execution of surveillance order informed Cook County State's Attorney office, because they were fully aware that Petitioner was on probation, and one of them, Donald Howard orchestrated his arrest. The Petitioner appealed his UUW conviction and his appeal was pending review at First Appellate Court of Illinois. The Unemployment Office (IDES) informed the Petitioner by mail that his employer decided to dispute the unemployment claim. Petitioner believes that Contractors that were involved in execution of surveillance order with assistance of Building Manager Mr. Pawel Gawron allegedly stole or misplaced the notice from the unemployment office (IDES) from Petitioner's mailbox. So the Petitioner would miss the phone interview with IDES, would certify for his benefits and would create a fraudulent activity – false unemployment claim. Cook County State's Attorney office prepared memorandum of revoking probation based on false unemployment claim. Cook County State's Attorney office **FORMALLY** informed the First Appellate Court of Illinois about this matter, so Cook County State's Attorney office would not have to file their brief as response to Mr. Selyutin's Petitioner's Appellant's brief. The Contractors that were involved in execution of surveillance order and Cook County State's Attorney Office conducted an operation to revoke the Petitioner's probation and have the Petitioner imprisoned. And once again, Cook County State's Attorney Office submitted Revocation of Probation Memorandum to First Appellate Court of Illinois **before (!)** the Petitioner committed a crime, or before he filed a formal certification and before he received funds from IDES. They knew that Petitioner will have no idea about the interview with IDES, and that his former employer challenged his unemployment claim because they knew that the Petitioner will not receive the letter from IDES because they stole it. The Petitioner never certified his incorrect unemployment claim;

never received a penny; and he called to IDES and immediately informed the unemployment office (IDES) about the error and informed his former employer about the unemployment claim filed in error. Alan J. Spellberg, Assistant Cook County State's Attorney and Head of Criminal Appeals Division was personally involved and he was late on his Appellee's Brief response that was due on February 20, 2019 or 35 days later as per Illinois Supreme Court Rule 343 - since he was informed that he won't even need to prepare response due to Petitioner's Probation Revocation. So Mr. Alan J. Spellberg, Assistant Cook County State's Attorney filed on April 3, 2019, a motion for time extension to file a Brief due to "miscommunications and procedural errors" in the Cook County State's Attorney's Appeals Division. Petitioner believes that this "miscommunications and procedural errors" were due to so called "Probation revocation". The Cook County State's Attorney submitted the Memorandum for Probation Revocation before Petitioner even committed anything illegal such as filing and certifying for "False Unemployment Claim", they did it in advance.

**EPISODES INVOLVED LOCAL POLICE DEPARTMENS:**

On July 3, 2016, former Petitioner's neighbor from 8828 Niles Center Rd. unit 313, Donald J. Howard and Andrea MacLennan induced the Petitioner for self-defense by using the entrapment technique by chasing him for 5 miles at very close range from the Petitioner's car and staged the Petitioner's arrest in Skokie Gardens Building underground garage.

During the arrest, the Village of Skokie Police Department Officer Rannochio (the arresting officer), asked Petitioner how many years he was practicing martial arts – asking if he was practicing Krav Maga; Petitioner never met Officer Rannochio, never discussed with him or any other police officer any personal matters. Later Village of Lincolnwood Police Officer Kieca asked Petitioner  if he has anything with him or/and on him from Petitioner's "ninja" collection like nunchucks; Petitioner never

met Officer Kieca never discussed with him or any other police officer any personal matters. Later at Lincolnwood Police station Village of Lincolnwood Police Officer Nunez asked Petitioner if he has his neck knife on him; Petitioner never met Officer Nunez, and never discussed with him or any other police officer any personal matters. These episodes are the evidence that arresting Police Officers from Village of Skokie Police Department and Village of Lincolnwood Police Department were very familiar with details of Petitioner's personal life, his possessions.

Petitioner lists below the additional episodes with involvement of Contractors that were involved in execution of surveillance order and Uniformed on Duty Police Officers from the multiple municipalities, the episodes are examples of alleged violations covered by 42 U.S. Code § 1983, 1985, 1986, Violation of Civil rights and US Constitutional rights of Petitioner:

1.     On or around April 25, 2020, alleged episode of Contractors that were involved in execution of surveillance order conducting set up operation with the local resident kid – Asian boy (Chinese or Korean), around 12 years old, was observed by Petitioner with his parents, mid aged Asian (Chinese or Korean) couple, that drive a Black Toyota SUV license plates BG926643. Petitioner observed the reflection of this kid with his father several times on the balcony of the Unit 313 above his in the windows of the building across of street. Also, the kid was looking several times down over the balcony, so his face was visible to Petitioner very clearly. Petitioner believes that the kid's father is working as Contractor to monitor Petitioner's activities. The Contractor B (from Bosnia and Herzegovina, resident of Skokie Gardens Unit 208) came up with the plan while in Unit 313 above Petitioner's, and discussed this plan with mid aged Asian man (Chinese or Korean)

the kid's father, to send a boy, who was walking around the Skokie Gardens Building, up to stairs when Petitioner would exit his unit. And due to the Covid 19, Petitioner was using black mask to cover head and face. So the kid was instructed to go upstairs, pass the Petitioner and then complaint to parents that he saw the Man in Black Mask on the stairs and got scared so they would call the Skokie Police Department. The Petitioner did not take stairs that time, so the Contractor B stated to mid aged Asian man (Chinese or Korean) the kid's father, "Where did he (the Petitioner) go? Where is he? (The Petitioner)". And this is evidence that the activities of these Contractors were not matter of a Public safety, National Security, or and Crime Prevention. They just wanted to get the Petitioner, arrest him, as they did back in 2016, and convict him, as they did back in July 2018.

2. On or around 04-29-2020, Petitioner went to FedEx Office Print & Ship Center, at 6829 Lincoln Ave, Lincolnwood, IL 60712, Phone: (847) 329-9464, to print his legal documents, Petitioner parked in front of FedEx Center, at their parking lot. When he was almost done, Inside the FedEx Center, Petitioner felt that he is having asthma attack; he could not breathe, so he used his asthma inhaler, and over-the-counter asthma medication Bronkaid. While he was getting better, Contractors that were involved in execution of surveillance order contacted the FedEx Office Print & Ship Center manager by phone, an African American female in her 40's. She was told that Petitioner is probably is using drugs in FedEx Center (his asthma medication). So later Petitioner was asked to leave the FedEx center. Again, Petitioner did not do anything illegal; did not break any laws, did not abuse on over-the-counter medication, he just used his asthma medication just to be able to breathe. And also here we have evidence that Contractors that were involved in

90

execution of surveillance order allegedly traced the Petitioner's vehicle location, and Petitioner's whereabouts and also contacted others regarding his disability and medication.

3. On or around 05-22-2020, Mr. Hasan Sayed, Contractos that was involved in execution of surveillance order, Pakistani young male, tenant of the units of 205 and 201, was in Unit 313, during so called "carpet change". He took the hammer and personally was running around of unit 313 to create as much noise as possible. As Petitioner learned based on conversation that took place around May 22, 2020, in Unit 313 in Skokie Gardens Building, between Contractors Mr. Hasan Sayed, and Mohammad Rafiq, there was a need for the Contractors to add more "Noise Episodes" for their Defenses. So they asked Mr. Todd Church, lead attorney from Littler who represented Aon, Petitioner's former employer, to buy some time in anticipation that Petitioner will produce more "Noises" that they can document; Mr. Mohammad Rafiq, in Unit 313 in Skokie Gardens also stated that he was asked to document episodes when Petitioner was not eating and or exercising. So this is clearly intrusion into Petitioner's seclusion. Petitioner believes that the Contractors used the a law enforcement radar tool such as Range-R (or similar one) that let them effectively see inside the Petitioner's condo seeing though the walls and ceiling to monitor his daily activities, that includes very personal episodes of his daily life routine, that includes use of bathroom, shower, food consumption etc. Petitioner believes that in the past, in 2016 and 2018, Mr. Hasan Sayed, contacted his attorneys to deprive Petitioner the guaranteed rights by the United States Constitution amendments V, VI and XIV and under the Illinois Constitutions article I, §8, to the effective assistance of counsel, fair trial (Joe Kennelly was contacted originally in June 2016 and Raymond Wigell in March 2018). Petitioner believes that Mr. Hasan Sayed also contacted

several other attorneys that Petitioner was working with, related to legal services (Norman

Goldmeyer of Skokie, IL 847-470-1140, 847-470-1112, was contacted around October 2017) and

also related to proposed "fantastic real estate deal" that is listed in Petitioner's 3rd Amended

Complaint against his former employer Aon. plc., (Please See Exhibit D, pages 12, 13, 54 -63),

(Robert N. Weiner, P.C. 790 Frontage Road Suite 701 North was contacted around August 2017.

4. On or around May 26, 2020 alleged act cyber stalking, blackmail and extortion by Contractors that

were involved in execution of surveillance order took place against the Petitioners. Petitioners

received an email to his yahoo email account stated that he must pay $2,000 in crypto currency

bitcoins or some very sensitive information would be released, that would include Petitioner's

computer the browsing history. This was almost immediately reported to the FBI by Petitioner.

Well, this kind of matter may happen to anyone, but in this case, the Contractor A, the resident of

Skokie Gardens Unit 209, on duty (his name may be Mr. Phillip Kljajic) immediately after

Petitioner filed electronic complaint with FBI made a phone call and stated to not yet identified

person "He (the Petitioner) just filed a report with FBI on line, what we going to do?". This was

done from Unit 313 above the Petitioner's in his home residence in Skokie Gardens Building.

Based on this statement, Petitioner believes that the act cyber stalking, blackmail and extortion by

computer might be done by Contractors that were involved in execution of surveillance order. This

was a planned act executed by a hack to his computer to get his browsing history and then attempt

to extort the $2,000 in crypto currency.

5. Petitioner believes that on or around 07-03-2020, around 09:00 PM CST, after Petitioner took his

asthma medication, and was ready to go outside for a short walk, the Contractors that were

involved in execution of surveillance order contacted Village of Skokie Police Department and advised them that Petitioner took his asthma medication, and was preparing to take a walk outside of Skokie Gardens Building. So the Village of Skokie Police Department did send **two** Skokie Police Squad Cars with uniformed officers to wait for Petitioner outside of his building, they both parked on Greenwood Street, and were waiting for Petitioner to target him, intimidate him, and since he took his asthma medication to provoke him so he would give them a reason to arrest him or and to use force, or even deadly force. Petitioner did not do anything illegal. Petitioner did not go for a walk that evening because he was scared for his life.

6. On or around 07-11-2020, around 05:00 CST, Petitioner believes that Officers of Skokie Police Department and Officers of Lincolnwood Police Department that were informed by Contractors conducted joint operation that targeted the Petitioner, in the area of the corner of Cicero Avenue and Touhy Avenue in Lincolnwood, IL. Petitioner believes that the Officers of Skokie Police Department were informed by the Contractors that were involved in execution of surveillance order. In a Unit above his, #313, the carpet was removed at the time of alleged violations and the windows were wide open, so the Petitioner overheard phone conversation of one of the Contractors –with Unknown Village of Skokie Police Department Officer. The Contractor was telling the Village of Skokie Police Department Officer that "He (the Petitioner) skipped his breakfast, so he is probably using his asthma med's, but they need to confirm and check his pockets, and will let you and the guys know so we can get him", (Petitioner kept at his own residence his emergency meds). That's exactly how it did happen: Two Village of Skokie Police Squad Cars with Police Officers followed Petitioner's vehicle at very close range on his way to

Chicago Public Library Edgebrook branch, around Caldwell Avenue and Devon Avenue in Chicago, until he passed to the Village of Lincolnwood around Howard Avenue and Cicero Avenue. Then Lincolnwood Police Squad Car tailed the Petitioners Car on his way from Chicago Public Library located in Edgebrook around Caldwell Avenue and Devon Avenue in Chicago, IL at very close range at slow speed for around a mile from corner of Pratt Avenue and Cicero Avenue and to Cicero Avenue Touhy Avenue. Based on the statements made by the Contractor A about Petitioner's asthma medication side effects, the Police Officers anticipated that the Petitioner's asthma Medication Bronkaid and its side effects would affect his judgment, so he would panic, while driving and having the Lincolnwood Police Squad Car behind him following him at very slow speed for about a mile. And he would start changing lanes, given reasons for a stop and potential arrest and or use of force or deadly force. But the Petitioner was not panicking and or changing lines due to very close distance from Lincolnwood Police Squad Car. And he did not make a turn to Touhy avenue, instead he drove forward to his home residence in Skokie, IL. So the Petitioner did pass Village of Lincolnwood without traffic stop. Petitioner did not do anything illegal. The Petitioner believes that he would not be targeted by the Police and Contractors if he would not have his disability asthma and would not take his asthma medication.

7. In addition, Petitioner believes that Contractors that were involved in execution of surveillance order assisted the Police during another joint operation that took place on Tuesday 07-14-2020, around 7:00 PM CST, around Devon Avenue and Lincoln Avenue in Lincolnwood, IL, with involvement of several Police Officers from several Municipalities. But the actual routine traffic stop / arrest / use of force / deadly force was suppose to take place again in Village of

94

Lincolnwood and done by the Lincolnwood Police Department. This time in the Village of Lincolnwood the traffic was really heavy, so the Lincolnwood Police Squad Car did follow the Petitioners Car at very close range at very slow speed for around a mile from the corner of Devon Avenue and Lincoln Avenue until around Devon Avenue and Cicero Avenue. And again, the Petitioner was only targeted because of his disability – asthma and his medication Bronkaid. Petitioner did not do anything illegal, did not use any illegal substances, or and did not abuse the legally purchased over-the counter asthma medication. He did not do anything wrong at all. The Police and Contractors anticipated that Petitioner's asthma Medication Bronkaid and its side-effects would affect his judgment so he would panic while driving and having the Lincolnwood Police Squad Car behind him following him at very slow speed for about a mile, and he would start changing lanes, given reasons for a stop and potential arrest and or use of force or deadly force. But the Petitioner was not panicking and or changing lines due to very close distance from Lincolnwood Police Squad Car. So the Petitioner did pass Village of Lincolnwood without traffic stop.

8. In addition, Petitioner believes that the Contractors that were involved in execution of surveillance order assisted the Police in another joint operation on Monday 07-27-2020, between 3:30 PM and 4:00 PM CST, with involvement of several Police Officers from several Municipalities. But the actual routine traffic stop / arrest / use of force / deadly force was suppose to take place in Chicago, IL and done by Chicago Police Department at the corner of Touhy Avenue and California Avenue in Chicago, IL. The Contractor A, the resident of Skokie Gardens, Unit 209, stated with Unknown Contractor, that "He (the Petitioner) typically stops to purchase lottery

tickets on his way back home from his parent's house on at 7-11 Store located at the corner of Touhy Avenue and California Avenue in Chicago, IL. And again, the Contractor A also stated that Petitioner's asthma medication can cause severe nervousness as a side effect, as stated on the medication box. Petitioner believes that there are also several Contractors that were involved in execution of surveillance order were / are residing in his parents building in Chicago, IL.  The Contractors that were involved in execution of surveillance order leased several units in Petitioner's parent's Chicago residence building, Units 407, 210. One of the Contractors resided in unit 407, the listed on mail box names were Velazquez, Cachu, Rufda. He was driving Red Ford SUV license plates L609739. He was a White Latino American or White European American Man in his upper 30' mid 40' has 1 son and a wife. Bur he moved out around a year ago. Another Contractor resides under the listed on mail box name as Mr. Luis Merino from Unit 210 – he is Latino American Man in his upper 30' mid 40' have 3 kids and a wife. He drives several cars; one of them is large White Wan license plates E740931 and Nissan Armada license plates BG 83507. (A Translator was involved from Unit 307 on 3rd Floor, Mr. Alex Samoylovich. And another Contractor, rented a Unit on 5th floor in the same building, also a young Latino American Man in his upper 20' – low 30'; he drove Large Dodge Red Truck license plates 92701.  He resided with Older Latin American Male in his 50's. (Another interesting episode took place in Petitioner parent's residence in Chicago, IL on or around April 9, 2019, and this neighbor Mr. Alex Samoylovich. Petitioner witnessed that Mr. Alex Samoylovich, was translating to Contractors that were involved in execution of surveillance order, private conversations that Petitioner just had with his parents inside of their residence from their Native language to English language about the

movie that they were watching. This episode is the evidence that Contractors were able to listen Petitioner's private conversations with his parents without their consent. Starting around December 2021, Petitioner observed several new female contractors. They were entering the premises of Petitioner's parent's residence and entering the next door Units. At least ones, the Petitioner observed, in December 2021 / January 2022, the Large South Asian Male, from Unit 313, entered the premises of Petitioner's parent's residence and entered the next door Unit. At least ones, the Petitioner observed, in December 2021 / January 2022, Mr. Hasan Sayed, also from Skokie Gardens Building Units 205 and 201, entered the premises of Petitioner's parent's residence and entered the next door Unit, during the late night hours), as one of the Contractors stated, they were looking for Hasan Sayed assistance to get access to the Petitioner's home laptop, and Mr. Hasan Sayed, in the past was able to access Petitioner's home laptops.

And after the Petitioner left his parents house, on Monday 07-27-2020, between 3:30 PM and 4:00 PM, Petitioner believes that the Unknown Contractor at his parent's residence informed the City of Chicago Police Department Officers. Petitioner was driving toward Touhy Avenue and California Avenue, did notice City of Chicago Police Squad Car waiting by 7/11 store with Chicago Police Officers patiently waiting, as Petitioner believes for him. The Petitioner believes that Chicago Police Officers received the info about Petitioner's routine stops from the one of the Contractors that were involved in execution of surveillance order when Petitioner left his parents building on his way to purchase a lottery tickets at 7/11 store. The Petitioner believes that Chicago Police Officers likely anticipated that again Petitioner's asthma Medication Bronkaid and its side-effects would impact the Petitioner's judgment so he would panic, while approached by Chicago Police

97

Officers, and he would start behave strange, given the reasons for arrest and or use of force or deadly force. But Petitioner did not stop by the 7/11 store. And again, Petitioner did not do anything illegal, he did not violate any rules of road, so he was targeted not while driving, but at the local convenience store.

But since the Petitioner did not stop by the 7/11 store on 07-27-2020, Chicago Police Department Officers had requested the Contractors that were involved in execution of surveillance order the exact timing when the Petitioner will be there visiting his parents. So the Petitioner believes that several Contractors (one of them was Contractor A, the resident of Skokie Gardens Unit 209) allegedly came up with a plan. They contacted the Technician from Orkin Pest Control that was servicing the Petitioner's parents Unit in Chicago, IL, Ms. Rochelle Taylor, (847) 724-4800; Orkin, 508-Skokie, IL; 7813 Gross Point Rd. Skokie, IL 60077 2617; (847) 724-4800; License # 51-001527. Petitioner believes that Ms. Rochelle Taylor was asked to call Petitioner by phone and ask him to schedule specific time for services at his parents building and making sure the Petitioner will be there. Then the Ms. Rochelle Taylor would share the time and dates with the Contractors who would pass the info to Chicago Police officers, so they can wait for Petitioner and again approach him to discriminate, intimidate and harass him with the threat of arrest. And again the Chicago Police Officers anticipated that Petitioner's asthma Medication Bronkaid and its side-effects would impact the Petitioner judgment so he would panic, while approached by Chicago Police Officers, and he would start behave strange, given the reasons for arrest and or use of force or deadly force.

98

9.  That exactly how it did happen at the early stages of their Plan, - Ms. Rochelle Taylor did call directly Petitioner around July – August 2020, and asked him to schedule the service and that Petitioner must be there with his parents. She said she was told to do it by her Office Manager. This was not true. Plainitff spoke with her supervisor and found out that her Office Manager never told her to do so. This was very unprofessional so, the Petitioner formally filed Complaint with Orkin and requested that they would change the service technician.  So Petitioner did not make an Orkin appointment, so the Contractors that were involved in execution of surveillance order and Chicago Police had to postpone their plan.

10. Also, Petitioner believes that Contractors that were involved in execution of surveillance order assisted the Police in another joint operation that targeted Petitioner on Sunday 08-02-2020, between 3:00 PM and 3:30 PM CST, with involvement of several on Duty Police Officers from several Municipalities. And the actual routine traffic stop / arrest / use of force / deadly force was suppose to take place in Morton Grove, IL and done by Morton Grove Police Department at the corner of Lehigh Avenue and Oakton Avenue in Morton Grove, IL. Petitioner overheard that another Unknown Contractor**,** was telling to the Village of Skokie Police Department Officer that, He (the Petitioner) is going to Jerry's Food Store Located in Niles, IL on 08-02-2020 store for shopping, he just had conversation with his mother, so he will be passing the Village of Morton Grove, IL on his way there. So then he asked the Village of Skokie Police Department Officer to share this with Village of Morton Grove Police Officers. But the Unknown Contractor had some concerns, the Unknown Contractor stated that "He (the Petitioner) had a breakfast and later lunch, so the Unknown Contractor was not sure if, the Petitioner took his asthma medication Bronkaid,

99

but suggested that a Police Squad Car would tail the Petitioner's car and if, the Petitioner would panic, (they hoped that this would caused by asthma emergency medication side effects) then exact wording was, "We can get (arrest) him". The Petitioner believes that the Village of Skokie Police Officer passed this info to the Morton Grove Police Officer. And the next episode took place when the Petitioner was passing by the Village of Morton Grove Public Library, located on Lincoln Avenue, Morton Grove, IL on his way to Jerry's Food Store Located in Niles, IL. And the Village of Morton Grove Police Squad Car tailed the Petitioner's car between 03:00 PM and 03:30 PM CST, and followed at very close distance for about 4.5 minutes or 1.4 miles until 6301 Oakton Street, Morton Grove, IL, where the Menards Store is. Based on the comments made by the Contractor A, about Petitioner's asthma medication, the Police Officers likely anticipated that the Petitioner's asthma Medication Bronkaid and its side-effects would affect the Petitioner judgment so he would panic, while driving and having Morton Grove Police Squad Car behind following him at very slow speed for about a 1.4 miles and around 4.5 minutes, and he would start changing lanes, or would stop, or would give any reasons for a police stop and for potential arrest and or use of force or deadly force. The Petitioner was not panicking and or changing lanes due to very close distance from the Morton Grove Police Squad Car. So this time the Petitioner did pass the Village of Morton Grove without traffic stop.

11. On or around August 5, 2020, Petitioner completed his shopping and was going back to his residence at Skokie Gardens. Earlier that day, Petitioner did notice the Contractor B, from Bosnia and Herzegovina, and also Mr. Hasan Sayed, and African American Contractor in his 60's were on their duty in Skokie Gardens Building. Later that day Skokie Police Department Conducted

100

another operation around 05:30 PM CST at 7/11 Store Parking lot at Skokie Boulevard and Main Street. Two Village of Skokie Police Squad cars followed Petitioner vehicle at close range from Oakton Street and Niles Center Rd. in Skokie, IL until 7/11 at Skokie Boulevard and Main Street, were Petitioner usually purchased his lottery tickets on his way home. And this was stated in another episode listed above by the Contractor A. Both the Village of Skokie Police Squad Cars parked at 7/11 parking lot and officers were waiting for Petitioner to stop there to purchase his lottery tickets. And once again, Plainitff did not do anything illegal, did not violate any of rules of the road, so he was targeted again at Convenience store. The Petitioner believes that the Village of Skokie Police Officers anticipated that again Petitioner's asthma Medication Bronkaid and its side-effects would impact the Petitioner judgment so he would panic, while approached by Village of Skokie Police Officers at 7/11 parking lot, and he would start behave strange, given the reasons for arrest and or use of force or even deadly force. But Petitioner did not stop by the 7/11 store that day because he was scared for his life. Once again Petitioner was targeted by the on duty uniformed Village of Skokie Police Officers in two Police Squad Cars only because his illness disability and his over-the counter medication Bronkaid. Petitioner did not anything illegal, did not use any illegal substances, or and did not abuse the legally purchased over-the counter asthma medication. He did not do anything wrong at all.

12. On or around October 20, 2020 Petitioner was watching old Netflix serial about Mexican Drug lord Joaquin "El Chapo" Guzman. In one of the episodes in season 3, the Sinaloa Drug Cartel was packing drugs to be transported to United States into seafood and vegetables. Around October 25, 2020, Petitioner ordered some seafood from the US Company located in Bellevue, WA. The cost

101

for seafood for $120, total box with ice weighted around 8.2 pounds. One of Contractors that were involved in execution of surveillance order. (Petitioner believes that this, received notification from one of the neighbors of Skokie Gardens, a young Asian (Chinese or Korean) male in his 20's who observed in the lobby that Petitioner picked up a box in the Mailbox area, so Contractor B came back immediately to 8828 Niles Center Rd. when Petitioner was leaving around 03:30 PM CST on 10-29-2020, Contractor B was in extreme hurry and almost hit Petitioner's car in underground garage level 2. A little bit later Contractor B allegedly contacted Village of Skokie Police Department and asked for forensics unit assistance, suggesting that in the seafood box there may be some drugs (Like in Netflix serial about El Chapo). But the Skokie Police Department did not find any drugs. Petitioner is not El Chapo. Petitioner believes that Contractor B is also from Bosnia and Herzegovina, young man in his upper 30', young wife similar age, one kid, a girl 6-7 y.o. She likes to jump up and down. He drives Dark Mercedes License Plates CV29714, used to drive Blue Mercedes License Plates BG 63884, Illinois. Parking space next to Petitioner from right side after mine #62 (Mr. Selyutin's parking space is #61, 2nd underground level at Skokie Gardens Condominiums. Other cars that Petitioner did see he was driving: Silver sedan License Plates N254386 Illinois; Dark Sedan License Plates AM 30301, Illinois. He resides at 8828 Niles Center Road, Skokie, IL 60077, Units 206 and Petitioner did see him and his daughter at Unit 310 several times and also on 12-26-2020, this individual was opening doors in Unit 208. (He may be related to another Contractor Phillip Kljajic, also from Bosnia and Herzegovina, who lives at 8828 Niles Center Road, Skokie, IL 60077, Units 209/610). Once again, this is another episode with evidence

102

of a tight cooperation and partnership between Contractors, other residents of Skokie Gardens and the Village of Skokie Police Department to violate the Petitioner's civil and other rights.

13. On around October 28, 2020, the Village of Skokie Police Department had a joint operation again. One of the Contractors that were involved in execution of surveillance order informed the Village of Skokie Police Officers that the Petitioner allegedly using drugs (his asthma medication Brankaid) in public bathroom at Sam's Club located in City of Evanston, IL. This info was then passed to the City of Evanston Police Department and City of Evanston PD did send two Police Squad Cars, and one Police Squad Car was there from the Village of Skokie Police Department. Their goal was to catch the "Drug – user in action" in Sam's Club Public Bathroom. One City of Evanston Police Department Uniformed Police Officer did follow and carefully viewed the Petitioner "actions" in public bathroom, but Petitioner did not do anything illegal, just the usual bathroom staff and did not even used his asthma medication.

14. On November 18, 2020, around 4:30 AM CST, the unknown Contractor that resides in Petitioner parents building in Chicago, IL knocked to their doors to intimidate and harass Petitioner. Later on November 18, 2020, around 09:00 PM another joint effort to intimidate the Petitioner, this time a young South Asian (Indian or Pakistani) female Contractor, pretend to be tenant from Unit 313 and Police Officer in Dark SUV License Plates MP-16 797, (MP states for Municipal Police). Petitioner was coming back to his residency in Skokie, IL and noticed the young South Asian (Indian or Pakistani) female Contractor pretend to be tenant from Unit 313. She was leaving the Skokie Gardens and driving away toward Demster Street in the dark sedan. The Police Officer in Dark SUV License Plates MP-16 797 that was parked by the Skokie Gardens driveway noticed

Mr. Selyutin and immediately contacted unknown person by the phone. Petitioner believes that the young South Asian (Indian or Pakistani) female was contacted by phone and asked immediately to come back to Skokie Gardens Garage underground level two, where the Silver SUV was parked next to Petitioner's parking spot #61 to intimidate and provoke the Petitioner and pin the false case on him. At all relevant time the Police Officers and Contractors knew that Petitioner has asthma, they knew he is taking the medication Bronkaid, they knew that this medication may cause some side-effects;, and they still targeted him in anticipation that medication side effects would impair the Petitioner judgment, so he would panic, or act strangely that would give a reason to Police Officer in Parked near Skokie Gardens SUV to arrest him, as they did in case with Howard, and or use a force or even deadly force. So this time they wanted to pin a false criminal case, similarly as in case with Don Howard, on Mr. Selyutin.

The Petitioner Aleksandr Selyutin believes that Contractors that were involved in execution of surveillance order during the proceedings that Hon Judge Maria Valdez conducted back in December 2020 to January 2021 were interviewed and some of them gave sworn affidavits regarding related events, and even admitted of targeting Mr. Aleksandr Selyutin, due to his over-the counter asthma medication. They allegedly stated that the Petitioner was using "drugs" – his asthma medication Bronkaid. And as Petitioner believes they specifically informed the Police because they noticed that Petitioner lost appetite due to his illness. So Petitioner's disability, illness and medication made him a target for Law Enforcement. Petitioner did not anything illegal, did not use any illegal substances, or and did not abuse the legally purchased over-the counter asthma medication. He did not do anything wrong at all. But the interviews during the proceedings

and sworn affidavits were conducted and collected to determine the legality of the Settlement and if the Settlement must be voided due to Duress and Undue Influence. But all of the related materials can be requested with the subpoena during by the Petitioner and by this Hon Court before the hearings for this Writ.

15. On or around December 21, 2020, Petitioner made an unplanned visit to the Jewel store located at 9449 Skokie Blvd, Skokie, IL 60077, on or around 07:30 PM CST. Immediately upon arrival to the store, a group of Contractors followed the Petitioner to the same store. One of them a white male in his upper 20' low 30', 6.2' 200 pounds, approached the Jewel store employee, and informed the Jewel store employee that they are (a group) are working with the Village of Skokie Police Department and watching one suspicious customer. He asked the Jewel employee to contact store security and have store security record the Petitioner's movements around the store, in anticipation to catch again a "drug user – in action". The Petitioner did not use any medications at the Jewel store that day. After that, they Contractors continued following the Petitioner until he exited the Jewel store.

16. On around February 5, 2021, around 07:30 PM CST, Village of Skokie Police Department allegedly conducted another operation. One of the Contractors Mohammad Rafiq was used as decoy. A young South Asian (Indian or Pakistani) female Contractor, tenant of Unit 313, while she was in Unit 313 at Skokie Gardens, allegedly stated to Skokie Police Officer – when Petitioner was exiting his unit below, "Officers he (the Petitioner) is leaving for a walk, and due to very cold weather, likely will walk to buy lottery tickets at the Mobil Gas station across the street (Niles Center Rd.), so wait for him". Mr. Mohammad Rafiq and his Female South Asian Companion in

105

her 60', had a slow walk around Skokie Boulevard and Dempster Street. They walked around a little bit, and the weather was wonderful for a walk, around 12F and with wind-chills around -5F. It was "very nice weather" for a lovely couple's walk. And Skokie Police Department was represented by the Police Officer, in the Dark SUV with License Plates MP 16 797 (Municipal Police) they were waiting for Petitioner at the corner of Niles Center Roud and Dempster Street in Skokie, IL. They were expecting that Petitioner, Mr. Selyutin would take a walk to buy his lottery tickets at Mobil Gas Station, Located at crossing of Skokie Blvd and Dempster Street in Skokie IL. But the Petitioner, Mr. Selyutin did not take a walk to Gas station, he was driving in his car and noticed the Officers that were patiently waiting for him in anticipation that his asthma medication would impact his judgment and he would express his feeling to a person who tortured him under color of law, as per the details that Petitioner disclosed to Hon Judge Maria Valdez about the personal involvement of Mr. Mohammad Rafiq in the matter of harassment, torture and intimidation of Petitioner. After Police Officer in Dark SUV with license plates MP 16 797 noticed Petitioner's vehicle at the corner of Niles Center Rd and Dempster street in Skokie IL they immediately made a very strange turn to Mobil Gas station, where Mr. Mohammad Rafiq and his Female South Asian Companion were, stopped there, and then they turned to Skokie Blvd and then left to Dempster street. They could just turn right to Dempster Street from Niles Center rd. They just were there.

17. On or around 03-17-2021 Petitioner witnessed as around 05-35 PM CST, that Dark SUV with license plates MP 16 797 (Municipal Police) took right turn on Niles Center road toward the closed automatic gates in Skokie Police Department located at 7300 Niles Center Rd, Skokie, IL 60077.

Then Petitioner witnessed that the automatic gates in Village of Skokie Police Department opened and Dark SUV Car with license plates MP 16 797 (Municipal Police) drove in to the Village of Skokie Police Department parking lot. Therefore, Petitioner believes that that Dark SUV's with license plates MP 16 797 (Municipal Police) is belongs to the Village of Skokie Police Department.

18. On or around April 25, 2021 around 03:00 PM CST, Petitioner was followed by the Dark SUV with license plates MP 13 709 (MP is Municipal Police). The SUV followed Petitioner at slow speed for about a mile on Niles Center Rd. then parked across of street on Niles Center Rd facing toward Skokie Boulevard. Again, Petitioner did not do anything wrong.

19. On or around July 3, 2021, two unsuccessful alleged attempts to create car accident against the Petitioner Mr. Selyutin took place. The first one took place around 04:30 PM CST at McCormick Boulevard and Howard Street in Evanston. With Direct involvement of Skokie Police, who passed the location and movements of Petitioner's vehicle to Contractor who was suppose to hit the Petitioner's vehicle with his car, while the Petitioner was driving his disabled parent's home to their residence in Chicago, IL. The second one took place around 08:15 PM CST at McCormick Boulevard and Church Street, in Evanston, IL. The second attempt was with the direct involvement of Evanston PD Squad Car, who passed the Petitioner's vehicle location to Skokie PD squad Car and to Contractor who was going to hit the Petitioner's vehicle with his car. The Petitioner contacted FBI Assistant Special Agent in Charge Mr. Aris Anastasas at Chicago FBI Office and informed him about these events by email. Petitioner believes that FBI reacted by interviewing Mr. Phillip Kljajic, the Resident of Skokie Gardens Unit 209.

20. On around November 3, 2021, around 04:36 PM CST, Village of Skokie Police Department had an operation again against the Petitioner Aleksandr Selyutin. Earlier that day, the Petitioner Aleksandr Selyutin had a phone conversation with his mother related to his father's much Progressing Alzheimer's. As per Fed. R. Civ. P. Rules 26 – 37, the phone conversation of Petitioner with his mother is **privileged activity**, Petitioner even can chose not to answer any question about that even during the deposition, and phone conversations are fully protected by the 1st Amendment of the US Constitution. Petitioner was upset about his father's condition, so one of the Contractors on duty that Monitored the Petitioners phone conversation contacted one of contractors from Bosnia and Herzegovina, the Resident of Unit 208, who came to the Skokie Gardens Building around 4:00 PM CST, parked his Mercedes, license plates # CV 29714 in the back of Skokie Gardens Building. He was told that the Petitioner Mr. Selyutin got upset, so he believed that the Petitioner probably used his asthma over-the-counter medication and its side-effects impacted the Petitioner's mood. Then they immediately contacted the pretend-to-be a tenant of Unit 313, the young South Asian female Contractor, who does not live there, but comes occasionally and who already was involved in several of their "Harassment-Intimidation Operations listed above. She came immediately when the Petitioner was exiting the building for his appointment around 04:30 PM CST, to intimidate, harass and provoke him, since they believed that he was under influence of as they called it "Drugs", or his asthma over-the-counter medication, so the Petitioner would probably act strangely and may be even would express his feelings to a person who tortured him under color of law for years. When this did not work, and after the Petitioner exited the Skokie Gardens Garage and turned left toward Niles Center Rd, the Police Officer, in the SUV dark vehicle with License Plates

108

MP16 797 immediately tailed him. The Uniformed Skokie Police Officer white male in sport's dark hat was driving the Police Car, and followed the Petitioner at very close range for several minutes on Niles Center Rd., behind the Petitioner's vehicle. On Demster Street and Niles Center Rd in Skokie IL, at that time was very heavy traffic due to construction. Only one line was opened, so after the Petitioner wanted to turn left to Demster Street on his way to appointment and to avoid any additional intimidation and harassment from the Police, there was no space for the Skokie Police vehicle to stay behind him to follow him, or it would block the traffic on the Niles Center rd. Police vehicle had to take the Niles Center rd and to drive toward south. The Police and Contractors used same tactics as they used back in 2016, when Village of Skokie Police Department and Village of Lincolnwood Police Department arrested the Petitioner, back then and now they used the bait from the same Police "Box of Surprises" or the same Unit 313 at Skokie Gardens Building.

21. On or around 12-09-2021 Petitioner was searching on internet at his home residence at Skokie, IL for Alzheimer's medication for his father, before discussion with his father's therapist Dr. Bodner the following day. Petitioner was wondering if Lithium can be used to treat his father's illness. The Contractor that was involved in execution of surveillance order and who was monitoring Petitioner's internet activities noticed Petitioner's searches for the medication. The Unknown Contractor used a direct marketing link directed to Petitioner's internet screen the Medication XYWAV. Xywav is a prescription medicine used to treat cataplexy, or excessive daytime sleepiness (EDS) and or Idiopathic Hypersomnia. One of Xywav's active drug ingredients, sodium oxybate, is a form of gamma-hydroxybutyrate (GHB). GHB is a Schedule One (I) controlled

substance that's illegal and has a high potential for misuse. Xywav itself is a Schedule Three (III) controlled substance. The following day Petitioner had appointment with Dr. Bodner at her Chicago office on Devon ave to discuss potential medication changes for his father treatment. The Contractor that was involved in execution of surveillance order contacted Dr. Bodner and advised her that they are watching the Petitioner's activities and they believe that Petitioner will ask her during their conversation for Xywav, a Schedule Three (III) controlled substance medication (with one of Xywav's active drug ingredients, sodium oxybate, is a form of gamma-hydroxybutyrate (GHB), GHB is a Schedule One (I) controlled substance) for himself, but pretending that is for his father. This is clear evidence on how the Contractors fabricated the evidence (again) they used direct marketing link to push the a Schedule Three (III) controlled substance medication to Petitioner's computer screen, then they contacted Dr. Bodner and told her that she should expect the "request for a Schedule Three (III) controlled substance medication" from the Petitioner. Petitioner believes that Contractor that was involved in execution of surveillance order fabricated this episode so they can show to Federal Judge that Petitioner is asking doctors for controlled substance medications, and this was a lie. Petitioner never asked Dr. Bodner for any controlled substance medications for himself.

22. On or around 01-01-2022, Petitioner while in his residence in Skokie Gardens Building, in Skokie, IL, discovered that Contractor that was involved in execution of surveillance order damaged his two pairs of black leather winter boots. Petitioner took a short walk across of street to purchase his Powerball tickets at Amoco gas station and discovered that a snow went directly through his boots and he got his socks and feet wet. After Petitioner came home, he took a detailed review of his

110

winter boots. It is appear that someone was extracted something from the boots, like tracking devices and completely damaged the Petitioner's boots. One boot was cracked in half. Petitioner also noticed that it was done to some of his sport shoes. Also, some of his dress pants went missing. Petitioner did share with his mother on the phone the fact of his winter boots damaged, some dress pants went missing, and the fact that since he got his feet wet and it was very cold he got the moderate asthma attack, and he had to take his asthma medication. Later on 01-02-2021, Petitioner decided to go for a walk in Butler Park, City of Evanston, IL. Petitioner noticed at the parking lot at Butler Park, City of Evanston, IL the Police Squad Car that was parked there. This was not a City of Evanston Police Squad Car that Petitioner noticed occasionally patrolling the area with the license plates MP14. This was Police Squad Car that does not have any identification of municipality, while had License Plates MP 16 and had side number 4002. Petitioner believes that this might be a Skokie Police Department Squad Car conducting surveillance and operation against the Petitioner in City of Evanston. The white female uniformed officer was inside of this car, window at driver's side was open. When Petitioner departed from the Butler Park, toward his residence in Skokie, IL he overheard that female Police Officer stated to not- yet-identified person "He (the Petitioner) is departing". After Petitioner departed from the Butler Park, toward Skokie, IL, he was followed by several cars, and upon the arrival to Skokie Gardens, he noticed that one of the Contractors / Hasan Sayed,  who used to reside at Skokie Gardens, and as Petitioner believes conducted monitoring surveillance of Petitioner's activities. Petitioner believes that Mr. Hasan Sayed and his team damaged his winter boots and other shoes, just to extract the tracking devices that they inserted in his shoes and boots. (Petitioner installed the security system back in 2014 and

111

as he believes only Police Officers and Contractors can disable the security system to enter his residence without starting the alarm). But on 01-02-2021, at 09:35 PM CST, Petitioner believes that the Police Operation conducted by the Village of Skokie Police Department took place that again targeted the Petitioner. And once again, Petitioner was targeted by Uniformed Police Officers and Contractors, they anticipated that Petitioner's asthma medication would compromise his judgment and he would express his feelings toward Mr. Hasan Sayed that was responsible for Petitioner's property damage and a person who tortured Petitioner for years under color of law. Petitioner believes that the Skokie Police used Mr. Hasan Sayed as a bate, as previously used other contractors like Mr. Don Howard, Mr. Mohammad Rafiq and several others who resided in Skokie Gardens Building and were involved in monitoring of Petitioner's activities. But for unknown reasons the fact that Howard was Contractor, and that the Petitioner's arrest was an operation was not disclosed to the Jury during 2018 Trial in Skokie IL.

23. On or around 01-12-2022, at Morton Grove Public library located on Lincoln Avenue, Morton Grove, IL, Petitioner was working on some legal confidential work products related to his legal matters. The Contractor that was in Morton Grove Public library for monitoring Petitioner's computer and internet activities noticed that some legal confidential work products include some information on some elected and appointed Cook County Public Officials – Cook County Circuit Court Judge James Allegretti, Village of Lincolnwood Police Department lieutenant Tim O'Connor and Assistant Cook County State Attorney James O'Connor (yes, they are related). As Petitioner understood, per conversation that took place in Petitioner's parent's residence in Chicago, IL, next door unit, that the Unknown Contractor, had with another not yet identified

112

person, the Contractors and other Law Enforcement Officers started immediately operation to cover up their wrong doings, such as, the Petitioner's arrest, malicious prosecution and wrongful conviction and sentence. The Unknown Contractor contacted by phone Ms. Huma Rashid, who back in 2018 represented the Petitioner, as part of defense team from Wigell Law Offices in his case in Cook County Circuit Court and who resides at 3833 Vardon Court Woodridge, IL 60517-1465. Ms Rashid was told that Mr. Selyutin is preparing some confidential legal documents that may impact her professional future. She was asked to prepare the sworn affidavit in opposition of Mr. Selyutin legal documents. She was told to remove her current registration address from the ARDC database and change it to another State, so the Petitioner would not be able to locate her and serve her with the subpoena. The update in ARDC database for Ms. Huma Rashid was done on or around January 13, 2022. Mr. Selyutin believes that on or around 06-28-2022, around 06:14 PM CST Ms. Huma Rashid personally visited Skokie Gardens Building in Skokie, IL – Petitioner's residence. Ms. Huma Rashid had meeting there with Contractors; one of them was Mr. Phillip Kljajic. Mr. Selyutin believes that Contractors and Ms Rashid met for coordination of their defenses and Reponses. But exactly what Ms. Huma Rashid, the Clemency Director at Aleph Institute was doing there we will find out during the discovery. While Ms. Huma Rashid and Raymond Wigell represented Petitioner back in March 2018 to July 2018, in his case, they never visited him at his home residence, despite of charging him over $13,000.00 for the Class A misdemeanor case charges. They always met in Downtown of Chicago Office and always charged Mr. Selyutin for their trips.

113

24. Later, in January 2022, per conversation that took place in Petitioner's parent's residence in Chicago, IL, next door unit, the Unknown Contractor had with another not yet identified person, the Contractors that were involved in execution of surveillance order informed the Village of Lincolnwood Police Department Lieutenant Tim O'Connor regarding the fact that Petitioner is preparing some legal documents related to his 2016-2018 arrest, prosecution and conviction. Later, they had a meeting that took place in Skokie, IL to discuss their cover-up plan. They basically concluded, that the only way to explain the violations of U.S Constitution, State of Illinois Constitution, Due Process, malicious prosecution, wrongful conviction and sentence, during the Petitioner trial and sentencing from 2016-2018, is to get on board very famous public official and to convince this public official for press conference to share the details of her being stalking by a person who was driving by her house so this can be used as explanation and **legal precedent** for the Illinois Case Law, of their violations during the Petitioner's trial and sentencing from 2018. It was also suggested during the meeting, by the Village of Lincolnwood Police Department lieutenant Tim O'Connor the specific wording during the press conference that famous public official should mention is that this Person was stalked by someone who **was driving by their house** and who would have a valid FOID card and or concealed carry license and or a loaded gun.

25. Petitioner believes they succeeded on their efforts on or around February 17, 2022, but due to high level of confidentiality and sensitivity, Petitioner will be able to share this info with this Hon Court only in the Sealed Document if requested by this Hon Court.

26. Mr. Craig Coit, former Deputy CFO of Aon Risk Solutions now retired, and a former President of Friends of Chicago River (Now Director), and also a person that alleged financial wrongdoing Petitioner reported to FBI,

114

in the past was allegedly upset that Petitioner was driving by his house on his way to Republic Bank branch at Devon ave in Chicago Rogers Park, IL and other public places while taking care of his disabled parents business. As per several statements made by Contractors some of his former co-workers and Mr. Craig Coit, were upset that Petitioner did some background check searches on internet while preparing his complaints and for other legally permitted researches. This was totally legal activity protected by the 1st Amendment of the US Constitution. So Mr. Coit involved Private Security Firms and Contractors to lease condo units in the same residence that Petitioner resided, to harass him, intimidate him, torture him and his disabled parents. As Petitioner believes Mr. Coit even provided directions on how to do so. When Contractors sabotaged Petitioner's disabled father oxygen machine, in their rented apartment in Chicago, IL, and Petitioner did send a formal email to Aon CEO Greg Case and Aon CFO Christa Davies regarding that matter, Mr. Coit allegedly was upset and even stated that "We do not do staff like that around here", and then he provided detailed direction on how intimidate and harass Petitioner in legally permitted way, stalking him, following him around and his parents, etc. If he Petitioner would have known earlier about Mr. Craig Coit being upset because Petitioner drove by his house using publicly open and non restricted road, he would use another road. But he did not and he also did not know how Mr. Coit would learn that Petitioner would drove by his house. Petitioner can only guess that Contractors were tracing his movements around and sharing with Mr. Coit. But Petitioner still believes that the real reason for Mr. Craig Coit being upset is the Petitioner's whistle blowing activity, his reports to EEOC and FBI, about significant Misstatement of Financial Statements, that took place at Aon Risk Services US Retail Division. This resulted in a significant financial statement misstatement of $160 million and a restatement of financial statements for Aon Risk Services' U.S. Retail division for three (3) years and a charge or reduction in equity of $160 million. The adjustment was recorded by Aon plc., on or around Q1, 2017. Later the CFO of US Retail, Mrs. Renae Flanders, Mr. Coit's personal appointee, was fired

115

due to this matter. But the person who made an executive decision error that caused this issue was Mr. Craig Coit, Deputy CFO of Global Aon Risk Solutions. So this is just a simple personal vendetta from Mr. Craig Coit against the Petitioner for his whistle blowing activity, complaints, and his reports to Aon HR, EEOC and FBI. And with Todd Church, Littler Mendelson, PA lead attorney for Aon in petitioner' wrongful termination case and Megan Cuniff Church, Mololamkin, a former assistant of US Attorney and former head of financial crimes division, and wife of Mr. Todd Church, personal involvement, against the Petitioner, it looks like Mr. Coit used all available resources to retaliate against the Petitioner. This was pure and clear retaliation against the Petitioner.

**Please Note: that On or around 08-22-2022**, around 03:45 PM CST, on his way to home residence form his parents' house, Petitioner stopped for a walk at in Twiggs Park, located at 1901 Simpson Street, City of Evanston, IL. Petitioner was sitting there when he noticed a person on bike, who looked like Mr. Craig I. Coit former executive of Aon and a person who Petitioner reported to the FBI for the alleged financial wrongdoing and who is now Director of Friends of Chicago River. Mr. Craig Coit gained some weight since Petitioner was able to observe him last time, and again drove very closely by Petitioner on his sport bike, wearing a protective helmet. And a young African American Male Security Contractor in his 30's was standing there, to protect Mr. Coit. Petitioner believes that Mr. Coit was informed about Petitioners' whereabouts and asked to go there for stalking and provocation purposes. Petitioner was able to obtain a background check for Mr. Coit for subpoena serving purposes, and found out that he resided in Chicago Rogers Park area, as per Google maps, it's around 10 miles trip from the Rogers Park, Chicago, Il to Butler Park, Evanston, IL. And Mr. Craig Coit is in his 70's. This is not a first time that Mr. Coit is stalking the Petitioner, the Petitioner reported the similar episode in his 3rd Amended Complaint against Aon, Case: 1:18-cv-03951 Document #: 72 Filed:

116

11/07/19 Page 49 of 66, (Please see 22-cv-4621 EXHIBIT D, Selyutin v. Aon plc., et all, 3rd Amended

Complaint). Similar to the episodes with Mr. Don Howard, this Hon Court can see that Mr. Craig Coit is the

aggressor; he is intimidating, harassing and stalking the Petitioner, even 5 years after his retirement from Aon

plc., Mr. Coit retired back in 2017, but he still remembers that Petitioner impacted his legacy, by his

complaints to Aon HR, EEOC and FBI of multiple episodes of alleged wrongdoing under Mr. Coit leadership.

27. On or around 03-21-2022, on Monday, around 02:25 PM CST, in Twiggs Park, located at 1901 Simpson

Street, City of Evanston, IL, Petitioner went for a walk and was surprised by the Village of Skokie Police

Chief Defendant Brian Baker circling around the Petitioner on the sport bike. As per Google maps, the Village

of Skokie Police Department is located around 6 miles away from the Twiggs Park, Evanston, IL. Chief Baker

was alone and was wearing a protective helmet with open face. If the Village of Skokie Police Chief

Defendant Brian Baker personally stalks and harasses the Petitioner, not even on the Village of Skokie

grounds, but in City of Evanston, 6 miles away from the Village of Skokie Police Department at the middle of

the day, on Monday after noon, what can be expected from the other Village of Skokie Police Officers. That's

perfect evidence that the Village of Skokie Police Chief Defendant Brian Baker knew all about the harassment

and stalking of Petitioner by his staff, and that the Village of Skokie Police Department targeted and harassed

the Petitioner, and He was even personally involved in these discriminatory actions and stalking under color of

law.

28. The following Monday, 03-28-2022, around 02:25 PM CST, in Twiggs Park, located at 1901 Simpson Street,

City of Evanston, IL, Petitioner went for a walk and was surprised by the two Village of Skokie Police

Officers, without bikes, the first one was walking, white officer, 5.6', 165 pounds, Petitioner recognized him

on several videos and photos that were posted by the Village of Skokie. He was getting an award. He may be

retired. He was dressed for a walk. He was followed by the very large Officer, 6.2', 275 pounds, white officer

in black face medical mask; He was dressed for a walk. Petitioner recognized him on several videos and

photos that were posted by the Village of Skokie, kind of younger copy of Village of Skokie Police Sergeant

Grims (or Grymes). Same very large Officer, 6.2', 275 pounds, white officer, passed by Petitioner on the bike

on or around 06-27-2022 at 06:24 PM CST in the area around Oakton Street and Gross Point Rd. / Austin

Street. (Mr. Selyutin believes that the movements of his car were traced by the Police Officers and

Contractors').

29. Petitioner goes for a walk there on his way to his parents residence in Chicago, IL, when his goes there to take

care of his disabled parents, his disabled father suffers from severe Alzheimer's, and his disabled mother is

walking with a walker, both over 80 years old. The Twiggs Park in Evanston IL, kind of midpoint between

Skokie and Chicago, on Petitioner's way. Petitioner used to go for a walk within Village of Skokie premises,

but stopped due to harassment, intimidation, threats and discrimination by the Contractors and Police Officers.

Petitioner thought that in City Evanston public parks, they will leave him alone. Petitioner was wrong.

Petitioner believes that once again, he was targeted only because of his disability and his medication.

30. On or around 06-23-2022, Petitioner went for a walk to the Twiggs Park in Evanston IL. Parked his car on the

public parking lot at International Friendship Garden, Rotary, Evanston, IL. After short walk Petitioner

decided to return to the parking lot, stopped near the parking lot and witnessed interesting conversation

between City of Evanston Police Officer who parked his squad car license plates M 20 946 on the same

parking lot as Petitioner and Village of Skokie Police Officer, they had discussion about the Petitioner, and

how they can to set him up using again, Mr. Donald Howard. For this assignment they had Mr. Howard come

that evening to Butler Park, Evanston, IL to do some Contractor's assignment. Mr. Howard would park his

118

vehicle near Hartley and Foster but in Butler Park, Evanston, IL. And when Mr. Selyutin would walk by Mr. Howard's vehicle in Butler Park, Evanston, IL, Mr. Howard would report that Mr. Selyutin is stalking him again. And as per their conversation, this trick would help the Village of Skokie Police Department, because Petitioner is suing them in Federal Court. The City of Evanston Police Officer that was in police squad car looked like Sergeant Carter of City of Evanston PD. Obviously, Petitioner did not pass even near Mr. Howard and left Butler Park as soon as possible. Mr. Howard was allegedly told to leave Butler Park, Evanston, IL around 09:05 PM CST in his truck. This may be just a Village of Skokie Police Operation using situation and the same guy for same trick as they did back in 2016, or joint Operation with City of Evanston PD. Obviously, this was not a public safety issue, crime prevention and not a National Security issue.

31. 06-23-2022, almost immediately after Petitioner left Butler Park, Evanston, IL around 09:10 PM CST, Evanston Police passed this info to the Village of Skokie Police, and the Village of Skokie Police squad car picked up the Petitioner's location, again turned immediately after noticed the Petitioner's vehicle.

32. A little bit later, around 09:18 PM CST, another Village of Skokie Police squad car was waiting for the Petitioner's vehicle at a stop of McCormick boulevard, noticed his vehicle, immediately turned to City of Evanston, on McCormick and Demister bridge on City of Evanston side, but without a traffic stop – was no vehicle in front of this Village of Skokie Police squad car, with all light on, again, outside of Village of Skokie, just to harass the Petitioner.

Petitioner believes that he exhausted all State level reliefs; And due to a personal involvement of several Assistants of Cook County State Attorney (James O'Connor, Kim Pressling) in his harassment,

119

stalking, conspiracy, fabrication of evidence make any of the State level attempts to reverse his conviction and drop the charges most likely are equal to zero.

Petitioner prays that this Hon Court can fix the ***Significant Miscarriage of Justice*** described in this Petition and will reverse his conviction and will drop the charges and will allow him to seal and or expunge the fabricated civil case of Order of No Contact  that was combined with the criminal case.

**CONCLUSION**

For the above-stated reasons, the petition for a writ of habeas corpus should be granted.

**PRAYER FOR RELEIF**

WHEREFORE, Petitioner prays that this Hon Court grant the following relief:

120

(1) Assume jurisdiction over this matter;

(2) Expedite consideration of this action pursuant to 28 U.S.C. § § 2254 because it is an action brought under chapter 153 (habeas corpus) of Title 28; 28 U.S.C. § 2254

(3) Pursuant to 28 U.S.C. § 2254 issue an order directing Respondents to show cause why the writ of habeas corpus should not be granted;

(4) Grant Petitioner a writ of habeas corpus, vacate his conviction for Unlawful Use of Weapon, drop the charges and acquit the Petitioner Aleksandr Selyutin;

(5) Issue an Order that allows the Petitioner to expunge or Seal the Civil Order of No Contact Case.

(6) Due to irreparable damages made to Petitioner's health since 2012, and the fact that his personal freedom was limited, and the fact that he lost portion of his liberty and privacy without Petitioner's even being convicted by fair trial in Federal or State courts, Petitioner prays this Hon Court to Amend, modify and vacate any Federal, State, County or Municipal Surveillance Orders against the Petitioner. The Petitioner is an individual with actual disability as defined by Americans with Disabilities Act. Continuing same practices that have been ongoing for the last 10 years may lead to even more worsening of his already poor health.

(7) Grant any other and further relief as the Court deems just and proper.

DATED:  September 9, 2022.

Respectfully Submitted By Petitioner:        **/s/ Aleksandr Selyutin, Pro Se_____**

                                          **Aleksandr Selyutin, Self-Represented**

121

**I HEREBY DECLARE** under penalty of perjury that the foregoing is true and correct, based on my knowledge.

**/S/  ALEKSANDR SELYUTIN**

**Aleksandr Selyutin**

**Pro Se – Self Represented**

**8828 Niles Center Rd**

**Skokie, IL**

**Main No.: 847-679-4587**

**Email: alex.selyutin2017@gmail.com**

122

# APPENDIX

**APPENDIX TABLE OF CONTENTS** ………………………………………………………………………………………**123**

**APPENDIX NARRATIVE**……………. ……………………………………………………………………………………**124**


**Table of Contents to the Common Law Record**…………………………………………………………………**126**

**Table of Contents to the Report of Proceedings**…………………………………………………….. .**129**

**Table of Contents to the Supplement to the Common Law Record**………………………………………**131**

**Table of Contents to the Secured Common Law Record**…………………………………………….. **132**

**Table of Contents to the Supplement to the Report of Proceedings**………………………………… **133**

**Table of Contents to the Supplement Audio File 911 Call**…………. …………………………………………**134**

**Judgment – Sentence**………………………………………………………………………………………………**135**

**Notice of Appeal**…………………………………………………..………………………………………………**137**

**Witness List During the Trial** …………………………………………………… ………………………………**139**

# APPENDIX NARRATIVE

**The Appendix for this Petition for Writ of Habeas Corpus includes 5 Certified by the Cook County Clerk's office files, the 911 Call Audio file and other documents, they are**:

**APPENDIX C - Common Law Record – CLR** that includes arrest records, motions, responses, Judicial Orders, - all of the records of the Petitioner's case in Cook County Court, the Judicial 2nd Circuit.

**APPENDIX D – Report of Proceedings – ROP** that includes the Trial Script, the Sentencing Script, and others script records recorded by the Official Court Reporter in Cook County Court.

**APPENDIX SEC – Secured Record – SEC** that includes secured by the Cook County Court Petitioner's record.

**APPENDIX SUP – Supplement to the Record – SUP** that includes supplement to the Common Law record section, supplement to the Report of Proceedings section, Supplement to other section, photographs made by the Police, exhibits that Prosecution used during the trial and other documents.

**APPENDIX SUP – Supplement to the Record – SUP** that includes additional supplement to the Common Law record section, additional supplement to the Report of Proceedings section.

**AUDIO FILE 911 Call -** that includes the 911 call made by Donald Howard on 07-03-2016, and his conversation with Police.

**JUDGEMENT –SENTENCE** - The actual records of the Judgement and sentencing.

**NOTICE of APPEAL** - The actual records of the Notice of Appeal at 1st Appellate Court of Cook County.

**WITHENSS LIST DURING THE TRIAL** - The list of witnesses during the criminal trial.

**In his 1ˢᵗ Amended Petition for Writ of Habeas Corpus, the Petitioner referenced the facts to the sections of the Appendix as follows:**

**Please see <u>C and the page #</u> to: APPENDIX C - Common Law Record – CLR;**

**Please see <u>R and the page #</u> to: APPENDIX D – Report of Proceedings – ROP;**

**Please see <u>SEC and the page #</u> to: APPENDIX SEC – Secured Record – SEC;**

**Please see <u>SUP and the page #</u> to: APPENDIX SUP – Supplement to the Record – SUP;**

**Please see <u>SUP3 and the page #</u> to: APPENDIX SUP3 – Supplement to the Record – SUP3.**

**COMMON LAW RECORD – (C) Page 1 of 3**

**TABLE OF CONTENTS**

| Date Filed | Title/Description | Page No. |
|---|---|---|
| 07/20/2016 | COMPLAINT | C 4-C 9 |
| 07/20/2016 | HALF SHEET | C 10-C 19 |
| 07/27/2016 | APPERANCE | C 20-C 21 |
| 07/27/2016 | COURT ORDER | C 22 |
| 07/27/2016 | MOTION 1 | C 23-C 24 |
| 07/27/2016 | MOTION | C 25-C 28 |
| 09/30/2016 | COURT ORDER | C 29 |
| 12/09/2016 | COURT ORDER | C 30-C 32 |
| 02/09/2017 | MOTION | C 33-C 34 |
| 02/10/2017 | MOTION | C 35-C 36 |
| 02/17/2017 | ORDER | C 37 |
| 02/17/2017 | RESTRICTED (Secured) | C 38 |
| 05/30/2017 | ORDER | C 39 |
| 06/30/2017 | ORDER | C 40-C 43 |
| 08/03/2017 | COURT ORDER | C 44-C 47 |
| 08/21/2017 | MOTION | C 48-C 50 |

**COMMON LAW RECORD – (C) Page 2 of 3**

**TABLE OF CONTENTS**

| Date Filed | Title/Description | Page No. |
|---|---|---|
| 08/30/2017 | COURT ORDER | C 51 |
| 09/15/2017 | MOTION | C 52-C 62 |
| 09/21/2017 | COURT ORDER | C 63-C 67 |
| 09/21/2017 | MOTION | C 68-C 78 |
| 10/13/2017 | MOTION | C 79-C 81 |
| 10/20/2017 | COURT ORDER | C 82 |
| 11/02/2017 | MOTION | C 83-C 86 |
| 11/13/2017 | COURT ORDER | C 87-C 88 |
| 12/15/2017 | MOTION | C 89-C 92 |
| 12/18/2017 | COURT ORDER 1 | C 93 |
| 12/18/2017 | COURT ORDER | C 94-C 96 |
| 12/19/2017 | MOTION | C 97 |
| 01/03/2018 | SUBPOENA | C 98-C 99 |
| 01/22/2018 | MOTION | C 100-C 121 |
| 01/23/2018 | ORDER | C 122-C 123 |

**COMMON LAW RECORD – (C) Page 3 of 3**

**TABLE OF CONTENTS**

| Date Filed | Title/Description | Page No. |
|---|---|---|
| 03/06/2018 | MOTION | C 124-C 126 |
| 03/07/2018 | ORDER | C 127-C 129 |
| 03/21/2018 | ORDER | C 130-C 131 |
| 04/16/2018 | ORDER | C 132-C 134 |
| 04/26/2018 | ORDER | C 135 |
| 05/17/2018 | ORDER | C 136-C 137 |
| 06/25/2018 | ORDER | C 138 |
| 06/26/2018 | ORDER | C 139 |
| 06/27/2018 | ORDER | C 140 |
| 07/24/2018 | RESTRICTED | C 141-C 153 |
| 07/24/2018 | IMPOUNDING ORDER | C 154 |
| 07/24/2018 | ORDER | C 155-C 161 |
| 08/17/2018 | NOTICE OF APPEAL | C 162-C 163 |
| 09/12/2018 | MOTION | C 164 |
| 09/17/2018 | APPEAL PAYMENT | C 165-C 167 |
| 07/24/2018 | MOTION | C 168-C 175 |

**REPORT OF PROCEEDINGS (R)  Page 1 of 1**

**TABLE OF CONTENTS**

**Date of Proceeding     Title/Description   Page No.**

| Date of Proceeding | Title/Description | Page No. |
|---|---|---|
| **06/30/2017** | **Continuance** | **R 2-R 13** |
| **08/30/2017** | **Defendant-wants-new-atty** | **R 14-R 23** |
| **03/07/2018** | **Motions** | **R 24-R 40** |
| **06/27/2018** | **Trial** | **R 41-R 245** |
| **07/24/2018** | **SENTENCING** | **R 246-R261** |

**SUPPLEMENT TO THE COMMON LAW RECORD – (SUP3) Page 1 of 1**

**SUPPLEMENT (SUP3)**

**TABLE OF CONTENTS**

**SECTION**                                                 **PAGE**

**SUPPLEMENT TO THE COMMON LAW RECORD SECTION:    SUP3 C 3-SUP3 C 35**

**SECURED COMMON LAW RECORD – (SEC C) Page 1 of 1**

**TABLE OF CONTENTS**

| Section | Page |
|---|---|
| SECURED COMMON LAW RECORD SECTION | SEC C 3-SEC C 4 |

**SUPPLEMENT TO THE REPORT OF PROCEEDINGS (SUP3) Page 1 of 1**

**SUPPLEMENT (SUP3)**

**TABLE OF CONTENTS**

**SECTION**                                                               **PAGE**

**SUPPLEMENT TO THE REPORT OF PROCEEDINGS SECTION SUP3 R 36-SUP3 R83**

SUPPLEMENT EXIBITS (SUP E) Page 1 of 1

**EXHIBITS - TABLE OF CONTENTS**

| Description/Possession | Page No. |
|---|---|
| **2016200178601 IMPOUNDING ORDER** | **SUP E 4** |
| **2016200178601 PEOPLE EX 1** | **SUP E 5-SUP E 6** |
| **2016200178601 PEOPLE EX 2** | **SUP E 7-SUP E 8** |
| **2016200178601 PEOPLE EX 4** | **SUP E 9** |
| **2016200178601 PEOPLE EX 5** | **SUP E 10** |
| **2016200178601 PEOPLE EX 6** | **SUP E 11** |
| **2016200178601 PEOPLE EX 7** | **SUP E 12** |
| **2016200178601 PEOPLE EX 8** | **SUP E 13** |
| **2016200178601 PEOPLE EX 9** | **SUP E 14** |
| **2016200178601 PEOPLE EX 10** | **SUP E 15** |
| **2016200178601 PEOPLE EX 11** | **SUP E 16** |
| **2016200178601 PEOPLE EX 12** | **SUP E 17** |
| **2016200178601 PEOPLE EX 13** | **SUP E 18** |
| **2016200178601 PEOPLE EX 14** | **SUP E 19** |
| **2016200178601 PEOPLE EX 15** | **SUP E 20** |
| **2016200178601 PEOPLE EX 16** | **SUP E 21** |
| **2016200178601 PEOPLE EX 17** | **SUP E 22** |

**SUPPLEMENT AUDIO FILE 911 call EXIBITS Page 1 of 1**

**CONTENTS:**

1) **911 Audio Recording File (0000000337_06,_W911-2_2016-07-**

   **03_18_42_25_by_ui_startdate_desc.wav).**

# Judgment – Sentencing

# C159, C160, C161

Sentencing Order/Supervision – Conditional Discharge – Probation      (02/10/16) CCCR N090 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

or

_____

**A Municipal Corporation**

v.

Selybtir, Aleksandr

**Defendant**

❑ Criminal Division

☑ Municipal District No. __2__ Br/Rm __104__

Case No. __1620017860 1__

Statute Citation: __UUW__

IR No. _____ SID No. _____

### SENTENCING ORDER
### SUPERVISION – CONDITIONAL DISCHARGE – PROBATION

IT IS HEREBY ORDERED that the Defendant is sentenced to a term of _____ __12__ ❑ year(s) ☑ month(s) ❑ day(s)
❑ Supervision ☑ Conditional Discharge ❑ Probation (720 ILCS 550/10, 720 ILCS 570/410, or 720 ILCS 646/70) ❑ Probation
❑ Reporting (All DUI orders are reporting) ❑ Non-Reporting ❑ Limited Reporting (Monitor community service or restitution only)
❑ Scheduled Termination Date __07/19__, __19__

IT IS FURTHER ORDERED that the Defendant shall comply with the conditions as specified below:

**STANDARD CONDITIONS**

If reporting is ordered, the Defendant shall report immediately to:

  ❑ Social Service Department for conditional discharge/supervision/community service and pay that department such sum as determined by that department in accordance with the standard probation fee guide. Said fee not to exceed $50.00 per month

  or

  ❑ Adult Probation Department for probation/community service, comply with Adult Probation's rules and regulations and pay that department such sum as determined by that department in accordance with the standard probation fee guide. Said fee not to exceed $50.00 per month.

☑ **Pay all fines, costs, fees, assessments, reimbursements and restitution (if applicable)**
☑ Not violate the criminal statutes of any jurisdiction
☑ Refrain from possessing a firearm or other dangerous weapons
☑ Notify monitoring agency of change of address
☑ Not leave the State of Illinois without the consent of the court or monitoring agency
☑ Comply with reporting and treatment requirements as determined by the Adult Probation Department assessment. Any treatment requirements not specified elsewhere on this order that would cause a financial hardship shall be reviewed by the court before being imposed.

**DRUG/ALCOHOL RELATED CONDITIONS**
❑ Complete drug/alcohol evaluation and treatment recommendation
❑ **Submit to random drug testing**
❑ **Adult Probation Department Intensive Drug Program**
❑ Complete TASC Treatment Program

**DUI RELATED CONDITIONS**
❑ DUI Offenders Classified Level A, report immediately to Central States Institute of Addictions and commence the following intervention program within sixty (60) days of this order:
    ❑ Minimum ❑ Moderate ❑ Significant
❑ DUI Offenders Classified Level B or C, report immediately to:
    ❑ The Social Service Department,
    ❑ The Adult Probation Department
and complete a Comprehensive Correctional Intervention Assessment within thirty (30) days, fully comply with the Comprehensive Intervention Plan and commence the following intervention program within sixty (60) days of this order:
    ❑ Minimum ❑ Moderate ❑ Significant ❑ High
❑ Attend a Victim Impact Panel
❑ File proof of financial responsibility with the Secretary of State
❑ Surrender Driver's License to the Clerk of the Court
❑ Pay all Driver's License reinstatement fees

**SPECIAL CONDITIONS**
❑ Obtain a GED
❑ **Home confinement** _____ **days**
❑ **Adult Probation Department Intensive Probation Supervision**
❑ Perform _____ hours of a community service as directed by the:
    ❑ Social Service Department Community Service Program
    ❑ Sheriff's Work Alternative Program (S.W.A.P.)
    (312) 603-2480
☑ Adult Probation Department
☑ Avoid contact with
Don Havard, Emily of Don Havard
❑ Complete mental health evaluation and treatment recommendations
❑ **Adult Probation Department Mental Health Unit**
❑ **Adult Probation Department Gang Unit**
❑ DNA Indexing

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
Page 1 of 2

# Judgment – Sentencing

## C160

---

**Sentencing Order/Supervision – Conditional Discharge – Probation**                    **(10/06/14) CCCR N090 B**

**DOMESTIC VIOLENCE RELATED CONDITIONS**
- ☐ Comply with all lawful court orders including an Order of Protection
- ☐ Complete Domestic Violence Program:
  - ☐ Defendant sentenced to Probation, as directed by Adult Probation
  - ☐ Defendant sentenced to Conditional Discharge or Supervision will complete domestic violence counseling and any other recommendations per the assessment of the Social Service Department, which may include an evaluation and/or treatment for alcohol and drug abuse, mental health, parenting, and sexual abuse.
- ☐ Modifications, which would impose a financial hardship shall be reviewed by the sentencing court before so ordered.
- ☐ Other _(& D) weapons held by Lincolnwood or Skokie P.D., incident to this Arrest_

**SEX OFFENDERS CONDITIONS**
- ☐ Complete evaluation and treatment recommendation for sex offenders
- ☐ Register as a sex offender
- ☐ STD/HIV Testing
- ☐ **Adult Probation Department Sex Offender Program**
- ☐ DNA Testing

**RESTITUTION**
- ☐ Make restitution to _____ in the amount of $_____, payable through the Social Service Department or Adult Probation Department at the rate of $_____ per _____ with final payment due on or before _____

I acknowledge receipt of this Order and agree to abide by the specified conditions. I agree to accept notice by regular mail at the address provided to the monitoring agency and to answer questions asked by the Court related to my behavior. I understand that a failure to comply with the conditions of this Order, or refusal to participate, or withdrawal or discharge from a required program, plan, or testing will be considered a violation of this Order and will be reported to the Court; and may result in a re-sentencing imposing the maximum penalty as provided for the offense.          # 213

8828 Niles Center Rd          Skokie IL          IL 60077
(Defendant's Address)          (City/Town)          (State/Zip Code)

11/4/68          (847) 770-8222          Alex Segura
(Defendant's Date of Birth)          (Defendant's Telephone Number)          (Defendant's Signature)

                              ENTERED

Dated: 07/24 · 18          Prepared by JUL 24 2018
                              DOROTHY BROWN
                              CLERK OF THE CIRCUIT COURT
                              OF COOK COUNTY, IL
                              ENTERED CLERK

                              Dated: 7-24-18

                              _(signature)_
                              Judge          Judge's No. 2465

*Note: Bold print specifications require additional written orders.*

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
Page 2 of 2

# Notice of Appeal

## C162

IN THE CIRCUIT COURT OF COOK COUNTY, CRIMINAL DIVISION
SKOKIE, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
                          Plaintiff, )
                             )
          vs.                )           NO: 162001786-01
Aleksandr SELYUTIN          )
                 Defendant  )
                           )

### NOTICE OF FILING

TO:    ASA Lindsay Hicks
        Cook County State's Attorney's Office
        5600 Old Orchard Road
        Skokie, IL 60077

PLEASE TAKE NOTICE that on _08-17-2018_ , the undersigned filed with the Cook County Circuit Clerk NOTICE OF APPEAL, copy of which is hereby served upon you.

Aleksandr SELYUTIN, **Pro Se**           Phone: 847-679-4587
8828 Niles Center Road #213        Email: alex.selyutin2017@gmail.com
Skokie, IL 60077

### CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalties of perjury as provided by law pursuant to 735 ILCS 5/1-109, that the above notice and any attached pleadings were
[ ] sent via facsimile
[X] personally delivered
[ ] sent US Mail properly addressed, with first class postage prepaid.
[ ] emailed to the parties at the addresses set forth above (on) (before) 5:00 p.m. on
_____

_Aleksandr Selyutin_          Aleksandr SELYUTIN
(Signature)                  (Print name)

# Notice of Appeal C163

IN THE CIRCUIT COURT OF COOK COUNTY, CRIMINAL DIVISION
SKOKIE, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
               Plaintiff, )
                      )
     vs.                  )    NO: 162001786-01
Aleksandr SELYUTIN      )
           Defendant )
                      )

## NOTICE OF APPEAL

An appeal is taken from the Order described below.

(1) Court To Which Appeal is Taken: Illinois State Court of Appeals, First District

(2) Appellant: Aleksandr SELYUTIN
                8828 Niles Center Road Apt. 213
                Skokie, IL 60077

(3) Appellant's attorney:

(4) Date of Order:    7/24/2018:    Motion for a New Trial denied; and
                                   Sentencing Hearing

(5) Offense of which convicted:   Unlawful Use of a Weapon

(6) Sentence:               12 months Conditional Discharge

Respectfully Submitted,

*Aleksandr Selyutin*
Aleksandr SELYUTIN
Defendant Pro Se

Aleksandr SELYUTIN
8828 Niles Center Road, Apt. 213
Skokie, IL 60077
Phone: 847-679-4587
Email: alex.selyutin2017@gmail.com

# **Witness List During the Trial**

**Witnesses**                                                    **DX**     **CX**

**For the State:**

DONALD HOWARD                                          R71        R92

Village of Skokie Police Department Officer RANNOCHIO     R113     R126

Village of Lincolnwood Police Department DET. CIECA     R136     R149

# EXHIBITS

**EXHIBITS TABLE OF CONTENTS** …………………………………………………………………………………………………**140**


**Table of Contents to the Exhibit A Law Offices of Raymond Wigell Invoices**…………..……………………**141**

**Table of Contents to the Exhibit B Defense Attorney Huma Rashid Email Appellate Forms**……………**142**

**Table of Contents to the Exhibit C APPELLATE COURT OF ILLINOIS 1 DISTRICT ORDER**……………………**143**

**2019 IL App (1st) 181927-U**

**Table of Contents to the Exhibit D Selyutin v. Aon et, al 3**[rd] **Amended Complaint**…………..…………....**144**

**Table of Contents to the Exhibit E Selyutin v. Village of Skokie Complaint** ……………………………………**145**

**Table of Contents to the Exhibit A:**

**Law Offices of Raymond Wigell Invoices Pages – 1 -7**

**Table of Contents to the Exhibit B:**

**Defense Attorney Huma Rashid Email Appellate Forms, Pages – 1 -4**

**Table of Contents to the Exhibit C:**

**APPELLATE COURT OF ILLINOIS 1 DISTRICT ORDER, EXHIBIT C, Pages – 1 -19**

**2019 IL App (1st) 181927-U**

**Table of Contents to the Exhibit D:**

**Selyutin v. Aon et, al 3rd Amended Complaint, Pages –1 -66**

**Table of Contents to the Exhibit E:**

**Selyutin v. Village of Skokie Complaint, Pages –1 -211**

DATED:  September 9th, 2022.


Respectfully Submitted By Petitioner:        **/s/ Aleksandr Selyutin, Pro Se**

           **Aleksandr Selyutin, Self-Represented**



       **/S/  ALEKSANDR SELYUTIN**

       **Aleksandr Selyutin**

       **Pro Se – Self Represented**

       **8828 Niles Center Rd**

       **Skokie, IL**

       **Main No.: 847-679-4587**

       **Email: alex.selyutin2017@gmail.com**